# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF TEXAS
# AUSTIN DIVISION

**WILD TYPE, INC. D/B/A WILDTYPE** AND
**UPSIDE FOODS, INC.**,

      *Plaintiffs*,

v.

**JENNIFER A. SHUFORD,** IN HER OFFICIAL
CAPACITY AS THE COMMISSIONER OF THE TEXAS
DEPARTMENT OF STATE HEALTH SERVICES;
**CECILE ERWIN YOUNG,** IN HER OFFICIAL
CAPACITY AS THE EXECUTIVE COMMISSIONER OF
THE TEXAS HEALTH AND HUMAN SERVICES
COMMISSION; **KEN PAXTON,** IN HIS OFFICIAL
CAPACITY AS THE ATTORNEY GENERAL OF
TEXAS; AND **DELIA GARZA,** IN HER OFFICIAL
CAPACITY AS THE COUNTY ATTORNEY OF TRAVIS
COUNTY,

      *Defendants*.

Civil Action No. <u>1:25-cv-1408</u>

---

# ORIGINAL COMPLAINT FOR
# DECLARATORY AND INJUNCTIVE RELIEF

---

## INTRODUCTION

1.      This case is a constitutional challenge to Texas's recently enacted SB 261, a law that prohibits the sale of a safe and innovative food product: cultivated meat.

2.      Through SB 261, Texas has closed its border to an entirely out-of-state industry to protect Texas agriculture from lawful competition.

3.      Plaintiffs Wild Type, Inc. d/b/a Wildtype and UPSIDE Foods, Inc. are California-based start-ups who are leading producers and sellers of cultivated meat and, therefore, shut out of Texas by SB 261.

4.      Wildtype produces cultivated salmon, while UPSIDE produces cultivated chicken.

5.      Unlike conventional meat, which is harvested from the carcasses of animals that are typically raised for slaughter, Wildtype and UPSIDE's cultivated meat products are produced by extracting cells from animals, growing the animal cells in clean and controlled facilities, and harvesting and using those cells to create food products that replicate the taste, texture, and appearance of conventional meat.

6.      Wildtype and UPSIDE have completed a pre-market safety consultation with the FDA to sell cultivated salmon and cultivated poultry products, respectively, throughout the United States.  Because UPSIDE sells a poultry product, it has received additional approvals from the USDA under the federal Poultry Products Inspection Act (PPIA).

7.      Since then, Wildtype and UPSIDE have distributed or sold their cultivated meat products at restaurants and tasting events throughout the country, including in Texas.

8.      Wildtype's and UPSIDE's products appeal to consumers for a number of reasons including, but not limited to, the following.  Some want to enjoy the taste of meat without the need for largescale raising and slaughtering of animals.  Others appreciate that cultivated meat does not contain the parasites, pathogens, and environmental contaminants that are commonly found in conventional meat.  Others wish to ensure that the United States maintains food security and its leadership in developing and commercializing important new technologies.  Others simply are

interested in cultivated meat and wish to exercise their freedom as consumers to try these innovative new products.

9.     But on June 20, 2025, Texas enacted SB 261, which banned the sale of cultivated meat in Texas starting September 1, 2025. The ban is backed by massive civil and administrative penalties and up to a year in jail for a first-time violation.

10.    SB 261 was not enacted to protect the health and safety of Texas consumers—indeed, it allows the continued distribution of cultivated meat to consumers so long as it is not sold. Instead, SB 261 was enacted to stifle the growth of the cultivated meat industry to protect Texas's conventional agricultural industry from innovative competition that is exclusively based outside of Texas.

11.    Wildtype and UPSIDE don't want to force anyone to eat cultivated meat. But they do want the opportunity to grow their businesses and sell their innovative products to willing consumers, so that consumers can decide for themselves whether their products are worth eating. And both Wildtype and UPSIDE have a right to do so; SB 261 is unconstitutional and preempted by federal law.

12.    First, SB 261 violates the dormant aspect of the Commerce Clause of the United States Constitution, because it was enacted with the purpose, and has the effect, of discriminating against competition coming exclusively from out of state.

13.    Second, as to UPSIDE's cultivated chicken product, SB 261 violates the Supremacy Clause because it is expressly preempted by the federal Poultry Products Inspection Act (PPIA). The PPIA regulates poultry products and prohibits states from enacting any additional requirements—even non-conflicting requirements—regarding the permissible ingredients in

poultry products or the premises, facilities, or operations of the official establishments in which they are made. The U.S. Supreme Court has held that states cannot circumvent express preemption clauses like the PPIA's "just by framing [a law] as a ban on the sale of meat produced in whatever way the State disapproved." *Nat'l Meat Ass'n v. Harris*, 565 U.S. 452, 464 (2012).

14.    Accordingly, this Court should declare SB 261 unconstitutional and preempted under federal law and permanently enjoin its operation.

15.    Additionally—and as will be detailed in a forthcoming motion—this Court should preliminarily enjoin SB 261 as applied to Plaintiffs' cultivated salmon and cultivated chicken products to ensure that Plaintiffs do not suffer irreparable harm during the pendency of this litigation.

## JURISDICTION

16.    Wildtype and UPSIDE bring this civil-rights lawsuit under the Supremacy Clause and Commerce Clause of the United States Constitution; the Civil Rights Act of 1871, 42 U.S.C. § 1983; the Declaratory Judgment Act, 28 U.S.C. § 2201; *Ex parte Young*, 209 U.S. 123 (1908); and this Court's inherent equitable power to enjoin state actors from performing unconstitutional acts.

17.    Wildtype and UPSIDE seek injunctive and declaratory relief against the enforcement of Texas's ban on the sale of cultivated meat (SB 261); the law's implementing rules and regulations; and the practices and policies of the Texas Department of State Health Services and the Texas Health and Human Services Commission, which facially and as applied violate Wildtype and UPSIDE's rights.

18.    This Court has jurisdiction over this action under 28 U.S.C. §§ 1331 and 1343.

## VENUE

19.     Venue lies in this Court under 28 U.S.C. § 1391(b) because the defendants reside in this district and because a substantial part of the events or omissions giving rise to the claims occurred in this district.

## PARTIES

20.     Plaintiff Wild Type, Inc. d/b/a Wildtype is a corporation organized under Delaware law with its principal place of business in San Francisco, California.

21.     Plaintiff UPSIDE Foods, Inc., is a corporation organized under Delaware law with its principal place of business in Emeryville, California.

22.     Defendant Jennifer A. Shuford is the Commissioner of the Texas Department of State Health Services.  SB 261 provides that a violation of its ban "may be enforced in the same manner as a violation of Section 431.021 is enforced under Subchapter C."  Tex. Health & Safety Code § 431.02105(b).  Subchapter C, in turn, authorizes the Department of State Health Services to (1) "petition the district court for a temporary restraining order to restrain a continuing violation . . . or a threat of continuing violation," *id.* § 431.047(a); (2) "assess an administrative penalty," *id.* § 431.054(a); (3) request the Texas Attorney General to "bring a civil action to recover an administrative penalty," *id.* § 431.058; (4) request "the attorney general or a district, county, or city attorney [to] institute an action in district court to collect a civil penalty," *id.* § 431.0585(a); and (5) "report[] a violation of this chapter," which causes "[t]he attorney general, or a district, county, or municipal attorney" to "initiate and prosecute appropriate proceedings without delay,"

*id.* § 431.060(a).[1]  Wildtype and UPSIDE sue Shuford in her official capacity and seek only prospective declaratory and injunctive relief against her.

23.    Defendant Cecile Erwin Young is the Executive Commissioner of the Texas Health and Human Services Commission.  Under SB 261, the Executive Commissioner is charged with adopting rules to implement SB 261. 2025 Tex. Sess. Law Serv. Ch. 968, § 7 (S.B. 261) (Vernon's); *see also* Tex. Health & Safety Code § 12.001(b) ("The executive commissioner shall adopt rules for the performance of each duty imposed by law on the executive commissioner, the department, or the commissioner[.]").  Wildtype and UPSIDE sue Young in her official capacity and seek only prospective declaratory and injunctive relief against her.

24.    Defendant Ken Paxton is the Attorney General of Texas.  At the request of the Texas Department of State Health Services, (1) the attorney general "may bring a civil action to recover an administrative penalty under this subchapter," Tex. Health & Safety Code § 431.058; or (2) "the attorney general or a district, county, or city attorney *shall* institute an action in district court to collect a civil penalty from a person who has violated Section 431.021," *id.* § 431.0585(a) (emphasis added).  Further, "[t]he attorney general, or a district, county, or municipal attorney to whom the department or a health authority reports a violation of this chapter, *shall* initiate and prosecute appropriate proceedings without delay." *Id.* § 431.060(a) (emphasis added).  Violations can also result in criminal proceedings. *See id.* § 431.059.  Wildtype and UPSIDE sue Paxton in his official capacity and seek only prospective declaratory and injunctive relief against him.

---

[1] "Department" is defined as "the Department of State Health Services."  Tex. Health & Safety Code  § 430.001(2).

25.     Defendant Delia Garza is the County Attorney of Travis County.  At the request of the Texas Department of State Health Services, (1) "a district, county, or city attorney *shall* institute an action in district court to collect a civil penalty from a person who has violated Section 431.021," Tex. Health & Safety Code § 431.0585(a) (emphasis added).  Further, "a district, county, or municipal attorney to whom the department or a health authority reports a violation of this chapter, *shall* initiate and prosecute appropriate proceedings without delay." *Id.* § 431.060(a) (emphasis added).  Violations can also result in criminal proceedings. *See id.* § 431.059.  The County Attorney of Travis County prosecutes misdemeanor cases that are filed in Travis County. *See generally* Tex. Code Crim. Pro. art. 2A.103(a).  The first violation of SB 261 is punishable by a Class A misdemeanor.  Tex. Health & Safety Code §§ 431.02105(b), 431.059(a).  Wildtype and UPSIDE sue Garza in her official capacity and seek only prospective declaratory and injunctive relief against her.

## STATEMENT OF FACTS

### Cultivated Meat

26.     Cultivated meat (also known as cultured meat) consists of animal cells, tissues produced from such cells, or food produced using such cells as an ingredient.  Those cells are grown outside of the animal, *i.e.*, *in vitro*, rather than being grown inside an animal.

27.     To produce cultivated meat, a manufacturer acquires animal cells from an animal and stores them before later placing those cells within a vessel known as a cultivator (or bioreactor).

28.     Inside the cultivator, the cells are supplied with oxygen and nutrients necessary for life, similar to what a live animal would receive.  These nutrients, which include vitamins, minerals,

essential amino acids, proteins, fats, carbohydrates, and clean water, allow the cells to multiply in the same way as an animal does when it grows.

29.    Once the cells have multiplied, these cells can be harvested, prepared, and packaged into food products that have a similar taste, texture, and appearance as conventional meat.

30.    In total, the cultivation process can take between two and eight weeks.

31.    Cultivated meat is genuine animal meat and includes organ meats and fish.

32.    Cultivated meat eliminates the need to raise entire animals that are slaughtered for food and, therefore, can prevent an increase in, or can decrease, the number of animals that are raised and slaughtered for conventional meat.

33.    Cultivated meat can help increase total food production by supplementing conventional production methods.

34.    Cultivated meat can serve as a substitute for conventional meat.

35.    Cultivated meat, as a substitute for conventional meat, reduces environmental costs associated with the production of conventional meat, especially if the cultivated meat industry is allowed to develop and scale.

36.    Conventional meat, by comparison, has environmental costs that include or are caused by producing and transporting animal feed, raising and transporting livestock, and pollution created by live animal and slaughterhouse waste.

37.    Cultivated meat can avoid some of the health risks associated with conventional meat. For example, cultivated meat is grown in controlled environments that are constantly monitored and eliminates the need to raise large numbers of animals in confined spaces, which in turn mitigates the risk of diseases and infections.

38.     Cultivated meat can help minimize disruptions in the traditional agriculture supply chain by diversifying food options.

39.     Cultivated meat can provide an alternative food source for people that would like to eat conventional meat but have ethical, environmental, or health concerns.

40.     Cultivated meat can provide consumers with an intriguing alternative food source, such as in sushi restaurants that are commonly known for their adventurous patrons.

41.     Because cultivated meat is a small and new industry, regulatory hurdles and outright sales bans threaten the ability for nascent cultivated meat companies to scale and survive.

**Wildtype**

42.     Wildtype is a start-up company based in California that was founded in 2016 by Aryé Elfenbein (a cardiologist with a background in stem-cell biology) and Justin Kolbeck (a former U.S. State Department diplomat).

43.     Wildtype focuses on cultured salmon.

44.     Wildtype's business aims to address multiple problems, including sustainability and safety.

45.     Regarding sustainability, commercial overfishing can threaten wildlife populations.

46.     Cultivated salmon, by comparison, offers a potential solution to overfishing that can also feed Americans.

47.     Regarding safety, conventional seafood often contains mercury and other heavy metals, sea lice, parasites, microplastics, and pollutants.

48.     Cultivated salmon, by comparison, seeks to provide a clean source of seafood.

49.     In 2021, Wildtype opened a production facility.

50.    Wildtype's process includes isolating cells from salmon, growing those genuine salmon cells in a cultivator by providing oxygen and nutrients, and harvesting and combining those cells with a plant-derived scaffold that recreates the texture and structure of conventional salmon.

51.    In May 2025, Wildtype completed a pre-market consultation process with FDA and began to sell its cultivated salmon throughout the United States.

52.    In July 2025, Wildtype began selling its cultivated salmon through OTOKO, a sushi restaurant in Austin, Texas.

53.    Wildtype has also distributed its cultivated salmon in other states, such as Oregon, Washington, and California.

## UPSIDE

54.    UPSIDE is a start-up company based in California that was founded in 2015 by Uma Valeti, a cardiologist with a background in cardiology, interventional cardiology, and cell biology as well as the company's CEO.

55.    Dr. Valeti became interested in alternatives to conventional meat in the mid-1990s while he was in medical school training to become a physician.  While running the student kitchen at his medical school, he had to take a trip to a local slaughterhouse to buy meat.  The experience left him convinced that there had to be a better way to produce meat.

56.    Two decades later, Dr. Valeti founded Memphis Meats, which has since been renamed UPSIDE and which was the first company in the United States to sell cultivated meat.

57.    UPSIDE produced the world's first cultivated chicken meat and has innovated various cultivated beef products.

58.    UPSIDE creates cultivated meat by taking cells from a humanely slaughtered chicken and identifying chicken cells that can multiply.

59.    Like Wildtype, UPSIDE then grows those chicken cells under controlled conditions before harvesting the cells and making them into products that have the appearance and culinary attributes of a boneless chicken cutlet, shredded chicken, and diced chicken.

60.    UPSIDE has distributed its cultivated chicken product throughout the United States, including in Austin, Texas.

### Federal Regulation of Cultivated Meat

61.    Under its power under the Commerce Clause of Article I, section 8 of the United States Constitution, Congress has enacted a variety of laws that regulate the interstate market for food, including specifically meat and poultry products.

62.    For cultivated meat and poultry products intended for human consumption, regulatory oversight is shared between the USDA's Food Safety and Inspection Service (FSIS) and the FDA under the statutory authorities of each agency.

63.    The USDA-FSIS regulates the post-harvest processing, formulation, and labeling of cultivated poultry products under the PPIA, 21 U.S.C. §§ 451–73, and FSIS's implementing regulations, while the FDA regulates pre-harvest production processes for these products primarily under the Federal Food, Drug, and Cosmetic Act (FDCA), 21 U.S.C. §§ 301 *et seq.*, and its implementing regulations.

64.    The USDA-FSIS regulated cultivated poultry products under the PPIA based upon the statute's broad definition of "poultry products," which encompasses "any poultry carcass, or part thereof; or *any product which is made wholly or in part from any poultry carcass or part thereof*[.]"

21 U.S.C. § 453(f) (emphasis added).  The USDA has issued a directive explaining that cultivated poultry products are "poultry food products" as defined under its regulations implementing the PPIA.  *See* U.S. Dep't of Agric., FSIS Directive 7800.1, *FSIS Responsibilities in Establishments Producing Cell-Cultured Meat and Poultry Food Products* (June 21, 2023), https://www.fsis.usda.gov/sites/default/files/media_file/documents/7800.1.pdf ("Cell-cultured meat and poultry food products are 'meat food products' and 'poultry food products' as defined under [USDA's] regulations (9 CFR 301.2 and 9 CFR 381.2).").

65.    In March 2019, the FDA and the USDA issued a Formal Agreement outlining how the federal government would apply the FDCA, the PPIA, and other existing federal laws and regulations to cultivated meat for human consumption.  *Formal Agreement Between the U.S. Department of Health and Human Services Food and Drug Administration and U.S. Department of Agriculture Office of Food Safety* (Mar. 7, 2019), https://www.fsis.usda.gov/sites/default/files/media_file/2020-07/Formal-Agreement-FSIS-FDA.pdf.

66.    Under the Formal Agreement, the FDA "[o]versee[s] initial cell collection and the development and maintenance of qualified cell banks" and the "proliferation and differentiation of cells through the time of harvest," pursuant to its authorities under the FDCA.  *Id.* at 2.

67.    At harvest, oversight transfers from the FDA to the USDA-FSIS.  The FSIS then, among other things, "determine[s] whether harvested cells are eligible to be processed into meat or poultry products that bear the USDA mark of inspection."  *Id.*

68.    The FSIS "[r]equire[s] each establishment that harvests cells cultured from livestock or poultry subject to the [Federal Meat Inspection Act (FMIA)] or PPIA for the purpose of producing human food required to bear the USDA mark of inspection [or] processes those cells

into such human food products . . . , to obtain a grant of inspection, as required by the FSIS regulations." *Id.* at 3.

69.    The FSIS inspects "establishments where cells cultured from livestock and poultry subject to the FMIA and PPIA are harvested, processed, packaged or labeled, in accordance with applicable FSIS regulations (including sanitation and physical product inspection, Hazard Analysis and Critical Control Point (HACCP) verification, product testing, and records review), to ensure that resulting products are safe, unadulterated, wholesome and properly labeled." *Id.*

70.    The FSIS also "[r]equires that the labeling of human food products derived from the cultured cells of livestock and poultry be preapproved and then verified through inspection, as required by FSIS regulations." *Id.*

71.    The FSIS has explained that because cultivated meat and poultry food products "are 'meat food products' and 'poultry food products' as defined under the regulations (9 CFR 301.2 and 9 CFR 381.2)," these products are "subject to the same statutory requirements, regulations, and FSIS oversight authority" as conventional meat products. *See* U.S. Dep't of Agric., FSIS Directive 7800.1, *FSIS Responsibilities in Establishments Producing Cell-Cultured Meat and Poultry Food Products* (June 21, 2023), https://www.fsis.usda.gov/sites/default/files/media_file/documents/7800.1.pdf.

72.    By passing the PPIA, Congress sought to facilitate a nationwide market of safe-to-consume poultry products.  For that reason, Congress expressly provided that the PPIA would preempt state regulatory provisions that exceed or differ from federal regulations promulgated under the PPIA.  *See* 21 U.S.C. §§ 451, 467e.

73.     These preemption provisions do not require there to be any conflict between state and federal requirements.  Even non-conflicting state laws that exceed or differ from federal regulations promulgated under the PPIA are expressly preempted.  *See, e.g.*, *Nat'l Meat Ass'n v. Harris*, 565 U.S. 452, 459–60 (2012) (holding that the FMIA's materially identical preemption provision "prevents a State from imposing any additional or different—*even if non-conflicting*—requirements that fall within the scope of the [FMIA] and concern an [official establishment's] facilities or operations" (emphasis added)); *see also* Complaint for Declaratory and Injunctive Relief 5–6, *United States v. California*, No. 2:25-CV-06230 (C.D. Cal. July 9, 2025) (noting that a materially similar preemption provision in the Egg Products Inspection Act "sweeps widely" and preempts laws "in addition to or different from" federal egg standards, even if those laws do not directly conflict with federal standards).

74.     Two of the PPIA's preemption provisions are relevant here.

75.     First, the PPIA provides that states "may not . . . impose[]" any "ingredient requirements" which are "in addition to, or different than, those made under [the PPIA] . . . with respect to articles prepared at any official establishment in accordance with the requirements under [the PPIA]."  21 U.S.C. § 467e.

76.     Second, the PPIA provides that states "may not . . . impose[]" any "[r]equirements . . . with respect to premises, facilities and operations of any official establishment which are in addition to, or different than those made under [the PPIA]."  21 U.S.C. § 467e.

77.     The USDA has promulgated ingredient requirements that govern the use of ingredients in poultry products, including cultivated poultry products.  *See, e.g.*, U.S. Dep't of Agric., FSIS Directive 7800.1, *FSIS Responsibilities in Establishments Producing Cell-Cultured Meat*

*and Poultry Food Products* (June 21, 2023), https://www.fsis.usda.gov/sites/default/files/media_f ile/documents/7800.1.pdf.  For example, (1) "[i]ngredients . . . used in cell-cultured meat or poultry products . . . must be considered safe and suitable by FSIS and used in accordance with the intended use listed in 9 CFR 424.21(c) or FSIS Directive 7120.1"; (2) "[i]ngredients listed as approved for meat in 9 CFR 424.21(c) or FSIS Directive 7120.1 may be used in cell-cultured meat food products, and ingredients listed as approved for poultry may be used in cell-cultured poultry food products, provided the intended use is consistent in terms of the application . . . , product type . . . , and any other criteria listed"; and (3) "[i]ngredients not listed in 9 CFR 424.21(c) or FSIS Directive 7120.1 . . . must be submitted for review" to the USDA-FSIS.  *Id.*

78.    In other words, the USDA has established that cultivated poultry cells may be used as an ingredient in finished poultry products, that products containing those cells may be sold in interstate commerce, and that the USDA's broader regulatory framework governing the lawful use of ingredients in poultry products applies to cultivated poultry products.

79.    The USDA has also stated that its existing regime of inspections applies to cultivated meat products.  U.S. Dep't of Agric., *Human Food Made with Cultured Animal Cells* (last updated    Aug.    17,    2023),    https://www.fsis.usda.gov/inspection/compliance-guidance/labeling/labeling-policies/human-food-made-cultured-animal-cells.

**Wildtype Gets the Green Light to Distribute its Product in the Interstate Market**

80.    In May 2025, Wildtype began selling its cultivated salmon product in the United States after passing a significant regulatory milestone.

81.    On May 28, 2025, the FDA concluded its pre-market consultation with Wildtype regarding its cultivated salmon.  As part of the consultation process, Wildtype submitted its safety

assessment for its cultivated salmon and production process, as well as supporting information, to the FDA. At the end of that consultation and the FDA's review, the FDA issued a scientific memorandum and a "no questions" letter to Wildtype, stating the FDA had "no questions at this time regarding Wildtype's conclusion that foods comprised of or containing cultured salmon cell material resulting from the production process defined in CCC 000005 are as safe as comparable foods produced by other methods." *See* Letter from FDA to Justin L. Kolbeck, Co-Founder & CEO of Wildtype (May 28, 2025), https://www.fda.gov/media/186752/download?attachment; Memorandum from Ashley Nazario Toole to Administrative File, CCC 000005 (May 28, 2025), https://www.fda.gov/media/186753/download?attachment.

82. Because Wildtype has satisfied all applicable regulatory requirements for the sale of its cultivated salmon product, it is lawful for Wildtype to manufacture its product and distribute it in interstate commerce.

83. Before SB 261 went into effect, Wildtype distributed and sold its cultivated salmon product in Texas.

84. Wildtype has also distributed its cultivated salmon product in other states, including California, Washington, and Oregon.

85. Wildtype does not wish to force or trick anyone into eating its product.

86. Wildtype does not wish to force or trick anyone into not eating conventional meat products.

87. Wildtype does, however, want to provide willing consumers, including Texans, with the opportunity to try and enjoy its product.

88.     Wildtype wants to showcase its product around the nation—including in Texas—to both demonstrate cutting-edge innovation and dispel false conceptions regarding what cultivated meat represents.

89.     Wildtype, however, may no longer sell or offer to sell its product within Texas without violating Texas law and thereby exposing itself to civil and criminal penalties.

**UPSIDE Gets the Green Light to Distribute Its Products in the Interstate Market**

90.     In July 2023, UPSIDE became the first manufacturer of cultivated meat or poultry to sell its product in the United States after passing three significant regulatory milestones.

91.     On November 16, 2022, UPSIDE became the first cultivated meat producer to successfully complete the FDA's pre-market consultation process.  As part of the consultation process, UPSIDE submitted its safety assessment for its cultivated chicken and production process, as well as supporting information, to the FDA.  At the end of that consultation and the FDA's review, the FDA issued a scientific memorandum as well as a "no questions" letter to UPSIDE, stating that the FDA had "no questions at this time regarding UPSIDE's conclusion that foods comprised of or containing cultured chicken cell material resulting from the production process defined in CCC 000002 are as safe as comparable foods produced by other methods." *See* Letter from FDA to Nicole Berzins, Director of Regulatory Affairs, UPSIDE Foods (Nov. 16, 2022), https://www.fda.gov/media/163260/download; Memorandum from Jeremiah Fasano to Administrative       File,       CCC       000002       (Nov.       14,       2022), https://www.fda.gov/media/163261/download.

92.     In June 2023, the USDA-FSIS approved UPSIDE's first product label, including the product's list of ingredients under the PPIA and the USDA FSIS's implementing regulations.

*See, e.g.*, 9 C.F.R. § 412.1(a) ("No final label may be used on any [poultry] product unless the label has been submitted for approval to the FSIS Labeling and Program Delivery Staff . . . .").

93.    UPSIDE's USDA-FSIS-approved product label describes the product as being made "from chicken cells" and states that the primary ingredient is "cell-cultivated chicken."

94.    In June 2023, the USDA-FSIS issued UPSIDE a Grant of Inspection, allowing the company to begin selling its cultivated poultry product in interstate commerce under federal inspection in accordance with FSIS's regulations. *See, e.g.*, 9 C.F.R. § 381.16 ("The operator of each establishment of the kind required by § 381.6 to have inspection shall make application to the Administrator for inspection service."); *id.* § 381.6(a) ("Inspection under the regulations is required at . . . [e]very establishment . . . in which any poultry products are wholly or in part, processed for transportation or sale in commerce, as articles intended for use as human food[.]").

95.    As an official establishment (i.e., an "establishment as determined by [the USDA] at which inspection of the slaughter of poultry, or the processing of poultry products, is maintained under the authority of [the PPIA]," 21 U.S.C. § 453(p)), UPSIDE's facility is subject to USDA-FSIS inspection, which is the same "inspection frequency also required for processing traditional meat and poultry products." U.S. Dep't of Agric., *Human Food Made with Cultured Animal Cells* (last updated Aug. 17, 2023), https://www.fsis.usda.gov/inspection/compliance-guidance/labeling/labeling-policies/human-food-made-cultured-animal-cells.

96.    Because UPSIDE has satisfied all applicable regulatory requirements for the sale of its cultivated chicken product, it is lawful for UPSIDE to manufacture its product and distribute it in interstate commerce.

97.    Separately, UPSIDE continues to develop additional cultivated chicken products that have either received the regulatory green light or are in the process of clearing regulatory hurdles.

98.    Before SB 261 went into effect, UPSIDE both distributed and sold its cultivated chicken product in Texas, including distribution during South by Southwest in March 2024.

99.    UPSIDE has also distributed or sold its cultivated chicken products in other states, including in California, Nevada, New York, and Alabama.

100.    UPSIDE does not wish to force or trick anyone into eating its cultivated chicken product.

101.    UPSIDE does not wish to force or trick anyone into not eating conventional meat products.

102.    UPSIDE does, however, want to provide willing consumers, including Texans, with the opportunity to try and enjoy its product.

103.    UPSIDE wants to showcase its product around the nation—including in Texas—to both demonstrate cutting-edge innovation and to dispel false information and conceptions regarding cultivated meat.

104.    UPSIDE, however, may no longer sell or offer to sell its product within Texas without violating Texas law and thereby exposing itself to civil and criminal penalties.

## SB 261

105.    On June 20, 2025, Texas Governor Greg Abbott signed SB 261, which banned the sale of cultivated meat in Texas.[2]

106.    SB 261 went into effect on September 1, 2025.  2025 Tex. Sess. Law Serv. Ch. 968, § 8 (S.B. 261) (Vernon's).

107.    SB 261 declares that "[t]he offering for sale or sale of cell-cultured protein for human consumption within this state is unlawful and prohibited."  Tex. Health & Safety Code § 431.02105(a).

108.    Similarly, SB 261 declares that "[a] person may not offer for sale or sell cell-cultured protein for human consumption."  Tex. Health & Safety Code § 433.057(b).

109.    SB 261 defines "Cell-cultured protein" as "a food product derived from harvesting animal cells and artificially replicating those cells in a growth medium to produce tissue."  Tex. Health & Safety Code § 431.002(5-a).

110.    Accordingly, SB 261 bans the sale of Wildtype's cultivated salmon and UPSIDE's cultivated chicken.

111.    SB 261 provides that a violation of its ban "may be enforced in the same manner as a violation of Section 431.021 is enforced under Subchapter C."  Tex. Health & Safety Code § 431.02105(b).

112.    Those penalties, in turn, can include:

    a.    An "administrative penalty" up to "$25,000 a day for each violation," where "[e]ach day a violation continues may be considered a separate violation."  Tex. Health & Safety Code § 431.054(a), (c)–(d).

---

[2]    https://capitol.texas.gov/BillLookup/History.aspx?LegSess=89R&Bill=SB261  (last  visited Aug. 7, 2025)

b. A "civil penalty" up to "$25,000 a day for each violation," where "[e]ach day of violation constitutes a separate violation for purposes of the penalty assessment." *Id.* § 431.0585(a)–(b).

c. A Class A misdemeanor for a first offense, which is punishable by up to one year in jail or a fine up to $4,000. *Id.* § 431.059(a); Tex. Pen. Code § 12.21.

d. A state jail penalty if there is a previous conviction, which is punishable by 180 days to two years and a fine up to $10,000. Tex. Health & Safety Code § 431.059(a); Tex. Pen. Code § 12.35(a)–(b).

113. SB 261 also provides: "As soon as practicable after the effective date of this Act, the executive commissioner of the Health and Human Services Commission shall adopt any rules necessary to implement the changes in law made by this Act." 2025 Tex. Sess. Law Serv. Ch. 968, § 7 (S.B. 261) (Vernon's).

### Texas Banned Cultivated Meat to Protect In-State Agricultural Businesses from Out-of-State Competition

114. There is no Texas-based company that sells cultivated meat. All companies currently authorized to sell cultivated meat, poultry, or seafood are based outside of Texas.

115. Statements before and after the signing of SB 261 make clear that the purpose of SB 261 was to protect in-state agricultural businesses from competition based exclusively outside the state.

116. SB 261's author is Senator Charles Perry.[3]

---

[3] https://capitol.texas.gov/BillLookup/Authors.aspx?LegSess=89R&Bill=SB261 (last visited Aug. 7, 2025)

117.    Senator Perry's "Statement of Intent" regarding SB 261 states: "The introduction of lab-grown meat could disrupt traditional livestock markets, affecting rural economies and family farms."[4]

118.    Senator Perry's "Statement of Intent" regarding SB 261 argues that the bill would "support traditional agriculture."[5]

119.    During a committee hearing on SB 261, Senator Perry said, "[i]ntroduction of lab-grown meat could disrupt traditional livestock markets, affecting rural communities and family farms."[6]

120.    During a committee hearing on SB 261, Senator Perry said in response to a question about funding for research in higher education, "I think if there's no market for it if we're successful in Texas then everyone would have the right in the higher ed community to hear this, that we don't think you should spend any taxpayer dollars—Texas taxpayer dollars—on research on a project that has no market in Texas."[7]

121.    During a committee hearing on SB 261, Senator Kelly Hancock laughed as he said, "When your family's in the cattle business, it's kind of tough.  You know.  Cory [Priest, president

---

[4]   https://capitol.texas.gov/tlodocs/89R/analysis/pdf/SB00261I.pdf#navpanes=0   (last visited Aug. 8, 2025).

[5]   https://capitol.texas.gov/tlodocs/89R/analysis/pdf/SB00261I.pdf#navpanes=0   (last visited Aug. 8, 2025).

[6] https://senate.texas.gov/videoplayer.php?vid=21497&lang=en at 3:14:47–54 (last visited Aug. 7, 2025).

[7] https://senate.texas.gov/videoplayer.php?vid=21497&lang=en at 3:30:16–32 (last visited Aug. 7, 2025).

of the Texas-based company Priest Cattle and Land, Inc., and Senator Hancock's brother-in-law] would be a little upset with me, wouldn't he?"[8]

122.    SB 261's lead House sponsor is Representative Stan Gerdes.[9]

123.    During a House debate on SB 261, Representative Gerdes said SB 261 is designed to "defend the integrity of the state's agricultural and ranching industries[.]"[10]

124.    During a House debate on SB 261, Representative Gerdes was asked directly, "Is the goal of this bill aimed at protecting the beef industry?"  Representative Gerdes responded affirmatively: "The goal of this bill is to protect our agriculture industry."[11]

125.    During a House debate on SB 261, Representative Gerdes said, "I think that our Texas agriculture industry is one of the backbones of Texas and our Texas way of life."[12]

126.    During a House debate on SB 261, Representative Gerdes was asked, "How will this legislative change interact with federal regulations and oversight from agencies like the FDA?" to which Representative Gerdes responded, "Texas needs to decide what happens in Texas as far as our meat production."[13]

127.    On social media, Representative Gerdes characterized SB 261's companion bill, HB 1431, as preventing the loss of ranchers: "We didn't lose ranchers because of climate change, we

---

[8] https://senate.texas.gov/videoplayer.php?vid=21497&lang=en at 3:30:41–59 (last visited Aug. 15, 2025).

[9]  https://capitol.texas.gov/BillLookup/Sponsors.aspx?LegSess=89R&Bill=SB261 (last visited Aug. 7, 2025).

[10] https://house.texas.gov/videos/22257 at 7:40:50–41:05 (last visited Aug. 7, 2025).

[11] https://house.texas.gov/videos/22257 at 7:42:20–43 (last visited Aug. 7, 2025).

[12] https://house.texas.gov/videos/22257 at 7:45:00–06 (last visited Aug. 7, 2025).

[13]  https://house.texas.gov/videos/22257 at 7:45:36–50 (last visited Aug. 7, 2025).

lost them because Washington sold them out to foreign meat and fake lab junk.  Time to go all-in on American beef."[14]

128.    On social media, Representative Gerdes touted his fight "against the global elite's plan to force the world to eat fake meat" because "[i]t's bad for Texans, and it's bad for our ranchers."[15]

129.    The Texas Department of Agriculture celebrated the passage of SB 161 by tweeting "#TexasAgricultureMatters."[16]

130.    Linked to that tweet is a press release by the Commissioner of the Texas Department of Agriculture, Sid Miller, stating:

    a.    "This ban is a massive win for Texas ranchers, producers, and consumers."

    b.    "It's plain cowboy logic that we must safeguard our real, authentic meat industry from synthetic alternatives."

    c.    "I tip my hat to Senator Perry, the Texas Legislature, and Governor Abbott for taking a bold stand for our ranching families."

    d.    "Lab-grown meat just doesn't belong in Texas, and now, it doesn't have a place on our tables."[17]

131.    Representative Gerdes retweeted the Texas Department of Agriculture's tweet, stating, "Time to go all in on American Beef.  If it ain't real, it ain't a meal!  #txlege @TSCRA."[18]

---

[14] https://x.com/StanGerdesforTX/status/1909343791787757907 (last visited Aug. 8, 2025).
[15] https://x.com/StanGerdesforTX/status/1860012033581744313 (last visited Aug. 8, 2025).
[16] https://x.com/TexasDeptofAg/status/1938406428617724237 (last visited Aug. 7, 2025).
[17]         https://texasagriculture.gov/News-Events/Article/10442/COMMISSIONER-MILLER-PRAISES-TEXAS-LEGISLATURE-FOR-PUTTING-A-FORK-IN-LAB-GROWN-M          (last visited Aug. 7, 2025).
[18] https://x.com/StanGerdesforTX/status/1939106368499392705 (last visited Aug. 7, 2025).

132.    TSCRA is the Texas & Southwestern Cattle Raisers Association, which describes itself as "[p]rotecting the stewards of land and livestock in the Southwest since 1877."[19]

133.    On March 31, 2025, during a Texas Senate Committee on Water, Agriculture, and Rural Affairs hearing, TSCRA offered the only testimony in favor of SB 261.[20]

134.    TSCRA testified that SB 261 is an "important bill" that can protect Texas ranchers.[21]

135.    TSCRA testified that cell-cultured proteins "work to undermine the public trust in the security of traditional proteins and put the reputation of our entire industry at risk."[22]

136.    On social media, TSCRA continued to praise SB 261 as protecting "ranchers & the beef industry."[23]

137.    In a press release, TSCRA described SB 261 as a "crucial piece of legislation" that "is designed to protect consumers and uphold the integrity of traditionally raised beef products" and "reinforces Texas' commitment to preserving the high standards of the beef industry and the livelihoods of the hardworking Texans who sustain it."[24]

---

[19] https://x.com/TSCRA (last visited Aug. 7, 2025).

[20] https://senate.texas.gov/videoplayer.php?vid=21497&lang=en at 3:15:47–42:03 (last visited Aug. 7, 2025); https://capitol.texas.gov/tlodocs/89R/witlistbill/pdf/SB00261S.pdf#navpanes=0 (last visited Aug. 8, 2025).

[21] https://senate.texas.gov/videoplayer.php?vid=21497&lang=en at 3:19:54–20:14 (last visited Aug. 7, 2025).

[22] https://senate.texas.gov/videoplayer.php?vid=21497&lang=en at 3:24:24–35 (last visited Aug. 7, 2025).

[23] https://x.com/TSCRA/status/1927812191207498079 (last visited Sept. 2, 2025).

[24] https://tscra.org/tscra-applauds-bipartisan-passage-of-sb-261-that-prohibits-the-sale-of-cell-cultured-proteins-in-the-state/ (last visited Aug. 8, 2025).

138.    Texas HB 1431 was a companion bill to SB 261 that similarly sought to ban cultivated meat.[25]

139.    During an April 7, 2025, committee hearing regarding HB 1431, Representative Gerdes (again, the lead House sponsor of SB 261) testified that "[t]he introduction of lab-grown meat could disrupt traditional livestock markets affecting rural economies and family farms."[26]

140.    During an April 7, 2025, committee hearing regarding HB 1431, Representative Gerdes testified that the bill would "support traditional agriculture."[27]

141.    During an April 7, 2025, committee hearing regarding HB 1431, TSCRA emphasized that, of the three cultivated meat companies that have received FDA approval at that time, none are based in Texas.[28]

142.    During an April 7, 2025, committee hearing regarding HB 1431, TSCRA was asked, "If beef is so good, if steak is good, if we're doing it so well, why are we afraid of a little competition?" to which TSCRA responded by expressing concern of what cultivated meat might be used for in the future, like blending into a ground-beef product.[29]

143.    TSCRA also responded that it had "a problem" and a "big, big issue" with a packer possibly saying he will "pay you less for your cattle because I'll just make 20% more here, and that says that I don't need it, and then I can push it down on you."[30]

---

[25]    https://capitol.texas.gov/BillLookup/History.aspx?LegSess=89R&Bill=HB1431 (last visited Aug. 7, 2025).
[26]    https://house.texas.gov/videos/21658 at 4:18:54–4:19:00 (last visited Aug. 7, 2025).
[27]    https://house.texas.gov/videos/21658 at 4:19:07–18 (last visited Aug. 7, 2025).
[28]    https://house.texas.gov/videos/21658 at 4:28:14–33 (last visited Aug. 7, 2025).
[29]    https://house.texas.gov/videos/21658 at 4:32:29–33:43 (last visited Aug. 7, 2025).
[30]    https://house.texas.gov/videos/21658 at 4:35:32–36:00 (last visited Aug. 7, 2025).

144.    TSCRA testified that it's "all about [the] free market, . . . but the big question mark that's out there is how this impacts the product we produce long term."[31]

145.    TSCRA even singled out "chicken and seafood" as examples of what is "being done currently."[32]

146.    During an April 7, 2025, committee hearing regarding HB 1431, Representative Mike Olcott said, "I'm torn on this bill because I see pluses and minuses.  I mean, I believe in [the] free market and also don't want cattlemen to go out of business because we need—we're always going to need cattle."[33]

147.    During an April 7, 2025, committee hearing regarding HB 1431, a resource witness from the Texas Department of State Health Services that was neutral on the bill was asked, "Do you know of any reason why this would be a health risk—a public safety, a public health risk?" to which she responded, "Personally, I don't have any information on that."  Representative John Bucy III, in response, said: "I'm just trying to understand what we're doing with this bill in public health committee.  Because if it's not a public health risk, I'm just wondering why we would tell the free market that they can't be free."[34]

148.    During a May 12, 2025, Senate session, Senator Perry reiterated that SB 261 is designed "to protect consumers and support agriculture."[35]

---

[31] https://house.texas.gov/videos/21658 at 4:44:08–26 (last visited Aug. 7, 2025).
[32] https://house.texas.gov/videos/21658 at 4:47:32–48:57 (last visited Aug. 7, 2025).
[33] https://house.texas.gov/videos/21658 at 5:09:34–44 (last visited Aug. 7, 2025).
[34] https://house.texas.gov/videos/21658 at 4:22:11–51 (last visited Aug. 25, 2025).
[35] https://senate.texas.gov/videoplayer.php?vid=22110&lang=en at 3:17:30–37 (last visited Sept. 2, 2025).

149.    During a May 25, 2025, House vote on SB 261, Representative Gerdes said, "The big idea here is, you know, Texas is not going to be getting rid of its agriculture industry, our cattle."[36]

150.    During a May 25, 2025, House vote on SB 261, Representative Gerdes said, in response to a comment by Representative Briscoe Cain about a supposed "agenda" of people not eating animals, "come hell or high water if anybody gets in the way of a grass-fed beef steak."[37]

151.    Immediately before the May 25, 2025, House record vote on SB 261 began, Representative Gerdes ceded the floor by stating, "A vote today is in support of our cattle raisers and our meat producers, and I urge you to vote with me."[38]

### The Market

152.    Texas has a robust conventional meat industry, which includes poultry and seafood.

153.    By contrast, there are no Texas-based sellers of cultivated meat.

154.    The cost to produce cultivated meat is high, and the only way to lower the cost of production is to scale manufacturing.

155.    Banning the sale of cultivated meat inhibits the scale of manufacturing.

156.    There is no public health and safety justification for banning cultivated meat.

157.    Cultivated meat is safe for human consumption.

158.    Animal cells grown in a cultivator are no more dangerous to ingest than animal cells grown in an animal.

---

[36] https://house.texas.gov/videos/22258 at 34:44–52 (last visited Aug. 18, 2025).
[37] https://house.texas.gov/videos/22258 at 35:03–24 (last visited Aug. 25, 2025).
[38] https://house.texas.gov/videos/22258 at 36:15–24 (last visited Aug. 18, 2025).

159.     For example, during an April 7, 2025, committee hearing regarding HB 1431, a resource witness from the Texas Department of State Health Services that was neutral on the bill was asked, "Do you know of any reason why this would be a health risk—a public safety, a public health risk?" to which she responded, "Personally, I don't have any information on that."[39]

160.     The FDA completed a pre-market safety assessment of Wildtype's cultivated salmon, after which Wildtype sold cultivated salmon throughout the United States.

161.     Indeed, after examining Wildtype's extensive assessment, the FDA stated that it had "no questions at this time regarding Wildtype's conclusion that foods comprised of or containing cultured salmon cell material resulting from the production process defined in CCC 000005 are as safe as comparable foods produced by other methods." *See* Letter from FDA to Justin L. Kolbeck, Co-Founder & CEO of Wildtype, Inc. (May 28, 2025), https://www.fda.gov/media/186752/download?attachment.

162.     In fact, cultivated salmon can be safer than conventional salmon because there are fewer contaminants, such as heavy metals or parasites, in Wildtype's cultivated salmon.[40]

163.     The FDA completed a pre-market safety assessment of UPSIDE's cultivated chicken product, after which UPSIDE sold and distributed its cultivated chicken product throughout the United States.

164.     Indeed, after examining UPSIDE's extensive assessment, the FDA stated that it had "no questions at this time regarding UPSIDE's conclusion that foods comprised of or

---

[39] https://house.texas.gov/videos/21658 at 4:22:11–38 (last visited Aug. 15, 2025).
[40] https://www.fda.gov/media/186754/download?attachment (last visited Aug. 18, 2025) (Figure 3 – Metal contaminants in cultivated vs. conventional salmon) (showing 36 ppb in mercury for "conventional salmon" and less than 20 ppb for "cultivated salmon cell culture media").

containing cultured chicken cell material resulting from the production process defined in CCC 000002 are as safe as comparable foods produced by other methods." *See* Letter from FDA to Nicole Berzins, Director of Regulatory Affairs, UPSIDE Foods (Nov. 16, 2022), https://www.fda.gov/media/163260/download.

165.    If it were legal for Wildtype and UPSIDE to sell their products in Texas, those products would compete economically with the state's conventional seafood and poultry industries.

166.    If it were legal for Wildtype and UPSIDE to sell their products in Texas, some consumers would choose to buy and consume their cultivated products rather than consume conventional seafood or poultry.

167.    Although there are currently no cultivated beef products authorized for sale in the United States, the Texas legislature and Texas-based agricultural interest groups like the TSCRA have sought to shut down the market for all cultivated meat products in the state before those products become a major source of competition for conventional in-state agriculture.

### Injury to Wildtype

168.    Before SB 261 went into effect, Wildtype was selling its cultivated salmon in Austin, Texas, at sushi restaurant OTOKO.

169.    Before Texas's ban went into effect, Wildtype took six sales trips to Austin, Texas (spanning August 2022 to July 2025) in connection with potential partnerships to sell cultivated salmon in Texas.

170.    Wildtype has spoken with a number of potential customers in Texas that expressed interest in Wildtype's cultivated salmon.

171.    Texas's ban forbids Wildtype from selling its cultivated salmon because it makes selling cultivated meat a crime.

172.    If Wildtype were to sell its cultivated salmon in Texas, Wildtype would expose itself to civil and criminal penalties.

173.    Wildtype has stopped selling its product in Texas because of SB 261.

174.    Wildtype is compelled and constrained by the state of affairs required by SB 261 and the threat of enforcement if Wildtype were to sell cultivated meat in Texas.

175.    The threat of enforcement by Defendants against Wildtype is real based on, among other considerations, Wildtype's past sales of cultivated meat in Texas, Wildtype's desire to resume the sale of cultivated meat in Texas, the statements of Texas legislators and officials regarding SB 261 and its related bill, the specific and mandatory duties imposed by law under SB 261, the usual assumption that officials discharge their duties, the onerous penalties under SB 261, and the virtual certainty that Texas officials will not repudiate their duties under SB 261.

176.    But for Texas's ban, Texas businesses and consumers would have the opportunity to purchase Wildtype's product.

177.    As a result of Texas's ban, Wildtype is enduring ongoing harm in the form of lost revenue, missed business and promotional opportunities, reputational damage, and loss of consumer goodwill.  In addition, Wildtype is deprived of critical opportunities to achieve economies of scale that are essential to lowering production costs and making cultivated seafood competitive in price with conventional seafood.  Because cultivated meat remains a nascent industry, restrictions in large consumer markets like Texas exacerbate barriers to scaling and place Wildtype at a significant competitive disadvantage compared to conventional producers.

178. As a result of Texas's ban, Wildtype has discontinued discussions with Texas businesses regarding the potential purchase of Wildtype's cultivated salmon, including sales trips.

179. As a result of Texas's ban, Wildtype is missing out on opportunities to continue working with Texas food establishments to sell its cultivated salmon.

180. By not being able to distribute its cultivated salmon through Texas restaurants, Wildtype loses not only revenue, but critical and irreplaceable opportunities to help grow the nascent market for cultivated meat by showing consumers how delicious it can taste.

181. As a result of Texas's ban, Wildtype is also enduring ongoing reputational harm. In Wildtype's view, statements by Texas legislators and officials falsely imply that there is something unwholesome or otherwise wrong with or gross about cultivated meat. Yet the ban deprives Wildtype of the most straightforward means of dispelling these false implications: allowing Texas consumers to try the product for themselves.

182. Texas is the seventh state to prohibit the sale of cultivated meat, further contributing to the fragmentation of the interstate market for meat, poultry, and seafood products.

183. This growing patchwork of conflicting state laws governing cultivated meat also harms Wildtype by making it more difficult for Wildtype to partner with national distributors.

184. For the same reason, Texas's ban also makes it much more difficult for Wildtype to partner with restaurants. The ban makes it impossible for these potential partners to purchase Wildtype's cultivated salmon in Texas without exposure to civil and criminal penalties.

185. Even when these ongoing harms are reducible to a dollar figure, they are irreparable because Texas state entities enjoy sovereign immunity from money damages under the Eleventh Amendment.

186.    But for Texas's ban, Wildtype would immediately resume its partnerships with restaurants in Texas like OTOKO, to whom Wildtype previously sold cultivated salmon.

187.    But for Texas's ban, Wildtype would immediately resume reaching out to other chefs in Texas with the goal of selling its cultivated salmon.

188.    Absent judicial intervention, Wildtype will continue suffering these irreparable harms.

### Injury to UPSIDE

189.    Under federal law, it is lawful for UPSIDE to distribute and sell its cultivated chicken product throughout the country.

190.    Before SB 261 went into effect, UPSIDE both distributed and sold its cultivated chicken product in Texas.

191.    Before Texas's ban went into effect, UPSIDE identified other chefs in Texas who were interested in purchasing UPSIDE's cultivated chicken product.

192.    Before Texas's ban went into effect, UPSIDE was in conversations with a supermarket chain in Texas and chefs in Texas to distribute one of its cultivated chicken products for sale to consumers in Texas.

193.    Texas's ban forbids UPSIDE from selling its cultivated chicken product because it makes selling cultivated meat a crime.

194.    If UPSIDE were to sell its cultivated chicken product in Texas, UPSIDE would expose itself to civil and criminal penalties.

195.    UPSIDE is compelled and constrained by the state of affairs required by SB 261 and the threat of enforcement if UPSIDE were to sell cultivated meat in Texas.

196.    The threat of enforcement by Defendants against UPSIDE is real based on, among other considerations, UPSIDE's past distribution and sale of cultivated meat in Texas, UPSIDE's desire to sell cultivated meat in Texas, the statements of Texas legislators and officials regarding SB 261 and its related bill, the specific and mandatory duties imposed by law under SB 261, the usual assumption that officials discharge their duties, the onerous penalties under SB 261, and the virtual certainty that Texas officials will not repudiate their duties under SB 261.

197.    But for Texas's ban, Texas businesses and consumers would have the opportunity to purchase UPSIDE's cultivated chicken product.

198.    As a result of Texas's ban, UPSIDE is enduring ongoing harm in the form of lost revenue, missed business and promotional opportunities, reputational damage, and loss of consumer goodwill.  UPSIDE likewise is harmed not only through lost sales, but through lost scale efficiencies.  By foreclosing access to one of the nation's largest poultry markets, SB 261 inhibits investment and chills consumer adoption, undermining UPSIDE's ability to compete in interstate markets.

199.    As a result of Texas's ban, UPSIDE is missing out on opportunities to continue working with Texas food establishments to sell its products.

200.    By not being able to distribute its products through Texas restaurants, UPSIDE loses not only revenue, but critical and irreplaceable opportunities to help grow the nascent market for cultivated meat by showing consumers how delicious it can taste.

201.    As a result of Texas's ban, UPSIDE is also enduring ongoing reputational harm.  In UPSIDE's view, statements by Texas legislators and officials falsely imply that there is something unwholesome or otherwise wrong with or gross about cultivated meat.  Yet the ban deprives

UPSIDE of the most straightforward means of dispelling these false implications: allowing Texas consumers to try the product for themselves.

202.    Texas is the seventh state to prohibit the sale of cultivated meat, further contributing to the fragmentation of the interstate market for meat, poultry, and seafood products.

203.    This growing patchwork of conflicting state laws governing cultivated meat also harms UPSIDE by making it more difficult for UPSIDE to partner with national meat distributors.

204.    For the same reason, Texas's ban also makes it much more difficult for UPSIDE to partner with potential purchasers.  The ban makes it impossible for these potential partners to purchase UPSIDE's products in Texas without exposure to civil and criminal penalties.

205.    Even when these ongoing harms are reducible to a dollar figure, they are irreparable because Texas state entities enjoy sovereign immunity from money damages under the Eleventh Amendment.

206.    But for Texas's ban, UPSIDE would sell its cultivated meat product in Texas.

207.    But for Texas's ban, UPSIDE would immediately resume discussing potential partnerships with whom UPSIDE spoke with previously regarding its cultivated chicken products.

208.    But for Texas's ban, UPSIDE would immediately resume reaching out to other chefs in Texas with the same goal of selling its cultivated chicken.

209.    Absent judicial intervention, UPSIDE will continue suffering these irreparable harms.

## CLAIMS FOR RELIEF

### First Claim for Relief

### (Dormant Commerce Clause by Wildtype and UPSIDE)

210.    Wildtype and UPSIDE incorporate and reallege the allegations in ¶¶ 1–209 of this complaint as though set forth in this section.

211.    The Commerce Clause grants Congress the authority to regulate commerce among the states.  U.S. Const. art. I, § 8, cl. 3.

212.    Implicit in that grant is a restriction on states enacting laws that discriminate against, or unduly burden, interstate commerce.  This restriction is commonly referred to as the Dormant Commerce Clause.

213.    Under 42 U.S.C. § 1983, *Ex parte Young*, and this Court's inherent equitable power, this Court has the authority to restrain governmental action that violates the Dormant Commerce Clause.

214.    Even a law that is facially neutral—nominally treating in-state and out-of-state interests the same—may violate the Dormant Commerce Clause if the law's purpose or effect is to discriminate against interstate commerce.

215.    SB 261's purpose and effect is to discriminate against interstate commerce.

216.    Texas has a robust and powerful agricultural industry that produces and sells conventional meat.

217.    By contrast, there are no Texas-based companies that sell cultivated meat.  All current sellers of cultivated meat, even before SB 261 was enacted, are located outside Texas.

218.    SB 261 was enacted with a discriminatory purpose to benefit in-state agricultural businesses at the expense of out-of-state competition by shielding in-state agricultural businesses from out-of-state businesses that otherwise would compete with in-state conventional-meat businesses.

219.    SB 261 operates with discriminatory effect to benefit in-state agricultural businesses at the expense of out-of-state competition by shielding in-state agricultural businesses from out-of-state businesses that otherwise would compete with in-state conventional meat businesses.

220.    SB 261 has the purpose and effect of preventing out-of-state companies from coming to Texas.

221.    SB 261 has the purpose and effect of hampering the small, innovative cultivated meat industry that will struggle to scale and survive if it faces bans like SB 261 and other cost-prohibitive measures.

222.    Simply put, SB 261 prevents an exclusively out-of-state industry from competing with Texas's in-state agricultural interests.

223.    Texas legislators and agricultural interests who supported SB 261 want the cultivated meat industry to end before it can come to Texas and compete with Texas-based conventional meat producers and sellers.

224.    Cultivated meat products compete with conventional meat products by allowing consumers to eat meat without raising the ethical, environmental, health, or other concerns associated with the large-scale production and sale of conventional meat.

225. Cultivated meat products compete with conventional meat products because consumers generally eat a finite amount of meat per week, so the consumption of cultivated meat often comes at the expense of the consumption of conventional meat.

226. For example, a person who visits a sushi restaurant once a month and normally purchases five rolls of sushi with conventional salmon may purchase less sushi with conventional salmon by purchasing some rolls of sushi with cultivated salmon.

227. Similarly, a restaurant patron may purchase less conventional chicken if given the opportunity to try cultivated chicken.

228. SB 261 is not supported by any legitimate justification.

229. SB 261 is not supported by any adequate health or safety justification.

230. The safety and healthfulness of cultivated meat is subject to the same standards of federal regulation as the safety and healthfulness of conventional meat.

231. If anything, cultivated meat poses fewer health and safety concerns than conventional meat because it is grown under clean and controlled conditions and therefore is not exposed to animal waste, animal pathogens, or environmental toxins.

232. Further evidence that SB 261 is not supported by any legitimate health and safety concerns can be found in the fact that the law allows the distribution and consumption of cultivated meat in Texas, and prohibits only the sale of those products. A law that permits consumption while criminalizing sale cannot plausibly be understood as protecting public health.

233. Even if there were a legitimate, nondiscriminatory justification for SB 261—such as preventing consumer confusion over the nature of cultivated meat—Texas has a variety of less

burdensome alternatives for achieving that interest, such as a point-of-sale disclosure that identifies products as containing cultivated cells.

234.    Wildtype and UPSIDE have suffered, and absent judicial intervention will continue to suffer, irreparable harm resulting from Defendants' enforcement of the ban. This harm includes lost business, sales, and promotional opportunities, as well as ongoing reputational harm.

235.    Wildtype and UPSIDE have no adequate remedy at law for these ongoing harms.

236.    Accordingly, Wildtype and UPSIDE seek a declaration that the ban violates the Dormant Commerce Clause and an injunction prohibiting Defendants from enforcing the ban.

**Second Claim for Relief**

**(Violation of § 1983 – Express Federal Preemption – PPIA Ingredients Clause by UPSIDE)**

237.    UPSIDE incorporates and realleges the allegations in ¶¶ 1–209 of this complaint as though set forth in this section.

238.    Congress, through 42 U.S.C. § 1983, has provided that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . , subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress[.]"

239.    The Supremacy Clause provides that the United States Constitution and the laws of the United States "shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2.

240.    Through the PPIA, 21 U.S.C. §§ 451–73, Congress has enacted a regulatory framework for the production, labeling, and distribution of poultry products.

241.    Congress's goal with the PPIA was to facilitate a uniform, nationwide market of safe and appropriately labeled poultry products.

242.    A patchwork of differing state regulations regarding the ingredients allowable in those products would hinder Congress's goals in enacting the PPIA.

243.    Accordingly, Congress has enacted legislation explicitly providing that states "may not . . . impose[]" on an entity subject to the PPIA any "ingredient requirements . . . in addition to, or different than, those made under [the PPIA] . . . with respect to articles prepared at any official establishment in accordance with the requirements under [the PPIA]."  21 U.S.C. § 467e.

244.    The PPIA's ingredient preemption provision confers on regulated entities a federal right to engage in certain conduct subject only to certain federal constraints.

245.    Under the PPIA, as well as other federal legislation, the USDA, in conjunction with the FDA, regulates the production, labeling, and distribution of cultivated poultry products.

246.    The USDA's jurisdiction over "any poultry product which is capable of use as human food" begins when poultry arrives at an "official establishment processing poultry or poultry products for commerce or otherwise subject to inspection under [the PPIA]."  21 U.S.C. § 455(a);  *see also* 21 U.S.C. § 453(f) (defining "poultry product" to include "any poultry carcass, or part thereof; or any product which is made wholly or in part from any poultry carcass or part thereof"); 9 C.F.R. § 381.1 (defining "poultry product"); *id.* § 381.145 (requiring inspection and approval of any poultry product introduced into an official establishment).

247.    Under the PPIA, as well as other federal legislation, the USDA has established

regulations for the safe production, labeling, and distribution of poultry products, which apply to

*both* conventional and cultivated poultry products.  These include regulations that specifically

govern which ingredients can and cannot be used in the production of conventional and cultivated

poultry products.  *See, e.g.,* FSIS Directive 7800.1 (providing that "[i]ngredients . . . used in cell-

cultured meat or poultry food products postharvest . . . must be considered safe and suitable by

FSIS and used in accordance with the intended use listed in 9 CFR 424.21(c) or FSIS Directive

7120.1" and that "[i]ngredients not listed in 9 CFR 424.21(c) or FSIS Directive 7120.1 . . . must be

submitted for review as described in FSIS Directive 5020.2"); 9 C.F.R. § 424.1 (noting "[t]he

rules in this part further the purposes of the" FMIA and the PPIA and stating that certain

regulations "specify rules for the use of certain food ingredients (e.g., food additives and color

additives)"); *id.* § 424.21(c) (listing certain "food ingredients that are acceptable for use in poultry

products" and stating that "[n]o meat or poultry product shall bear or contain any food ingredient

that would render it adulterated or misbranded, or which is not approved in this part, or by the

Administrator in specific cases").

248.    Under the PPIA, cultivated chicken cells and poultry meat made from such cells

prepared at a USDA-regulated official establishment in accordance with the PPIA's requirements

are allowable ingredients in poultry food products, and the USDA has authorized the use of such

ingredients in certain products, including UPSIDE's cultivated chicken product.

249.    Texas has prohibited the sale of UPSIDE's product solely because it is "derived

from harvesting animal cells and artificially replicating those cells in a growth medium to produce

tissue." Tex. Health & Safety Code § 431.002(5-a) (defining "cell-cultured protein"); *see also id.*

§ 431.02105(a) ("The offering for sale or sale of cell-cultured protein for human consumption within this state is unlawful and prohibited.").

250.    By preventing UPSIDE from selling its cultivated chicken product solely on the basis that the product contains or is made from cultivated chicken cells (i.e., solely on the basis that the product contains a specific "physical or chemical component" that is permissible for use in poultry food products under the PPIA), Texas (and Defendants in their official capacities) is imposing an "ingredient requirement" that, in contravention of section 467e of the PPIA, is "in addition to, or different than," the federal requirement. *See Ass'n des Éleveurs de Canards et d'Oies du Québec v. Becerra*, 870 F.3d 1140, 1146–48 (9th Cir. 2017) (holding that "ingredient requirements" in the PPIA means "the physical components that comprise a poultry product").

251.    SB 261 is unlike state laws that prohibit the sale of poultry products—such as foie gras—based on the husbandry or treatment of animals while they are alive and *before* the animals arrive at USDA-regulated official establishments for slaughter and processing subject to USDA oversight. SB 261, instead, regulates whether certain poultry parts harvested from a slaughtered bird *after arrival* at a USDA-regulated official establishment may subsequently be used as an ingredient in poultry food products prepared at such official establishments in accordance with USDA requirements and offered for sale in Texas. Put differently, Texas has banned the sale of UPSIDE's poultry food product based on the way ingredients in that product were produced from a part of a poultry carcass while under the USDA's oversight and in accordance with USDA's requirements.

252.    Specifically, the cells from which UPSIDE's cultivated chicken product are made were harvested from the carcass of a chicken *after* that chicken was slaughtered within a USDA-

inspected official establishment and in accordance with USDA's ingredient and other requirements.

253.    Because the USDA has established ingredient requirements that apply to cultivated poultry products under the PPIA and its implementing regulations, and because the USDA has expressly allowed for the use of cultivated chicken cells in UPSIDE's product, Texas (and Defendants in their official capacities) is imposing an "ingredient requirement[] . . . in addition to, or different than, those made under [the PPIA] . . . with respect to articles prepared at any official establishment in accordance with the requirements under [the PPIA]."  21 U.S.C. § 467e; *see also* FSIS Directive 7800.1.

254.    Even if SB 261 does not directly conflict with the USDA ingredient requirements that apply to cultivated poultry products, SB 261 would still be expressly preempted by federal law because the PPIA expressly preempts states from imposing any requirements—*even non-conflicting requirements*—regarding the permissible ingredients in poultry products that are not identical to federal requirements.

255.    Therefore, Texas's ban is expressly preempted by federal law and violates rights secured under 42 U.S.C. § 1983.

256.    UPSIDE has suffered, and absent judicial intervention will continue to suffer, irreparable harm resulting from Defendants' enforcement of the ban.  This includes lost business, sales, and promotional opportunities, as well as ongoing reputational harm.

257.    UPSIDE has no adequate remedy at law for these ongoing harms.

258.    Accordingly, UPSIDE seeks a declaration that the ban is expressly preempted and violates rights secured under 42 U.S.C. § 1983.  UPSIDE also seeks an injunction prohibiting Defendants from enforcing the ban.

### Third Claim for Relief

### (Equitable Relief – *Ex parte Young* – Express Federal Preemption – PPIA Ingredients Clause by UPSIDE)

259.    UPSIDE incorporates and realleges the allegations in ¶¶ 1–209 of this complaint as though set forth in this section.

260.    Federal courts have the inherent equitable power to grant injunctive relief against state officers who are violating, or planning to violate, federal law.  *See, e.g.*, *Ex parte Young*, 209 U.S. 123 (1908).

261.    The Supremacy Clause provides that the United States Constitution and the laws of the United States "shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."  U.S. Const. art. VI, cl. 2.

262.    Through the PPIA, 21 U.S.C. §§ 451–73, Congress has enacted a regulatory framework for the production, labeling, and distribution of poultry products.

263.    Congress's goal with the PPIA was to facilitate a uniform, nationwide market of safe and appropriately labeled poultry products.

264.    A patchwork of differing state regulations regarding the ingredients allowable in those products would hinder Congress's goals in enacting the PPIA.

265.    Accordingly, Congress has enacted legislation explicitly providing that states "may not . . . impose[]" on an entity subject to the PPIA any "ingredient requirements . . . in addition

to, or different than, those made under [the PPIA] . . . with respect to articles prepared at any official establishment in accordance with the requirements under [the PPIA]."  21 U.S.C. § 467e.

266.    The PPIA's ingredient preemption provision confers on regulated entities a federal right to engage in certain conduct subject only to certain federal constraints.

267.    Under the PPIA, as well as other federal legislation, the USDA, in conjunction with the FDA, regulates the production, labeling, and distribution of cultivated poultry products.

268.    The USDA's jurisdiction over "any poultry product which is capable of use as human food" begins when poultry arrives at an "official establishment processing poultry or poultry products for commerce or otherwise subject to inspection under [the PPIA]."  21 U.S.C. § 455(a);  *see also* 21 U.S.C. § 453(f) (defining "poultry product" to include "any poultry carcass, or part thereof; or any product which is made wholly or in part from any poultry carcass or part thereof"); 9 C.F.R. § 381.1 (defining "poultry product"); *id.* § 381.145 (requiring inspection and approval of any poultry product introduced into an official establishment).

269.    Under the PPIA, as well as other federal legislation, the USDA has established regulations for the safe production, labeling, and distribution of poultry products, which apply to both conventional and cultivated poultry products.  These include regulations that specifically govern which ingredients can and cannot be used in the production of conventional and cultivated poultry products.  *See, e.g.*, FSIS Directive 7800.1 (providing that "[i]ngredients . . . used in cell-cultured meat or poultry food products postharvest . . . must be considered safe and suitable by FSIS and used in accordance with the intended use listed in 9 CFR 424.21(c) or FSIS Directive 7120.1" and that "[i]ngredients not listed in 9 CFR 424.21(c) or FSIS Directive 7120.1 . . . must be submitted for review as described in FSIS Directive 5020.2"); 9 C.F.R. § 424.1 (noting "[t]he

rules in this part further the purposes of the" FMIA and the PPIA and stating that certain regulations "specify rules for the use of certain food ingredients (e.g., food additives and color additives)"); *id.* § 424.21(c) (listing certain "food ingredients that are acceptable for use in poultry products" and stating that "[n]o meat or poultry product shall bear or contain any food ingredient that would render it adulterated or misbranded, or which is not approved in this part, or by the Administrator in specific cases").

270.    Under the PPIA, cultivated chicken cells and poultry meat made from such cells prepared at a USDA-regulated official establishment in accordance with the PPIA's requirements are allowable ingredients in poultry food products, and the USDA has authorized the use of such ingredients in certain products, including UPSIDE's cultivated chicken product.

271.    Texas has prohibited the sale of UPSIDE's product solely because it is "derived from harvesting animal cells and artificially replicating those cells in a growth medium to produce tissue." Tex. Health & Safety Code § 431.002(5-a) (defining "cell-cultured protein"); *see also id.* § 431.02105(a) ("The offering for sale or sale of cell-cultured protein for human consumption within this state is unlawful and prohibited.").

272.    By preventing UPSIDE from selling its cultivated chicken product solely on the basis that the product contains or is made from cultivated chicken cells (i.e., solely on the basis that the product contains a specific "physical or chemical component" that is permissible for use in poultry food products under the PPIA), Texas (and Defendants in their official capacities) is imposing an "ingredient requirement" that, in contravention of section 467e of the PPIA, is "in addition to, or different than," the federal requirement. *See Ass'n des Éleveurs de Canards et d'Oies*

*du Québec v. Becerra*, 870 F.3d 1140, 1146–48 (9th Cir. 2017) (holding that "ingredient requirements" in the PPIA means "the physical components that comprise a poultry product").

273.    SB 261 is unlike state laws that prohibit the sale of poultry products—such as foie gras—based on the husbandry or treatment of animals while they are alive and before the animals arrive at USDA-regulated official establishments for slaughter and processing subject to USDA oversight.  SB 261, instead, regulates whether certain poultry parts harvested from a slaughtered bird *after arrival* at a USDA-regulated official establishment may subsequently be used as an ingredient in poultry food products prepared at such official establishments in accordance with USDA requirements and offered for sale in Texas.  Put differently, Texas has banned the sale of UPSIDE's poultry food product based on the way ingredients in that product were produced from a part of a poultry carcass while under the USDA's oversight and in accordance with USDA's requirements.

274.    Specifically, the cells from which UPSIDE's cultivated chicken product are made were harvested from the carcass of a chicken *after* that chicken was slaughtered within a USDA-inspected official establishment and in accordance with USDA's ingredient and other requirements.

275.    Because the USDA has established ingredient requirements that apply to cultivated poultry products under the PPIA and its implementing regulations, and because the USDA has expressly allowed for the use of cultivated chicken cells in UPSIDE's product, Texas (and Defendants in their official capacities) is imposing an "ingredient requirement[] . . . in addition to, or different than, those made under [the PPIA] . . . with respect to articles prepared at any official

establishment in accordance with the requirements under [the PPIA]."  21 U.S.C. § 467e; *see also* FSIS Directive 7800.1.

276.    Even if SB 261 does not directly conflict with the USDA ingredient requirements that apply to cultivated poultry products, SB 261 would still be expressly preempted by federal law because the PPIA expressly preempts states from imposing any requirements—*even non-conflicting requirements*—regarding the permissible ingredients in poultry products that are not identical to federal requirements.

277.    Therefore, Texas's ban is expressly preempted by federal law and invalid under the Supremacy Clause.

278.    UPSIDE has suffered, and absent judicial intervention will continue to suffer, irreparable harm resulting from Defendants' enforcement of the ban.  This includes lost business, sales, and promotional opportunities, as well as ongoing reputational harm.

279.    UPSIDE has no adequate remedy at law for these ongoing harms.

280.    Accordingly, UPSIDE seeks a declaration, under this Court's inherent equitable power, that the ban is expressly preempted under federal law and an injunction prohibiting Defendants from enforcing the ban.

### Fourth Claim for Relief

### (Violation of § 1983 – Express Federal Preemption – PPIA Facilities Clause by UPSIDE)

281.    UPSIDE incorporates and realleges the allegations in ¶¶ 1–209 of this complaint as though set forth in this section.

282.    The Supremacy Clause provides that the United States Constitution and the laws of the United States "shall be the supreme Law of the Land; and the Judges in every State shall be

bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2.

283.    Through the PPIA, 21 U.S.C. §§ 451–73, Congress has enacted a regulatory framework for the production, labeling, and distribution of poultry products.

284.    Congress's goal with the PPIA was to facilitate a uniform, nationwide market of safe and appropriately labeled poultry products.

285.    A patchwork of differing state regulations regarding the production and distribution of those products would hinder Congress's goals in enacting the PPIA.

286.    Accordingly, Congress has explicitly stated that states "may not . . . impose[]" a "[r]equirement[] . . . with respect to premises, facilities and operations of any official establishment which [is] in addition to, or different than those made under [the PPIA]." 21 U.S.C. § 467e.

287.    The PPIA's premises, facilities, and operations preemption provision confers on regulated entities a federal right to engage in certain conduct subject only to certain federal constraints.

288.    The Supreme Court, in examining the materially identical preemption provision of the FMIA, has held that it "sweeps widely" and that it "prevents a State from imposing any additional or different—*even if non-conflicting*—requirements that fall within the scope of the [FMIA] and concern an [official establishment's] facilities or operations." *Nat'l Meat Ass'n v. Harris*, 565 U.S. 452, 459–60 (2012) (emphasis added).

289.    The Supreme Court, in examining the materially identical preemption provision of the FMIA, has also held that states cannot circumvent its preemptive sweep "just by framing [a

law] as a ban on the sale of meat produced in whatever way the State disapproved" because "[t]hat would make a mockery of the FMIA's preemption provision." *Id.* at 464.

290.    Under the PPIA, as well as other federal legislation, USDA, in conjunction with FDA, regulates the production, labeling, and distribution of cultivated chicken products.

291.    Under the PPIA, as well as other federal legislation, the USDA has established regulations for the safe production, labeling, and distribution of poultry products, including cultivated chicken products.  These include regulations that specifically govern the processing of cultivated poultry products at establishments that are subject to a USDA Grant of Inspection.  *See, e.g.*, FSIS Directive 7800.1 ("Cell-cultured meat and poultry food products are . . . subject to the same statutory requirements, regulations, and FSIS oversight authority as meat and poultry food products derived from slaughter."); 9 C.F.R. § 381.65(a) ("Operations and procedures involving the processing, other handling, or storing of any poultry product must be strictly in accord with clean and sanitary practices and must be conducted in a manner that will result in sanitary processing, proper inspection, and the production of poultry and poultry products that are not adulterated."); *id.* § 381.145(a) ("No poultry product . . . may be brought into any official establishment unless it has been processed in the United States only in an official establishment . . . , and inspected and passed, in accordance with the regulations; and unless the container of such product is marked so as to identify the product as so inspected and passed, in accordance with § 381.115 or § 381.205[.]"); *id.* § 381.145(b) (detailing the required "examination by an inspector" of poultry products and the disposal of an article or portion that is "adulterated").

292.    Even if SB 261 did not directly conflict with the USDA premises, facilities, and operations requirements that apply to cultivated poultry products, SB 261 would still be expressly

preempted because the PPIA prohibits states from imposing any requirements—*even non-conflicting requirements*—regarding the premises, facilities, or operations of poultry producers that are not identical to federal requirements.

293.    The USDA issued a Grant of Inspection for UPSIDE's manufacturing facility, and the facility is subject to routine inspection by the USDA-FSIS.

294.    UPSIDE's cultivated chicken product passes the USDA inspection and, accordingly, bears the USDA's mark of inspection.

295.    Texas has prohibited the sale of UPSIDE's cultivated chicken product even though the product is produced in a USDA-inspected official establishment and in accordance with the operational requirements established by the USDA.

296.    By preventing UPSIDE from selling cultivated chicken that is produced in accordance with federal requirements for poultry facilities, Texas (and Defendants in their official capacities) is "substitut[ing] a new regulatory scheme for the one the FSIS uses," *Nat'l Meat Ass'n*, 565 U.S. at 460, and therefore is imposing a "[r]equirement[] . . . with respect to premises, facilities and operations of any official establishment which [is] in addition to, or different than those made under [the PPIA]," 21 U.S.C. § 467e.

297.    Texas's law is unlike laws that have been held not to be preempted because those laws prohibit certain animals, such as horses, from being slaughtered for human consumption or prohibit slaughterhouses from possessing horse meat intended for human consumption. Those laws categorically restricted facilities from slaughtering a specific animal species (e.g., horses) for human consumption or from receiving or possessing meat sources from that specific animal species with the intent to sell for human consumption, thus preventing those animals or meat products

from *arriving at official establishments in the first place.* As a result, those laws operated "at a remove from the sites and activities that the [PPIA] most directly governs," i.e., activities within official establishments. *See Nat'l Meat Ass'n*, 565 U.S. at 467.

298.    SB 261 is wholly distinguishable from such laws, since it dictates how official establishments may handle certain animals—or parts of animals—*after their arrival at an official establishment.* Put differently, SB 261 does not prohibit the slaughter of chickens, but instead prohibits UPSIDE's cultivated poultry products based entirely on how UPSIDE processed poultry parts *following slaughter.*

299.    Therefore, Texas's ban is expressly preempted by federal law and invalid under the Supremacy Clause.

300.    UPSIDE has suffered, and absent judicial intervention will continue to suffer, irreparable harm resulting from Defendants' enforcement of the ban. This includes lost business, sales, and promotional opportunities, as well as ongoing reputational harm.

301.    UPSIDE has no adequate remedy at law for these ongoing harms.

302.    Accordingly, UPSIDE seeks a declaration that the ban violates rights secured under 42 U.S.C. § 1983 and an injunction prohibiting Defendants from enforcing the ban.

**Fifth Claim for Relief**

**(Equitable Relief – *Ex parte Young* – Express Federal Preemption – PPIA Facilities Clause by UPSIDE)**

303.    UPSIDE incorporates and realleges the allegations in ¶¶ 1–209 of this complaint as though set forth in this section.

304.    Federal courts have the inherent equitable power to grant injunctive relief against state officers who are violating, or planning to violate, federal law.  *See, e.g.*, *Ex parte Young*, 209 U.S. 123 (1908).

305.    The Supremacy Clause provides that the United States Constitution and the laws of the United States "shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."  U.S. Const. art. VI, cl. 2.

306.    Through the PPIA, 21 U.S.C. §§ 451–73, Congress has enacted a regulatory framework for the production, labeling, and distribution of poultry products.

307.    Congress's goal with the PPIA was to facilitate a uniform, nationwide market of safe and appropriately labeled poultry products.

308.    A patchwork of differing state regulations regarding the production and distribution of those products would hinder Congress's goals in enacting the PPIA.

309.    Accordingly, Congress has explicitly stated that states "may not . . . impose[]"a "[r]equirement[] . . . with respect to premises, facilities and operations of any official establishment which [is] in addition to, or different than those made under [the PPIA]."  21 U.S.C. § 467e.

310.    The Supreme Court, in examining the materially identical preemption provision of the FMIA, has held that it "sweeps widely" and that it "prevents a State from imposing any additional or different—*even if non-conflicting*—requirements that fall within the scope of the [FMIA] and concern an [official establishment's] facilities or operations."  *Nat'l Meat Ass'n v. Harris*, 565 U.S. 452, 459–60 (2012) (emphasis added).

311.    The Supreme Court, in examining the materially identical preemption provision of the FMIA, has also held that states cannot circumvent its preemptive sweep "just by framing [a law] as a ban on the sale of meat produced in whatever way the State disapproved" because "[t]hat would make a mockery of the FMIA's preemption provision." *Id.* at 464.

312.    Under the PPIA, as well as other federal legislation, USDA, in conjunction with FDA, regulates the production, labeling, and distribution of cultivated chicken products.

313.    Under the PPIA, as well as other federal legislation, USDA has established regulations for the safe production, labeling, and distribution of poultry products, including cultivated chicken products.  These include regulations that specifically govern the processing of cultivated poultry products at establishments that are subject to a USDA Grant of Inspection.  *See, e.g.*, FSIS Directive 7800.1 ("Cell-cultured meat and poultry food products are . . . subject to the same statutory requirements, regulations, and FSIS oversight authority as meat and poultry food products derived from slaughter."); 9 C.F.R. § 381.65(a) ("Operations and procedures involving the processing, other handling, or storing of any poultry product must be strictly in accord with clean and sanitary practices and must be conducted in a manner that will result in sanitary processing, proper inspection, and the production of poultry and poultry products that are not adulterated."); *id.* § 381.145(a) ("No poultry product . . . may be brought into any official establishment unless it has been processed in the United States only in an official establishment . . . , and inspected and passed, in accordance with the regulations; and unless the container of such product is marked so as to identify the product as so inspected and passed, in accordance with § 381.115 or § 381.205[.]"); *id.* § 381.145(b) (detailing the required "examination by an inspector" of poultry products and the disposal of an article or portion that is "adulterated").

314.    Even if SB 261 did not directly conflict with the USDA premises, facilities, and operations requirements that apply to cultivated poultry products, SB 261 would still be expressly preempted because the PPIA prohibits states from imposing any requirements—*even non-conflicting requirements*—regarding the premises, facilities, or operations of poultry producers that are not identical to federal requirements.

315.    The USDA issued a Grant of Inspection for UPSIDE's manufacturing facility, and the facility is subject to routine inspection by the USDA-FSIS.

316.    UPSIDE's cultivated chicken product passes the USDA inspection and, accordingly, bears the USDA's mark of inspection.

317.    Texas has prohibited the sale of UPSIDE's cultivated chicken product even though the product is produced in a USDA-inspected official establishment and in accordance with the operational requirements established by the USDA.

318.    By preventing UPSIDE from selling cultivated chicken that is produced in accordance with federal requirements for poultry facilities, Texas (and Defendants in their official capacities) is "substitut[ing] a new regulatory scheme for the one the FSIS uses," *Nat'l Meat Ass'n*, 565 U.S. at 460, and therefore is imposing a "[r]equirement[] . . . with respect to premises, facilities and operations of any official establishment which [is] in addition to, or different than those made under [the PPIA]," 21 U.S.C. § 467e.

319.    Texas's law is unlike laws that have been held not to be preempted because those laws prohibit certain animals, such as horses, from being slaughtered for human consumption or prohibit slaughterhouses from possessing horse meat intended for human consumption.  Those laws categorically restricted facilities from slaughtering a specific animal species (e.g., horses) for

human consumption or from receiving or possessing meat sources from that specific animal species with the intent to sell for human consumption, thus preventing those animals or meat products from *arriving at official establishments in the first place.* As a result, those laws operated "at a remove from the sites and activities that the [PPIA] most directly governs," i.e., activities within official establishments. *See Nat'l Meat Ass'n*, 565 U.S. at 467.

320.    SB 261 is wholly distinguishable from those laws, since it dictates how official establishments may handle certain animals—or parts of animals—*after their arrival* at an official establishment.  Put differently, SB 261 does not prohibit the slaughter of chickens, but instead prohibits UPSIDE's cultivated poultry products based entirely on how UPSIDE processed poultry parts *following slaughter*.

321.    Therefore, Texas's ban is expressly preempted by federal law and invalid under the Supremacy Clause.

322.    UPSIDE has suffered, and absent judicial intervention will continue to suffer, irreparable harm resulting from Defendants' enforcement of the ban.  This includes lost business, sales, and promotional opportunities, as well as ongoing reputational harm.

323.    UPSIDE has no adequate remedy at law for these ongoing harms.

### REQUEST FOR RELIEF

Wildtype and UPSIDE respectfully request the following relief:

i.    Entry of judgment declaring that SB 261, and the rules and regulations promulgated thereunder, are unconstitutional on their face and as applied to the extent they are preempted by federal law and violate the dormant aspect of the Commerce Clause of the U.S. Constitution;

ii.    Entry of preliminary and permanent injunctions against Defendants, prohibiting the enforcement of these regulations, laws, rules, and policies;

iii.   An award of attorneys' fees and costs in this action under 42 U.S.C. § 1988(b); and

iv.   Any further legal or equitable relief as the Court deems just and proper.

Dated: September 2, 2025                    Respectfully submitted,

**INSTITUTE FOR JUSTICE**

*/s/ Arif Panju*
Marco Vasquez Jr. (TX Bar No. 24115892)
Arif Panju (TX Bar No. 24070380)
816 Congress Ave., Suite 970
Austin, TX 78701
Phone: (512) 480-5936
Fax: (512) 480-5937
mvasquez@ij.org
apanju@ij.org

Paul M. Sherman (VA Bar No. 73410)*
901 North Glebe Road, Suite 900
Arlington, VA 22203
Phone: (703) 682-9320
Fax: (703) 682-9321
psherman@ij.org

*Attorneys for Plaintiffs*
*Wild Type, Inc. d/b/a Wildtype and*
*UPSIDE Foods, Inc.*

*\* Motion for Admission* Pro Hac Vice *Forthcoming*