# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
### AUSTIN DIVISION

| | |
|---|---|
| **WILD TYPE, INC. D/B/A WILDTYPE** AND **UPSIDE FOODS, INC.**, | |
| *Plaintiffs*, | |
| v. | Civil Action No. <u>1:25-cv-1408-ADA-ML</u> |
| **JENNIFER A. SHUFORD**, in her official capacity as the Commissioner of the Texas Department of State Health Services; **CECILE ERWIN YOUNG**, in her official capacity as the Executive Commissioner of the Texas Health and Human Services Commission; **KEN PAXTON**, in his official capacity as the Attorney General of Texas; and **DELIA GARZA**, in her official capacity as the County Attorney of Travis County, | |
| *Defendants*. | |

---

## PLAINTIFFS' OPPOSED MOTION FOR A PRELIMINARY INJUNCTION

---

# TABLE OF CONTENTS

**Page**

Table of Authorities .................................................................................................. iii

Introduction .............................................................................................................. 1

Facts ......................................................................................................................... 2

   I.   Cultivated meat is an innovative and safe industry. ............................................ 2

   II.  Plaintiff Wildtype produces cultivated salmon in California. ............................... 3

   III.  Plaintiff UPSIDE produces cultivated poultry in California. ............................. 4

   IV.  The federal government extensively regulates cultivated meat products to ensure safe and uniform regulation. ....................................................................................5

   V.  Texas enacted SB 261, which bans the sale of cultivated meat. ......................... 6

   VI.  Texas banned the sale of cultivated meat to protect an in-state industry. .........7

   VII. Wildtype and UPSIDE are experiencing irreparable harm. .............................10

Argument .................................................................................................................12

   I.   Plaintiffs are likely to succeed on the merits of their challenge to SB 261. ......................13

       A.  Plaintiffs are likely to succeed on their claim that SB 261 violates the Dormant Commerce Clause. ........................................................................13

           1.  Facially neutral laws that impede the interstate flow of commercial goods, with the purpose or effect of favoring an in-state commercial interest, are subject to heightened scrutiny. ....................................13

           2.  SB 261 impedes the interstate flow of commercial goods, with the purpose or effect of favoring an in-state commercial interest. .......................15

           3.  SB 261 is unlikely to survive heightened scrutiny. .........................17

       B.  Plaintiff UPSIDE Foods is likely to succeed on its claims that SB 261 is preempted by federal law. .........................................................................19

           1.  UPSIDE's product is a "poultry product" within the meaning of the PPIA. ................................................................................ 20

i

2. The PPIA's express preemption provisions preempt even nonconflicting state requirements that differ from or exceed federal requirements.................................................................................................21

3. SB 261 is expressly preempted under the PPIA. .......................................... 24

II. The remaining factors favor granting a preliminary injunction.....................................26

III. This Court should waive the bond requirement of Rule 65(c) of the Federal Rules of Civil Procedure...........................................................................................................29

Conclusion ......................................................................................................................... 29

Certificate of Conference....................................................................................................31

Certificate of Service...........................................................................................................32

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allstate Ins. Co. v. Abbott,*
495 F.3d 160 (5th Cir. 2007) ..............................................................................13, 19

*Armour & Co v. Ball,*
468 F.2d 76 (6th Cir. 1972) ............................................................................22, 23, 24

*Ascension Seton v. Nat'l Lab. Rels. Bd.,*
756 F. Supp. 3d 405 (W.D. Tex. 2024) ................................................................. 28

*Ass'n des Éleveurs de Canards et d'Oies du Québec v. Becerra,*
870 F.3d 1140 (9th Cir. 2017) ............................................................................. 24

*Bacchus Imports, Ltd. v. Dias,*
468 U.S. 263 (1984) ......................................................................................15, 16

*Baldwin v. G.A.F. Seelig, Inc.,*
294 U.S. 511 (1935) ...................................................................................... 14, 15

*Book People, Inc. v. Wong,*
91 F.4th 318 (5th Cir. 2024) .................................................................................26

*Brimmer v. Rebman,*
138 U.S. 78 (1891) ...........................................................................................14

*W. Lynn Creamery, Inc. v. Healy,*
512 U.S. 186 (1994) ......................................................................................16, 17

*Dean Milk Co. v. City of Madison,*
340 U.S. 349 (1951) ...........................................................................................18

*Ferrellgas Partners, L.P. v. Barrow,*
143 F. App'x 180 (11th Cir. 2005) ...........................................................................27

*Fort Gratiot Sanitary Landfill, Inc. v. Mich. Dep't of Nat. Res.,*
504 U.S. 353 (1992) ..................................................................................... 14, 18

*Franciscan All., Inc. v. Burwell,*
227 F. Supp. 3d 660 (N.D. Tex. 2016) .......................................................................29

*Free Speech Coal., Inc. v. Paxton,*
    95 F.4th 263 (5th Cir. 2024) ................................................ 28

*Freeman v. Corzine,*
    629 F.3d 146 (3d Cir. 2010) ................................................ 18

*Friends of the E. Hampton Airport, Inc. v. Town of E. Hampton,*
    152 F. Supp. 3d 90 (S.D.N.Y. 2015) ...................................... 27

*Gbalazeh v. City of Dallas,*
    No. 3:18-CV-0076-N, 2019 WL 2616668
    (N.D. Tex. June 25, 2019) ................................................... 29

*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal,*
    546 U.S. 418 (2006) ......................................................... 17

*Healthy Vision Ass'n v. Abbott,*
    138 F.4th 385 (5th Cir. 2025) .............................................. 28

*Hunt v. Wash. State Apple Advert. Comm'n,*
    432 U.S. 333 (1977) ............................................. 14, 15, 16, 17

*Kaepa, Inc. v. Achilles Corp.,*
    76 F.3d 624 (5th Cir. 1996) ................................................ 29

*Kassel v. Consol. Freightways Corp. of Del.,*
    450 U.S. 662 (1981) ...................................................... 17, 18

*Maine v. Taylor,*
    477 U.S. 131 (1986) ...................................................... 17, 19

*Nat'l Meat Ass'n v. Harris,*
    565 U.S. 452 (2012) .......................................... 21, 22, 24, 25

*New Energy Co. of Ind. v. Limbach,*
    486 U.S. 269 (1988) ...................................................... 13, 18

*NextEra Energy Cap. Holdings, Inc. v. Lake,*
    48 F.4th 306 (5th Cir. 2022) ............................................... 28

*Qin v. P'ships & Unincorporated Ass'ns on Schedule "A,"*
    No. 6:21-CV-1243-ADA, 2022 WL 80274
    (W.D. Tex. Jan. 7, 2022) .................................................... 27

*Rest. L. Ctr. v. U.S. Dep't of Lab.,*
    66 F.4th 593 (5th Cir. 2023) ............................................... 26

*Siembra Finca Carmen, L.L.C. v. Sec'y of Dep't of Agric. of P.R.*,
    437 F. Supp. 3d 119 (D.P.R. 2020) .................................................................27

*Tenn. Wine & Spirits Retailers Ass'n v. Thomas*,
    588 U.S. 504 (2019) ..................................................................................... 28

*Tex. Midstream Gas Services, LLC v. City of Grand Prairie*,
    608 F.3d 200 (5th Cir. 2010) .........................................................................26

*Turtle Island Foods Inc. v. Abbott*,
    No. 1:23-CV-1032-DII, 2024 WL 5659990
    (W.D. Tex. Sept. 23, 2024). ......................................................................... 15

*United Healthcare Ins. Co. v. AdvancePCS*,
    316 F.3d 737 (8th Cir. 2002) .........................................................................27

*Wages & White Lion Invs., L.L.C. v. FDA*,
    16 F.4th 1130 (5th Cir. 2021) ...................................................................26, 27

*Wal-Mart Stores, Inc. v. Tex. Alcoholic Beverage Comm'n*,
    945 F.3d 206 (5th Cir. 2019) .................................................................... 17, 18

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ........................................................................................12

## Codes, Statutes, and Rules

9 C.F.R.
    § 381.6(a) ....................................................................................................5
    § 381.16 ......................................................................................................5
    § 381.65 ................................................................................................22, 25
    § 381.145(a)–(b) ....................................................................................22, 23
    § 412.1(a) ....................................................................................................4
    § 424.1 ...................................................................................................... 22
    § 424.21(c) ................................................................................................ 22

21 U.S.C.
    § 453(f) ..................................................................................................6, 20
    § 453(p) .................................................................................................5, 25
    § 467e .................................................................................. 6, 21, 24, 25, 26
    § 678 ........................................................................................................ 22

25 Tex. Admin. Code § 228.1(b) ..................................................................... 19

FDA, Food Code 2017, § 3-603.11 .................................................................. 19

Tex. Health & Safety Code
  § 431.002(5-a) .............................................................................. 6, 7, 25
  § 431.054(a) ...........................................................................................7
  § 431.054(c)–(d) ....................................................................................7
  § 433.057(b) .................................................................................... 6, 25
  § 431.059(a) ...........................................................................................7
  § 431.0585(a)–(b) ..................................................................................7
  § 431.02105(a) .......................................................................................6

Tex. Pen. Code
  § 12.21 ....................................................................................................7
  § 12.35(a)–(b) ........................................................................................7

Fed. R. Civ. P. 65 .................................................................................. 12, 29

**Other Authorities**

2025 Tex. Sess. Law Serv.
  Ch. 968, § 8 (S.B. 261) (Vernon's) ......................................................6

The Federalist No. 11 (Alexander Hamilton),
  https://guides.loc.gov/federalist-papers/text-11-20 ........................... 28

*Formal Agreement Between the U.S. Department of Health and Human Services Food and Drug
  Administration and U.S. Department of Agriculture Office of Food Safety* (Mar. 7, 2019),
  https://www.fsis.usda.gov/sites/default/files/media_file/2020-07/Formal-
  Agreement-FSIS-FDA.pdf ...............................................................5, 6

FSIS Notice 31-23, *Updated Cell-Cultured Meat & Poultry Food Products Sampling Program*
  (Jun 29, 2023), https://www.fsis.usda.gov/sites/default/files/media_file/documents
  /31-23.pdf .......................................................................................... 23

Senate Rsch. Serv., *Bill Analysis* (Mar. 25, 2025),
  https://capitol.texas.gov/tlodocs/89R/analysis/pdf/SB00261I.pdf .......8

Stan Gerdes, @StanGerdesforTX, X.com (Nov. 22, 2024, 11:26 AM),
  https://x.com/StanGerdesforTX/status/1860012033581744313 ...........8

Stan Gerdes, @StanGerdesforTX, X.com (June 28, 2025, 6:39 PM),
  https://x.com/StanGerdesforTX/status/1939106368499392705 ...........9

Tex. Dep't of Agric., @TexasDeptofAg, X.com (June 26, 2025, 8:18 PM),
  https://x.com/TexasDeptofAg/status/1938406428617724237 ...............9

Tex. Dep't of Agric., *Commissioner Miller Praises Tx. Legis for Putting a Fork in Lab-Grown Meat* (June 26, 2025), https://texasagriculture.gov/News-Events/Article/10442/commissioner-miller-praises-texas-legislature-for-putting-a-fork-in-lab-grown-m ...................................................................................................9

Tex. House of Representatives, *Comm. on Pub. Health*, (Apr. 7, 2025), https://house.texas.gov/videos/21658 ............................................. 8, 9, 10, 18

Tex. House of Representatives, *89th Legis. Session*, (May 24, 2025), https://house.texas.gov/videos/22257 ................................................1, 7, 8, 16

Tex. House of Representatives, *89th Legis. Session*, (May 25, 2025), https://house.texas.gov/videos/22258 ........................................................7

Tex. Senate, *Senate Comm. on Water, Agric., & Rural Affs.*, (Mar. 31, 2025), https://senate.texas.gov/videoplayer.php?vid=21497 ...............................8, 9

TSCRA, *TSCRA Applauds Bipartisan Passage of SB 261 that Prohibits the Sale of Cell-Cultured Proteins in the State* (May 26, 2025), https://tscra.org/tscra-applauds-bipartisan-passage-of-sb-261-that-prohibits-the-sale-of-cell-cultured-proteins-in-the-state/ ...................................................................................................10

TSCRA, @TSCRA, X.com (May 28, 2025, 2:40 PM), https://x.com/TSCRA/status/1927812191207498079......................................................9, 10

U.S. Dep't of Agric., FSIS Directive 7800.1, *FSIS Responsibilities in Establishments Producing Cell-Cultured Meat & Poultry Food Products* (June 21, 2023), https://www.fsis.usda.gov/policy/fsis-directives/7800.1............................................................ 22

U.S. Dep't of Agric., *Human Food Made with Cultured Animal Cells* (Aug. 17, 2023), https://www.fsis.usda.gov/inspection/compliance-guidance/labeling/labeling-policies/human-food-made-cultured-animal-cells .............................................23, 25

## INTRODUCTION

This case is a constitutional challenge to Texas's recently enacted SB 261, a law that prohibits the sale of safe, innovative food products. Plaintiffs Wild Type, Inc. (Wildtype) and UPSIDE Foods, Inc. (UPSIDE) are start-up companies based in California that produce cultivated salmon and cultivated chicken, respectively. Unlike conventional salmon or chicken, which are harvested from slaughtered animals, Plaintiffs' cultivated products are produced by growing real salmon and real chicken cells in clean and controlled facilities. Using this technology, Plaintiffs reproduce the taste and texture of conventional salmon and chicken without the need to raise and kill large numbers of animals.

Wildtype and UPSIDE have been given the greenlight by the FDA and the USDA to distribute and sell their products throughout the country, including here in Texas. But on June 20, 2025, Texas enacted SB 261, banning the sale of cultivated meat. That ban went into effect on September 1. As a result, both Wildtype and UPSIDE have ceased distributing their products to Texas consumers.

Texas did not enact SB 261 because cultivated meat is unsafe. Rather, it did so to protect Texas's traditional agriculture industry from innovative out-of-state competition. As the lead House sponsor of the bill bluntly put it, "The goal of this bill is to protect our agriculture industry." Tex. House of Representatives, *89th Legis. Session*, at 7:42:20–30 (May 24, 2025), https://house.texas.gov/videos/22257.

That act of naked economic protectionism is unlawful under the Dormant Commerce Clause and is preempted by federal law. To avoid ongoing irreparable harm to Plaintiffs, this Court should preliminarily enjoin SB 261 to allow Wildtype and UPSIDE to continue selling and offering to sell their products to Texas consumers while this lawsuit moves forward.

1

## FACTS

### I.     Cultivated meat is an innovative and safe industry.

Cultivated meat consists of animal cells, tissues produced from animal cells, or food produced using animal cells as an ingredient. Decl. of Justin Kolbeck in Supp. of Mot. for Prelim. Inj. (Ex. 1) ¶ 10; Decl. of Uma Valeti in Supp. of Mot. for Prelim. Inj. (Ex. 2) ¶ 12. To produce cultivated meat, a manufacturer acquires animal cells from an animal and stores them in clean and controlled facilities. Kolbeck Decl. ¶ 15; Valeti Decl. ¶ 17. These cells are later placed inside a cultivator, where they are supplied with oxygen and nutrients that allow the cells to multiply. *Id.* These cells are then harvested, prepared, and packaged into food products that have a similar taste, texture, and appearance as conventional meat. *Id.*[1]

Cultivated meat offers many potential benefits to consumers. Cultivated meat can increase the United States' food security by supplementing and diversifying food production. Kolbeck Decl. ¶ 20; Valeti Decl. ¶ 22. Cultivated meat can mitigate the risks of diseases and infections because it is grown in clean, controlled, and constantly monitored environments (rather than in the typical tight spaces associated with many animals and their waste). Kolbeck Decl. ¶ 22; Valeti Decl. ¶ 23. Cultivated meat does not require the large scale raising and slaughtering of animals. Kolbeck Decl. ¶ 18; Valeti Decl. ¶ 20. Cultivated meat can limit many of the environmental costs associated with conventional meat, such as transportation costs, greenhouse-gas emissions, and pollution—especially if states allow the cultivated meat industry to develop and scale. Kolbeck Decl. ¶ 19; Valeti Decl. ¶ 21. Besides appealing to consumers who have these concerns, cultivated meat also appeals

---

[1] Unless otherwise specified, in this motion the term "meat" will be used to encompass poultry and seafood along with beef, pork, etc. *See* Kolbeck Decl. ¶ 10; Valeti Decl. ¶ 12.

to those who enjoy trying new food products produced with innovative technology. Kolbeck Decl. ¶ 24; Valeti Decl. ¶ 25.

For these reasons, cultivated meat serves as a substitute for, and competes with, conventional meat. Kolbeck Decl. ¶¶ 28–29; Valeti Decl. ¶¶ 29–30.

## II.    Plaintiff Wildtype produces cultivated salmon in California.

Wildtype is a start-up company based in San Francisco, California, and founded by Aryé Elfenbein (a cardiologist with a background in cardiac biology) and Justin Kolbeck (a former U.S. State Department diplomat). Kolbeck Decl. ¶¶ 3, 5–6. Wildtype aims to address problems related to seafood, including safety and sustainability. *Id.* ¶ 7. To that end, Wildtype creates and sells cultivated salmon. *Id.* ¶¶ 3, 7, 9. Wildtype's production facility is in San Francisco, California, and Wildtype doesn't produce any products in Texas. *Id.* ¶¶ 13–14. Wildtype's cultivated salmon avoids many of the problems that often accompany conventional salmon, such as heavy metals. *Id.* ¶¶ 17–22.

In May 2025, Wildtype completed an extensive pre-market consultation process with FDA. *Id.* ¶ 32. As part of the consultation process, Wildtype submitted its safety assessment for its cultivated salmon and production process, as well as supporting information, to the FDA. *Id.* At the end of that consultation and the FDA's review, the FDA issued a scientific memorandum and a "no questions" letter to Wildtype, stating the FDA had "no questions at this time regarding Wildtype's conclusion that foods comprised of or containing cultured salmon cell material resulting from the production process defined in CCC 000005 are as safe as comparable foods produced by other methods." *Id.* ¶ 33, Ex. 1-A (letter); *see also id.* ¶ 34, Ex. 1-B (memo.). Since the FDA's greenlight, Wildtype has been subject to routine FDA inspections. *Id.* ¶ 35.

In May 2025, Wildtype began selling its cultivated salmon product in the United States. *Id.*
¶ 36. Starting in July 2025 until SB 261 went into effect, Wildtype sold its cultivated salmon
through OTOKO, a sushi restaurant in Austin, Texas. *Id.* ¶¶ 37–39. Wildtype has also sold or dis-
tributed its cultivated salmon in states including Oregon, Washington, and California. *Id.* ¶ 40.
Wildtype hasn't had a single recall of its cultivated salmon product and hasn't received a single
health-related complaint from those who have tried it. *Id.* ¶¶ 59–60.

## III.    Plaintiff UPSIDE produces cultivated poultry in California.

UPSIDE is a start-up company based in Emeryville, California, and founded by Uma Valeti,
a cardiologist with a background in cardiac biology as well as the company's CEO. Valeti Decl.
¶¶ 3–4. Dr. Valeti aims to provide alternative sources to produce meat. *Id.* ¶¶ 6, 10. To that end,
UPSIDE creates and sells cultivated chicken products. *Id.* ¶ 11. UPSIDE's production facility is in
Emeryville, California, and UPSIDE doesn't produce any products in Texas. *Id.* ¶¶ 15–16.

In November 2022, UPSIDE completed a pre-market consultation process with the FDA.
*Id.* ¶ 33. As part of the consultation process, UPSIDE submitted its safety assessment for its culti-
vated chicken and production process, as well as supporting information, to the FDA. *Id.* At the
end of that consultation and the FDA's review, the FDA issued a scientific memorandum as well
as a "no questions" letter to UPSIDE, stating that the FDA had "no questions at this time regard-
ing UPSIDE's conclusion that foods comprised of or containing cultured chicken cell material re-
sulting from the production process defined in CCC 000002 are as safe as comparable foods pro-
duced by other methods." *Id.* ¶ 34, Ex. 2-A (letter); *see also id.* ¶ 35, Ex. 2-B (memo.). Since the
FDA's greenlight, UPSIDE has been subject to continuous FDA oversight and routine FDA audit.
*Id.* ¶ 36.

Because UPSIDE sells a poultry product, it received additional approvals from the USDA. In June 2023, UPSIDE received USDA-FSIS approval of its product label. Valeti Decl. ¶ 37; *see* 9 C.F.R. § 412.1(a) (requiring a poultry product to submit a final label for approval). In June 2023, the USDA-FSIS also issued UPSIDE a Grant of Inspection, allowing the company to begin selling its cultivated poultry product in interstate commerce under federal inspection. Valeti Decl. ¶ 38; *see* 9 C.F.R. §§ 381.16, 381.6(a) (inspection); 21 U.S.C. § 453(p) (defining "official establishment"). As a result, UPSIDE has USDA inspectors onsite during its production operations. Valeti Decl. ¶ 38.

In July 2023, UPSIDE began selling its cultivated poultry product in the United States. Valeti Decl. ¶ 39. UPSIDE has sold or distributed its cultivated poultry product in states including Texas, Alabama, and California. *Id.* In March 2024, UPSIDE distributed its cultivated chicken product at an event during the South by Southwest conference in Austin, Texas. *Id.* ¶ 40. In March 2024, UPSIDE also sold its cultivated chicken product to a West Lake Hills, Texas, resident. *Id.* ¶ 41. UPSIDE hasn't had a single recall of its cultivated chicken product and hasn't received a single health-related complaint from those who have tried it. *Id.* ¶¶ 61–62.

## IV.    The federal government extensively regulates cultivated meat products to ensure safe and uniform regulation.

Besides the premarket review processes discussed above, cultivated meat production is subject to ongoing federal supervision to ensure its safety. The USDA and the FDA have a formal agreement regarding how the federal government applies existing federal laws to cultivated meat for human consumption.[2] Under that agreement, the FDA "[o]versee[s] initial cell collection and

---

[2] *Formal Agreement Between the U.S. Department of Health and Human Services Food and Drug Administration   and   U.S.   Department   of   Agriculture   Office   of   Food   Safety*

the development and maintenance of qualified cell banks" and the "proliferation and differentiation of cells through the time of harvest," pursuant to its authority under the FDCA. *Id.* at 2.

At harvest, oversight for meat or poultry products transfers to the USDA-FSIS, where that agency "determine[s] whether harvested cells are eligible to be processed into meat or poultry products that bear the USDA mark of inspection." *Id.* The USDA-FSIS requires establishments that harvest cells from poultry under the PPIA to obtain a grant of inspection, be subject to inspection, and obtain preapproval for labels. *Id.* at 3. The USDA-FSIS regulates cultivated poultry products under the PPIA based on the statute's broad definition of "poultry products," which encompasses "any poultry carcass, or part thereof; or any product which is made wholly or in part from any poultry carcass or part thereof[.]" 21 U.S.C. § 453(f).

By passing the PPIA, Congress sought to facilitate a nationwide market of safe-to-consume poultry products. For that reason, Congress expressly provided that the PPIA would preempt state regulatory provisions that exceed or differ from federal regulations promulgated under the PPIA. 21 U.S.C. § 467e.

## V.     Texas enacted SB 261, which bans the sale of cultivated meat.

SB 261 went into effect in Texas starting September 1, 2025. 2025 Tex. Sess. Law Serv. Ch. 968, § 8 (S.B. 261) (Vernon's). SB 261 declares that "[t]he offering for sale or sale of cell-cultured protein for human consumption within this state is unlawful and prohibited." Tex. Health & Safety Code § 431.02105(a). Similarly, SB 261 declares that "[a] person may not offer for sale or sell cell-cultured protein for human consumption." *Id.* § 433.057(b). "Cell-cultured protein" is

---

(Mar. 7, 2019), https://www.fsis.usda.gov/sites/default/files/media_file/2020-07/Formal-Agreement-FSIS-FDA.pdf.

defined as "a food product derived from harvesting animal cells and artificially replicating those cells in a growth medium to produce tissue." *Id.* § 431.002(5-a). Wildtype and UPSIDE's cultivated meat products are food products that are derived from harvested animal cells and replicate those cells in a growth medium to produce tissue. Kolbeck Decl. ¶ 12; Valeti Decl. ¶ 14.

The penalties for violating SB 261 are steep and can include administrative penalties up to $25,000 a day, civil penalties of up to $25,000 a day, and even jail time. Tex. Health & Safety Code §§ 431.054(a), (c)–(d); 431.0585(a)–(b); 431.059(a); Tex. Pen. Code §§ 12.21; 12.35(a)–(b).

## VI. Texas banned the sale of cultivated meat to protect an in-state industry.

Texas has a robust conventional meat industry, which includes poultry and seafood. Kolbeck Decl. ¶ 61; Valeti Decl. ¶ 64. By comparison, all companies in the United States that are approved to sell cultivated meat products are based outside of Texas. Kolbeck Decl. ¶¶ 14, 63; Valeti Decl. ¶¶ 16, 65. As Texas legislators and officials repeatedly emphasized, the purpose of SB 261 was to protect Texas's agricultural industry from competition with this out-of-state industry.

Starting with the Texas House of Representatives, where the lead House sponsor of SB 261, Representative Stan Gerdes, when directly asked about the goal of SB 261, stated, "The goal of [SB 261] is to protect our agriculture industry." Tex. House of Representatives, *89th Legis. Session*, at 7:42:20–30 (May 24, 2025), https://house.texas.gov/videos/22257. Immediately before the House record vote on SB 261 began, Rep. Gerdes stated, "A vote today is in support of our cattle raisers and our meat producers, and I urge you to vote with me." Tex. House of Representatives, *89th Legis. Session*, at 36:15–24 (May 25, 2025), https://house.texas.gov/videos/22258. Rep. Gerdes also said, "The big idea here is, you know, Texas is not going to be getting rid of its agriculture industry, our cattle." *Id.* at 34:44–52. Rep. Gerdes argued that the Texas agriculture industry "is one of the backbones of Texas and our Texas way of life." Tex. House of

Representatives, *89th Legis. Session*, at 7:45:00–06 (May 24, 2025), https://house.texas.gov/videos/22257. In his view, SB 261 "defend[s] the integrity of the state's agricultural and ranching industries." *Id.* at 7:40:50–41:05. Rep. Gerdes was concerned with "our meat production" and preventing the loss of or harm to "our ranchers." *Id.* at 7:45:36–50 ("our meat production"); Stan Gerdes, @StanGerdesforTX, X.com (Nov. 22, 2024, 11:26 AM), https://x.com/StanGerdesforTX/status/1860012033581744313 ("our ranchers"). In a committee hearing on a companion bill to SB 261, Rep. Gerdes repeated the same talking points, including the goal to "support traditional agriculture." Tex. House of Representatives, *Comm. on Pub. Health*, at 4:19:07–18 (Apr. 7, 2025), https://house.texas.gov/videos/21658 ("House Comm. Hearing"). Another House representative said he believes in the free market but doesn't "want cattlemen to go out of business." *Id.* at 5:09:34–44.

The Texas Senate repeated the theme. The author of SB 261 issued a "Statement of Intent" that argues "[t]he introduction of lab-grown meat could disrupt traditional livestock markets," whereas SB 261 will "support traditional agriculture." Senate Rsch. Serv., *Bill Analysis* (Mar. 25, 2025), https://capitol.texas.gov/tlodocs/89R/analysis/pdf/SB00261I.pdf. The author of SB 261 repeated similar talking points during a committee hearing on the bill and during a Senate session. For example, he hoped that "success[] in Texas" would mean that taxpayer dollars shouldn't be spent "on research on a project that has no market in Texas." Tex. Senate, *Senate Comm. on Water, Agric., & Rural Affs.*, at 3:30:16–32 (Mar. 31, 2025), https://senate.texas.gov/videoplayer.php?vid=21497 ("Senate Comm. Hearing"). Another senator joked: "When your family's in the cattle business, it's kind of tough . . ." before pointing out that his brother-in-law would be mad at him if he opposed the bill. *Id.* at 3:30:41–59.

The Texas Department of Agriculture reiterated SB 261's protectionist purpose. The Department of Agriculture celebrated SB 161 by tweeting "#TexasAgricultureMatters." Tex. Dep't Agric., @TexasDeptofAg, X.com (June 26, 2025, 8:18 PM), https://x.com/TexasDeptofAg/status/1938406428617724237. In a press release, the Commissioner of the Department of Agriculture stated SB 261 is "a massive win for Texas ranchers, producers, and consumers." Tex. Dep't of Agric., *Commissioner Miller Praises Tx. Legis for Putting a Fork in Lab-Grown Meat* (June 26, 2025), https://texasagriculture.gov/News-Events/Article/10442/COMMISSIONER-MILLER-PRAISES-TEXAS-LEGISLATURE-FOR-PUTTING-A-FORK-IN-LAB-GROWN-M. In his view, "[i]t's plain cowboy logic that we must safeguard our real, authentic meat industry from synthetic alternatives," and SB 261 represents "a bold stand for our ranching families." *Id.* The goal: ensure cultivated meat "doesn't have a place on our tables" in Texas. *Id.*

The powerful Texas agriculture industry pushed SB 261. Rep. Gerdes tagged the Texas & Southwestern Cattle Raisers Association (TSCRA) in a tweet celebrating the passage of SB 261. Stan Gerdes, @StanGerdesforTX, X.com (June 28, 2025, 6:39 PM), https://x.com/StanGerdesforTX/status/1939106368499392705. During multiple hearings, TSCRA offered the only testimony in favor of SB 261. *See* Senate Comm. Hearing at 3:15:47–42:03; House Comm. Hearing at 4:23:30–51:40. TSCRA testified that SB 261 is an "important bill" that can protect Texas ranchers. Senate Comm. Hearing at 3:19:54–20:14. TSCRA expressed explicit concern that one day cultivated meat would become price competitive with conventional meat, which could lead a meat packer to say, "I'm gonna pay you less for your cattle because I'll just make 20% more [selling cultivated meat]." House Comm. Hearing at 4:35:32–36:00. TSCRA's representative stated that he had "a big, big issue with that," describing it as "price manipulation."

*Id.* On social media, TSCRA continued to praise SB 261 as protecting "ranchers & the beef industry." TSCRA, @TSCRA, X.com (May 28, 2025, 2:40 PM), https://x.com/TSCRA/status/1927812191207498079. In a press release, TSCRA described SB 261 as "designed to protect consumers and uphold the integrity of traditionally raised beef products" and "reinforc[ing] Texas' commitment to preserving the high standards of the beef industry and the livelihoods of the hardworking Texans who sustain it." TSCRA, *TSCRA Applauds Bipartisan Passage of SB 261 that Prohibits the Sale of Cell-Cultured Proteins in the State* (May 26, 2025), https://tscra.org/tscra-applauds-bipartisan-passage-of-sb-261-that-prohibits-the-sale-of-cell-cultured-proteins-in-the-state/.

Absent from the debate over SB 261 was any evidence that the bill promoted public health or safety. Indeed, during a committee hearing regarding a companion bill to SB 261, a resource witness from the Department of State Health Services (DSHS) that was neutral on the bill was asked, "Do you know of any reason why this would be a health risk—a public safety, a public health risk?" to which she responded, "Personally, I don't have any information on that." House Comm. Hearing at 4:22:11–51.

## VII.    Wildtype and UPSIDE are experiencing irreparable harm.

SB 261 has caused Wildtype and UPSIDE to suffer irreparable harms, and both companies will continue to suffer irreparable harms unless this Court intervenes. Kolbeck Decl. ¶ 44; Valeti Decl. ¶ 45.

SB 261 has forced Wildtype and UPSIDE to stop selling or offering to sell their cultivated meat products in Texas. Kolbeck Decl. ¶¶ 45–47; Valeti Decl. ¶¶ 46–48. Before Texas's ban, Wildtype and UPSIDE sold their cultivated meat products in Texas and received revenue from those sales. Kolbeck Decl. ¶¶ 37–39; Valeti Decl. ¶ 41. As a result of Texas's ban, Wildtype and

UPSIDE have lost access to Texas customers as a source of revenue. Kolbeck Decl. ¶ 48; Valeti Decl. ¶ 49.

Wildtype and UPSIDE are also experiencing irreparable harm in the form of lost business opportunities. Before Texas's ban and as recently as in July 2025, Wildtype took six sales trips to Austin, Texas, in connection with potential partnerships to sell cultivated salmon in Texas. Kolbeck Decl. ¶ 41. Wildtype has spoken with potential customers in Texas that expressed interest in Wildtype's cultivated salmon and was distributing its product through an Austin-based sushi restaurant. *Id.* ¶¶ 37–38, 42. Similarly, before Texas's ban, UPSIDE had conversations with chefs and supermarket chains in Texas regarding their interest in selling UPSIDE's cultivated chicken products and sold its cultivated chicken product to a Texan. Valeti Decl. ¶¶ 42–43. As a result of SB 261, Wildtype and UPSIDE have stopped pursuing these business opportunities. Kolbeck Decl. ¶¶ 46–47, 49–50; Valeti Decl. ¶¶ 46–47, 50–51.

Wildtype and UPSIDE are also enduring irreparable harm because of the fragmentation of the interstate market of meat and the reduced ability to develop scale efficiencies. Texas is the seventh state that has banned cultivated meat in any capacity. This growing patchwork of state laws makes it more difficult for Wildtype and UPSIDE to partner with distributors or potential purchasers (like restaurants) because the states with bans have closed their borders to the industry, thereby eliminating potential customers. Kolbeck Decl. ¶ 53; Valeti Decl. ¶¶ 54–55. By foreclosing access to one of the nation's largest meat markets, SB 261 hampers Wildtype and UPSIDE's ability to achieve economies of scale that are essential to lowering production costs and making cultivated meat competitive in price to conventional meat. Kolbeck Decl. ¶¶ 54, 61; Valeti Decl. ¶¶ 56, 64. That's because sales bans decrease revenue, eliminate the ability for consumers to try cultivated

11

meat and share their experiences, and threaten continued investments. Kolbeck Decl. ¶ 54; Valeti Decl. ¶ 56. These outcomes place Wildtype and UPSIDE at a significant competitive disadvantage compared to conventional producers, as the cost to produce cultivated meat is high and will be difficult to lower without scaling manufacturing. *Id.*

Separately, Texas's ban is causing Wildtype and UPSIDE ongoing reputational harm and the loss of consumer goodwill. Kolbeck Decl. ¶ 51; Valeti Decl. ¶ 52. Statements by Texas legislators and officials before and after the passage of SB 261 falsely imply that there is something wrong with cultivated meat. *See supra*, 7–10. Yet the ban deprives Wildtype and UPSIDE of the ability to allow consumers to try their products and decide for themselves. Kolbeck Decl. ¶ 52; Valeti Decl. ¶ 53.

## ARGUMENT

Plaintiffs move for a preliminary injunction under Federal Rule of Civil Procedure 65. "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

As explained in Section I, Plaintiffs are likely to succeed on the merits of their Dormant Commerce Clause and federal preemption claims. As explained in Section II, Plaintiffs have also carried their burden under the remaining preliminary injunction factors. Finally, as explained in Section III, because this is a constitutional case with no potential for economic harm to the state, this Court should waive the bond requirement of Federal Rule of Civil Procedure 65(c).

I.    **Plaintiffs are likely to succeed on the merits of their challenge to SB 261.**

Plaintiffs allege that SB 261 violates the dormant aspect of the Commerce Clause and that it is preempted by federal law as to Plaintiff UPSIDE's cultivated poultry products. *See* ECF 1 at 36–56. As explained below, Plaintiffs are likely to prevail on both sets of claims.

A.    **Plaintiffs are likely to succeed on their claim that SB 261 violates the Dormant Commerce Clause.**

The dormant Commerce Clause prohibits economic protectionism. *New Energy Co. of Ind. v. Limbach*, 486 U.S. 269, 273 (1988). "A statute violates the dormant Commerce Clause where it discriminates against interstate commerce either facially, by purpose, or by effect." *Allstate Ins. Co. v. Abbott*, 495 F.3d 151, 160 (5th Cir. 2007) (citation omitted). Laws that discriminate against interstate commerce are valid "only if the state can demonstrate, under rigorous scrutiny, that it has no other means to advance a legitimate local interest." *Id.* (cleaned up).

In Section 1, Plaintiffs explain that laws that impede the interstate flow of commercial goods, with the purpose or effect of favoring an in-state commercial interest, are subject to heightened scrutiny under the Dormant Commerce Clause even if written in facially neutral terms. In Section 2, Plaintiffs show that SB 261 is such a law, and therefore must satisfy heightened scrutiny. Finally, in Section 3, Plaintiffs explain why the government is unlikely to satisfy heightened scrutiny.

1.    **Facially neutral laws that impede the interstate flow of commercial goods, with the purpose or effect of favoring an in-state commercial interest, are subject to heightened scrutiny.**

Plaintiffs expect that the government will argue that because SB 261 does not facially discriminate against interstate commerce, it is not subject to heightened scrutiny under the Dormant Commerce Clause. But as the Supreme Court has explained, a challenged law does not escape this

scrutiny merely because it "applies alike to the people of all the States, including the people of the State enacting such statute." *Fort Gratiot Sanitary Landfill, Inc. v. Mich. Dep't of Nat. Res.*, 504 U.S. 353, 361 (1992) (quoting *Brimmer v. Rebman*, 138 U.S. 78, 82–83 (1891)). Instead, courts must ask whether the law operates, either by design or effect, to shield an in-state commercial interest from competition posed by interstate commerce. *Hunt v. Wash. State Apple Advert. Comm'n,* 432 U.S. 333, 350–51 (1977).

The Supreme Court's ruling in *Hunt* is instructive. There, North Carolina had passed a statute requiring that "all closed containers of apples sold, offered for sale, or shipped into the State to bear 'no grade other than the applicable U.S. grade or standard.'" *Id.* at 335. Although the statute applied to everyone in North Carolina, it had the effect of nullifying a competitive advantage of the Washington apple industry, whose marketing had relied on advertising Washington's grades (which were more stringent than the U.S. grade). *Id.* at 351. Moreover, statements by the North Carolina Agriculture Commissioner suggested that the statute was passed in service to the state's apple industry. *Id.* at 352. Despite the statute's "declared purpose of protecting consumers from deception and fraud in the marketplace," the Supreme Court found that the law was subject to heightened scrutiny, as its effect was to provide "the North Carolina apple industry the very sort of protection against competing out-of-state products that the Commerce Clause was designed to prohibit." *Id.* at 352–53.

*Hunt* did not break new ground. The Supreme Court had applied the principle decades earlier in *Baldwin v. G.A.F. Seelig, Inc.*, 294 U.S. 511 (1935). There, New York passed a law that banned milk sales unless the milk had been obtained from the producer at a minimum price. *Id.* at 519. The law, like the challenged law in *Hunt*, applied to all sales equally—that is, regardless of

whether the milk was obtained from an in-state or an out-of-state producer. *Id*. But the effect of its application to in-state sales of milk obtained from producers located outside of New York was to negate those products' competitive advantage, which would "suppress or mitigate the consequences of competition between the states." *Id*. at 522. Thus, the law was subject to heightened scrutiny—which it could not satisfy. *See id*. at 522–26.

Modern cases from within this Circuit confirm the continued vitality of the rule that facial neutrality will not save a law from heightened scrutiny under the Dormant Commerce Clause if it has the purpose and effect of discriminating against interstate commerce. The recent decision in *Turtle Island Foods Inc. v. Abbott*, although decided in a different procedural posture, is particularly instructive. There, plaintiffs challenged a food-labeling law that they alleged had been enacted to benefit in-state meat producers at the expense of out-of-state producers of plant-based meat alternatives. No. 1:23-CV-1032-DII, 2024 WL 5659990, at *11–12 (W.D. Tex. Sept. 23, 2024). After reviewing allegations that the law was the result of extensive lobbying by cattle interests, that allegations of harm to the public were entirely speculative, and that the burdens of the law fell predominately on out-of-state producers of plant-based meat alternatives, the court concluded that the plaintiffs had sufficiently pleaded that the law "has a discriminatory purpose and effect" and was thus subject to "rigorous scrutiny." *Id*.

### 2. SB 261 impedes the interstate flow of commercial goods, with the purpose or effect of favoring an in-state commercial interest.

The next question, then, is whether SB 261 impedes the interstate flow of commercial goods with the purpose or effect of shielding an in-state commercial interest from competition. *See Bacchus Imports, Ltd. v. Dias*, 468 U.S. 263, 270 (1984). It does, and thus SB 1084 is subject to heightened scrutiny.

First, there is extensive evidence that the overriding *purpose* behind SB 261 was to prevent cultivated meat—all of which is produced for sale by companies outside of Texas—from competing with Texas's domestic agriculture industry. Indeed, Texas officials could hardly have been more brazen in announcing that "the goal of [SB 261] is to protect our agriculture industry." Tex. House of Representatives, *89th Legis. Session*, at 7:42:20–30 (May 24, 2025), https://house.texas.gov/videos/22257. Given the extensive evidence of that purpose, *supra*, 7–10, "we need not guess at the legislature's motivation"; it is readily apparent. *Bacchus*, 468 U.S. at 271. Indeed, the extensive, repeated statements are far more "glaring" evidence of a protectionist motive than the single statement attributed to the North Carolina Agriculture Commissioner in *Hunt*. *See* 432 U.S. at 352 (noting statement from the North Carolina Agriculture Commissioner that in-state apple producers "were mainly responsible for this legislation being passed").

Second, SB 261 has the direct *effect* of impeding interstate commerce, to the competitive advantage of an in-state commercial interest. Cultivated meat has been newly developed and is produced for sale by companies entirely outside of Texas. Kolbeck Decl. ¶¶ 30, 62; Valeti Decl. ¶¶ 31, 65. The interstate sale of cultivated meat presents new competition to Texas's robust conventional meat industry, as cultivated meat promises to replicate the sensory and taste profile of conventional meat without posing environmental, ethical, or certain health concerns associated with conventional meat. Kolbeck Decl. ¶¶ 11, 17–29; Valeti Decl. ¶¶ 13, 19–30. That is a significant competitive advantage that could cause some consumers to switch to cultivated meat if it were widely available. *Cf. W. Lynn Creamery, Inc. v. Healy*, 512 U.S. 186, 196 n.12 (1994) (Dormant Commerce Clause applies regardless of whether the state is seeking to "increase[] the market share of local producers" or to "mitigate[] a projected decline"). And Texas is deliberately and

effectively suppressing these competitive advantages for the benefit of its existing in-state commercial interests. *See supra*, 7–10. That is problematic because "[p]reservation of local industry by protecting it from the rigors of interstate competition is the hallmark of the economic protectionism that the Commerce Clause prohibits." *W. Lynn Creamery*, 512 U.S. at 205.

That some members of the Texas legislature paid lip service to purely speculative public health and safety concerns changes none of this. As this Circuit has held, "[t]he challenger [in a Dormant Commerce case] must show that the discriminatory effect was 'a substantial or motivating factor' leading to the enactment of the statute," *Wal-Mart Stores, Inc. v. Tex. Alcoholic Beverage Comm'n*, 945 F.3d 206, 214 (5th Cir. 2019) (citation omitted)—not that it was the exclusive one. And, in any event, the mere "incantation of a purpose to promote the public health or safety does not insulate a state law from Commerce Clause attack." *Kassel v. Consol. Freightways Corp. of Del.*, 450 U.S. 662, 670 (1981) (plurality). After all, the challenged law in *Hunt* expressed "the declared purpose of protecting consumers from deception and fraud in the marketplace." 432 U.S. at 353. That did not prevent the Court from employing heightened scrutiny to strike it down. *See id.* at 350–54.

### 3. SB 261 is unlikely to survive heightened scrutiny.

"[O]nce a state law is shown to discriminate against interstate commerce either on its face or in practical effect, the burden falls on the State to demonstrate both that the statute serves a legitimate local purpose, and that this purpose could not be served as well by available nondiscriminatory means." *Maine v. Taylor*, 477 U.S. 131, 138 (1986) (cleaned up); *see also Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 429 (2006) ("[T]he [government's] burdens at the preliminary injunction stage track the burdens at trial."). Where the state alleges an interest in promoting public health or safety, "courts must look for 'concrete evidence' that the statute

'actually promotes public health or safety.'" *See Wal-Mart Stores*, 945 F.3d at 213 (citation omitted). This "standard has teeth," and requires more than "[m]ere speculation" or "unsupported assertions." *Id.*; *see Dean Milk Co. v. City of Madison*, 340 U.S. 349, 354 (1951) (acknowledging a law is not constitutional merely because it is a "health measure")

Texas cannot satisfy that demanding standard. In all the hearings over the passage of SB 261, not once did proponents of the law present evidence that called into question the FDA's and the USDA's assessments that cultivated meat is safe for human consumption. Indeed, they did not present safety evidence of any kind. When, during a committee hearing regarding a companion bill to SB 261, a neutral resource witness from the DSHS was asked, "Do you know of any reason why this would be a health risk—a public safety, a public health risk?" she responded, "Personally, I don't have any information on that." House Comm. Hearing at 4:22:11–51. This lack of support is sufficient to find SB 261 likely violates the Dormant Commerce Clause. *See, e.g.*, *Freeman v. Corzine*, 629 F.3d 146, 161 (3d Cir. 2010) ("This absence of evidence is dispositive, because '[t]he burden is on the State to show that the discrimination is demonstrably justified[.]'" (citation omitted)). And the structure of SB 261 itself belies any genuine interest in public health and safety, because the law prohibits only the sale of cultivated meat but not its distribution. *See Fort Gratiot*, 504 U.S. at 367 (acknowledging the lack of a "valid health and safety reason" based on the way the law operates); *New Energy Co.*, 486 U.S. at 279 (acknowledging "health is not the purpose of the provision" even if health might be "an occasional and accidental effect" of the true "purpose"); *Kassel*, 450 U.S. at 671 n.12 (plurality) (noting the statute's "exemptions" as "highly relevant" to the Commerce Clause analysis). There is no reason to believe that cultivated meat that is sold is

less safe than cultivated meat that is given away—the only apparent difference is that sales of cultivated meat compete economically with sales of conventional meat.

Even if Texas genuinely believed—without any evidence—that cultivated meat posed some unknown risk to the public, the state would also have the burden of showing that there were no alternative ways of advancing its interest in promoting public health and safety that would not impede interstate commerce. *See Allstate*, 495 F.3d at 160; *Taylor*, 477 U.S. at 138. But the state *has* such alternatives. For example, there are well-documented health and safety risks associated with eating raw shellfish and rare hamburgers. Texas does not address these risks through bans, but through disclosure requirements. *See* 25 Tex. Admin. Code § 228.1(b) (adopting the FDA Food Code 2017 by reference); FDA, *Food Code 2017*, 3-603.11 (requiring disclosures of the risks of consuming raw or undercooked animal products). Because Texas cannot show that disclosure would be inadequate here, the state necessarily fails to carry its burden under the Commerce Clause.

### B.    Plaintiff UPSIDE Foods is likely to succeed on its claims that SB 261 is preempted by federal law.

In addition to violating the Dormant Commerce Clause, SB 261 is expressly preempted under federal law as applied to Plaintiff UPSIDE's poultry products. As explained below, UPSIDE's product is a "poultry product" within the meaning of the PPIA. The PPIA expressly preempts all state requirements—even non-conflicting state requirements—that differ from or exceed federal requirements regarding the permissible ingredients in poultry products or the premises, facilities, or operations of the USDA-regulated establishments in which they are produced. SB 261 violates both of these preemption provisions.

### 1. UPSIDE's product is a "poultry product" within the meaning of the PPIA.

The USDA has determined that cultivated products like UPSIDE's meet the federal definition of "poultry product" and thus are subject to the terms of the PPIA. *See infra*, 22–23. That conclusion is correct.

The federal definition of "poultry product" is broad. It includes not just "any poultry carcass, or part thereof," but also "any product which is made wholly *or in part* from any poultry carcass *or part thereof*[.]" 21 U.S.C. § 453(f) (emphasis added). Thus, if any part of a food product is made from any part of a poultry carcass, that product is presumptively a "poultry product."

Products are excepted from this broad definition only if they meet two conditions, neither of which applies to UPSIDE's cultivated poultry product. First, the product must "contain poultry ingredients only in a relatively small proportion or historically have not been considered by consumers as products of the poultry food industry[.]" *Id.* Second, such products must also be "exempted by the [United States] Secretary [of Agriculture] . . . under such conditions as the Secretary may prescribe[.]" *Id.* As a result, even products that "contain poultry ingredients only in a relatively small proportion" are still "poultry products" under the PPIA unless they have also been exempted by the U.S. Secretary of Agriculture.

UPSIDE's product easily falls within this broad definition. The cells from which UPSIDE's product is produced were initially extracted from a poultry carcass. Valeti Decl. ¶ 17. UPSIDE made the cultivated cells, which are the main ingredient in its cultivated poultry product, from those initially extracted cells. *See id.* ¶¶ 14, 17. Thus, UPSIDE's product is a "poultry product."

### 2. The PPIA's express preemption provisions preempt even nonconflicting state requirements that differ from or exceed federal requirements.

Because UPSIDE's product is a "poultry product" as defined by federal law, Texas's efforts to regulate that product must comply with the express preemption provisions of the PPIA. Two of those provisions are relevant here.

The first pertains to state efforts to regulate the "premises, facilities and operations of any official establishment" regulated under the PPIA:

> Requirements within the scope of this chapter with respect to premises, facilities and operations of any official establishment which are in addition to, or different than those made under this chapter may not be imposed by any State or Territory or the District of Columbia, except that any such jurisdiction may impose record-keeping and other requirements within the scope of paragraph (b) of section 460 of this title, if consistent therewith, with respect to any such establishment.

21 U.S.C. § 467e.

The second pertains to state efforts to regulate the marking, labeling, packaging, or ingredient requirements for articles prepared in any official establishment regulated under the PPIA:

> Marking, labeling, packaging, or ingredient requirements (or storage or handling requirements found by the Secretary to unduly interfere with the free flow of poultry products in commerce) in addition to, or different than, those made under this chapter may not be imposed by any State or Territory or the District of Columbia with respect to articles prepared at any official establishment in accordance with the requirements under this chapter . . . .

*Id.*

This is not a regime of conflict preemption. By their terms, neither of these express preemption provisions requires that there be a conflict between state and federal law before a state requirement will be held preempted. Instead, as the Supreme Court explained when interpreting a materially identical preemption language from the Federal Meat Inspection Act (FMIA), the language "sweeps widely" to "prevent[] a State from imposing any additional or different—*even if*

*non-conflicting*—requirements that fall within the scope of the [PPIA]." *Nat'l Meat Ass'n v. Harris*, 565 U.S. 452, 459–60 (2012) (emphasis added); *see* 21 U.S.C. § 678. As one federal appellate court summarized it—interpreting the materially identical ingredient preemption provision of the FMIA—"Congress has unmistakably ordained that the Federal Act fixes the sole standards." *Armour & Co v. Ball*, 468 F.2d 76, 84 (6th Cir. 1972) (cleaned up).

Here, although the USDA has not yet enacted separate regulations specific to cultivated poultry products, it has taken the unequivocal position that cultivated meat and poultry products are "subject to the same statutory requirements, regulations, and [USDA Food Safety and Inspection Service (FSIS)] oversight authority as meat and poultry food products derived from slaughter."[3] Under its existing statutory authority, the USDA has promulgated ingredient requirements that govern the use of ingredients in meat and poultry products. These include regulations that specifically govern which ingredients can and cannot be used in the production of conventional and cultivated poultry products.[4] The USDA has also established regulations for the safe production, labeling, and distribution of poultry products, including cultivated chicken products. These include regulations that specifically govern the processing of poultry products at "official establishments" that are subject to a USDA Grant of Inspection.[5] The USDA has stated that its existing

---

[3] *See* U.S. Dep't of Agric., FSIS Directive 7800.1, *FSIS Responsibilities in Establishments Producing Cell-Cultured Meat & Poultry Food Products* (June 21, 2023), https://www.fsis.usda.gov/policy/fsis-directives/7800.1.

[4] *See, e.g.*, U.S. Dep't of Agric., FSIS Directive 7800.1, *FSIS Responsibilities in Establishments Producing Cell-Cultured Meat & Poultry Food Products* (June 21, 2023), https://www.fsis.usda.gov/sites/default/files/media_file/documents/7800.1.pdf; 9 C.F.R. § 424.1 (generally discussing "rules for the use of certain food ingredients"); 9 C.F.R. § 424.21(c) (listing approved ingredients for poultry products).

[5] *See, e.g.*, 9 C.F.R. §§ 381.65 ("Operations and procedures, generally"), 381.145(a)–(b)

inspectional regime for official establishments that produce meat or poultry products is "immediately applicable" to facilities that produce cultivated meat and poultry products.[6]

Texas may not add to these requirements, even if its additions do not conflict with federal requirements. The Sixth Circuit's ruling in *Armour* is instructive. There, a manufacturer of sausage regulated under the FMIA challenged a Michigan law that governed the sale of "meat that has been subjected to a process whereby it has been reduced to minute meat particles." *Armour*, 468 F.2d at 79. That definition encompassed sausage, and Michigan's law prohibited the sale within the state of any sausage that did not meet the state's definition of "grade 1" sausage. *Id.* Many of these standards—such as the requirement that sausages not be made from organ meat— did not directly conflict with federal requirements for the production of sausage; they were simply more stringent than federal requirements. *See id.* at 81–82, 86. But, as the court recognized, Congress's manifest intent was to establish "uniform national standards" for meat products and, as a result, the court held that the ingredients provision of the FMIA preempted Michigan's sales ban. *Id.* at 83–85. Simply put, Michigan's extra restrictions on ingredients were invalid because federal law "fixes the sole standards." *Id.* at 84.

The same principle applies to the "premises, facilities and operations" preemption provision, as the Supreme Court made clear in *National Meat Association*. There, the Supreme Court

---

("examination and other requirements").

[6] U.S. Dep't of Agric., *Human Food Made with Cultured Animal Cells*, https://www.fsis.usda.gov/inspection/compliance-guidance/labeling/labeling-policies/human-food-made-cultured-animal-cells (Aug. 17, 2023); *see also* FSIS Notice 31-23, *Updated Cell-Cultured Meat & Poultry Food Products Sampling Program* (Jun 29, 2023), https://www.fsis.usda.gov/sites/default/files/media_file/documents/31-23.pdf (providing instructions to inspection program personnel on sampling and inspections at facilities that produce cultivated meat and poultry).

held that the FMIA's "premises, facilities and operations" preemption provision "prevents a State from imposing any additional or different—*even if non-conflicting*—requirements that fall within the scope of the [FMIA] and concern an [official establishment's] facilities or operations." *Nat'l Meat Ass'n*, 565 U.S. at 459–60 (emphasis added). The essential question is whether "under federal law a[n] [official establishment] *may* take one course of action in handling a [poultry ingredient]" or whether "under state law the [official establishment] must take another." *Id.* at 460 (emphasis added).[7]

### 3.    SB 261 is expressly preempted under the PPIA.

The reasoning of *National Meat Association* and *Armour* applies with equal force here. It is possible to create poultry products that comply with both the PPIA and SB 261: One must simply ensure that those products do not contain cultivated poultry cells. But just as that reasoning could not save the challenged laws in California or Michigan, it cannot save SB 261.

First, Texas has enacted an "ingredient requirement[]" that is "in addition to, or different than," the federal requirement. 21 U.S.C. § 467e. "Ingredient requirements" refer "to the physical components that comprise a poultry product[.]" *Ass'n des Éleveurs de Canards et d'Oies du Québec v. Becerra*, 870 F.3d 1140, 1147–48 (9th Cir. 2017). Here, the USDA has authorized the use of cultivated cells as ingredients (i.e., "physical components") in poultry products. Indeed, UPSIDE's USDA-FSIS-approved product label describes the product as being made "from chicken

---

[7] That Texas's law takes the form of a sales ban does not affect the preemption analysis. As the Supreme Court explained in *National Meat Ass'n* when analyzing a California sales ban under the identical preemption language of the FMIA, "if the sales ban were to avoid the FMIA's preemption clause, then any State could impose any regulation on [USDA-regulated facilities] just by framing it as a ban on the sale of meat produced in whatever way the State disapproved. That would make a mockery of the FMIA's preemption provision." 565 U.S. at 464.

cells" and states that the product's primary ingredient is "cell-cultivated chicken." ECF 1 at 18. Despite this, Texas forbids UPSIDE from using this same ingredient in its poultry products. *See* Tex. Health & Safety Code § 431.002(5-a) (defining "[c]ell-cultured protein" as "a food product derived from harvesting animal cells and artificially replicating those cells in a growth medium to produce tissue"); *id.* § 433.057(b) ("A person may not offer for sale or sell cell-cultured protein for human consumption."). Thus, SB 261 is expressly preempted under the "ingredients" clause of 21 U.S.C. § 467e.

Second, Texas has imposed "[r]equirements within the scope of [the PPIA] with respect to premises, facilities and operations of any official establishment, which are in addition to, or different than those made under [the PPIA]." 21 U.S.C. § 467e. UPSIDE's production facility is an "official establishment" under the PPIA. *See id.* § 453(p) (defining "official establishment"). The USDA, acting under the authority of the PPIA, has adopted requirements for the premises, facilities, and operations of establishments at which cultivated chicken products are manufactured.[8] Yet Texas has enacted requirements for premises, facilities, and operations that are "different than" the federal requirements. By preventing UPSIDE from manufacturing, distributing, and selling cultivated chicken that is produced in accordance with federal requirements for poultry facilities, Texas "reaches into" UPSIDE's federally regulated facility and "substitutes a new regulatory scheme for the one the FSIS uses." *Nat'l Meat Ass'n*, 565 U.S. at 460, 467. Simply put, under the PPIA, an official establishment is permitted to slaughter a chicken, extract its cells, and cultivate

---

[8] *See, e.g.*, 9 C.F.R. §§ 381.65, .145(a), .145(b); *see also* U.S. Dep't of Agric., *Human Food Made with Cultured Animal Cells*, https://www.fsis.usda.gov/inspection/compliance-guidance/labeling/labeling-policies/human-food-made-cultured-animal-cells (Aug. 17, 2023) (stating that existing USDA premises, facilities, and operations requirements for conventional meat and poultry facilities are "immediately applicable" to facilities that produce cultivated meat or poultry).

those cells for use in human food. Under Texas law, an official establishment may process those cells in any other manner permitted under federal law—and sell the resulting product in Texas—*except* cultivation. Thus, SB 261 imposes "[r]equirements . . . with respect to premises, facilities and operations of [an] official establishment, which are in addition to, or different than those made under [the PPIA]." 21 U.S.C. § 467e.

## II.    The remaining factors favor granting a preliminary injunction.

In addition to having a high likelihood of success on the merits, Wildtype and UPSIDE easily satisfy the remaining elements necessary to secure injunctive relief.

First, Wildtype and UPSIDE will suffer irreparable harm without an injunction. "When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary." *Book People, Inc. v. Wong*, 91 F.4th 318, 340–41 (5th Cir. 2024) (citation omitted). Similarly, where, as here, "a statute is expressly preempted, a finding with regard to likelihood of success fulfills the remaining [preliminary injunction] requirements." *Tex. Midstream Gas Services, LLC v. City of Grand Prairie*, 608 F.3d 200, 206 (5th Cir. 2010).

Besides these general principles, Wildtype and UPSIDE face a variety of concrete economic harms that are also irreparable. Under SB 261, they are prohibited from selling or offering to sell their products in Texas. And although the market for cultivated meat is currently not large, this Circuit has emphasized that "[i]n determining whether costs are irreparable, the key inquiry is not so much the magnitude but the irreparability." *Rest. L. Ctr. v. U.S. Dep't of Lab.*, 66 F.4th 593, 597 (5th Cir. 2023) (cleaned up). "Even purely economic costs may count as irreparable harm where they cannot be recovered in the ordinary course of litigation." *Id.* (cleaned up). Applying this principle, this Circuit has held that economic harm is irreparable when, as here, the

government "enjoy[s] sovereign immunity for any monetary damages." *Wages & White Lion Invs., L.L.C. v. FDA*, 16 F.4th 1130, 1142 (5th Cir. 2021).

Wildtype and UPSIDE also stand to suffer irreparable harm in the form of lost business opportunities, reputational harm, and the lost opportunity to cultivate consumer goodwill. For example, before SB 261 went into effect, Wildtype was selling its cultivated salmon at an Austin sushi restaurant. Kolbeck Decl. ¶¶ 29, 37–39, 45–46. Similarly, before SB 261, UPSIDE had distributed its product during the annual South by Southwest festival and sold it in Travis County. Valeti Decl. ¶¶ 40–41. These were important opportunities to expose Texas consumers to their innovative products. Yet now, not only has Texas portrayed their products as something unwholesome or gross, but Texas has also foreclosed Wildtype and UPSIDE from engaging in the sales that would allow them to show customers that, actually, their products are delicious. This reputational damage and loss of consumer goodwill are precisely the sort of injuries that federal courts across the country—including this Court—have found irreparable in a variety of contexts.[9]

---

[9] *See, e.g.*, *Qin v. P'ships & Unincorporated Ass'ns on Schedule "A*," No. 6:21-CV-1243-ADA, 2022 WL 80274, at *3 (W.D. Tex. Jan. 7, 2022) (holding, in a patent case, that "(1) loss of customers' goodwill and (2) reputational harm" may constitute irreparable harm); *Ferrellgas Partners, L.P. v. Barrow*, 143 F. App'x 180, 190 (11th Cir. 2005) (per curiam) (holding, in a trademark infringement case, that "[g]rounds for irreparable injury include loss of control of reputation, loss of trade, and loss of goodwill"); *United Healthcare Ins. Co. v. AdvancePCS*, 316 F.3d 737, 741 (8th Cir. 2002) (holding, in a deceptive trade practices case, that "[l]oss of intangible assets such as reputation and goodwill can constitute irreparable injury"); *Siembra Finca Carmen, L.L.C. v. Sec'y of Dep't of Agric. of P.R.*, 437 F. Supp. 3d 119, 136–37 (D.P.R. 2020) (holding, in a federal preemption case, that the loss of a "unique business opportunity" due to preempted laws, along with "general harm to . . . goodwill and reputation among . . . existing business partners" is irreparable harm); *Friends of the E. Hampton Airport, Inc. v. Town of E. Hampton*, 152 F. Supp. 3d 90, 106 (S.D.N.Y. 2015) (stating, in a federal preemption case, that "[t]he threat that a business will suffer a significant loss of 'good will'—a matter not easily quantified—is particularly suited to a claim for injunctive relief"), *vacated in part on other grounds*, 841 F.3d 133 (2d Cir. 2016).

Second, the balance of equities and public interest favor granting an injunction. This Circuit has held that these factors "often overlap considerably in suits against public officers." *Healthy Vision Ass'n v. Abbott*, 138 F.4th 385, 408 (5th Cir. 2025) (cleaned up); *see also Ascension Seton v. Nat'l Lab. Rels. Bd.*, 756 F. Supp. 3d 405, 409 (W.D. Tex. 2024) ("Where the government is a defendant, the harm to the opposing party and public interest factors merge.").

Here, there is no harm to the government because it "suffers no injury when a court prevents it from enforcing an unlawful law." *Free Speech Coal., Inc. v. Paxton*, 95 F.4th 263, 287 (5th Cir. 2024), *aff'd*, 606 U.S. 461 (2025). Besides that, an injunction will not require the state to expend any resources or obligate any funds; it will simply restore the status quo as it existed before September 1, 2025, under which cultivated meat products could legally be sold in Texas.

Restoring that status quo would also benefit the public. The public has a strong interest in the free flow of goods in the commercial marketplace. A major reason for adopting the U.S. Constitution was to ensure a national common market—in the words of Alexander Hamilton, "[a] unity of commercial, as well as political, interests." The Federalist No. 11 (Alexander Hamilton), *available at* https://guides.loc.gov/federalist-papers/text-11-20. Indeed, it is no exaggeration to say that *the* driving purpose behind the enactment of the U.S. Constitution was the desire to create a national common market. *See Tenn. Wine & Spirits Retailers Ass'n v. Thomas*, 588 U.S. 504, 515–17 (2019); *NextEra Energy Cap. Holdings, Inc. v. Lake*, 48 F.4th 306, 317–18 (5th Cir. 2022). Simply put, consumers benefit when they are allowed to decide for themselves what goods to buy in the interstate market, and they are harmed when state governments unconstitutionally take that choice away from them.

### III.     This Court should waive the bond requirement of Rule 65(c) of the Federal Rules of Civil Procedure.

Federal Rule of Civil Procedure 65(c) provides: "The court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." But the Fifth Circuit has clarified that "the amount of security required pursuant to Rule 65(c) is a matter for the discretion of the trial court," and has "ruled that the court may elect to require no security at all." *Kaepa, Inc. v. Achilles Corp.*, 76 F.3d 624, 628 (5th Cir. 1996) (cleaned up).

Courts in the Fifth Circuit commonly waive the bond requirement where, as here, "Plaintiffs are engaged in public-interest litigation to protect their constitutional rights." *See, e.g.*, *Gbalazeh v. City of Dallas*, No. 3:18-CV-0076-N, 2019 WL 2616668, at *2 (N.D. Tex. June 25, 2019) (cleaned up). Waiving the bond requirements is also appropriate where, as here, there is "no evidence that Defendants will suffer any financial loss" if this Court issues a preliminary injunction. *Franciscan All., Inc. v. Burwell*, 227 F. Supp. 3d 660, 696 (N.D. Tex. 2016).

### CONCLUSION

For the foregoing reasons, Plaintiffs respectfully ask the Court to enter a preliminary injunction under Federal Rule of Civil Procedure 65 to preserve the status quo until the Court can decide the final merits.

Dated: October 17, 2025

Respectfully submitted,

/s/ Marco Vasquez Jr.
Marco Vasquez Jr. (TX Bar No. 24115892)
Arif Panju (TX Bar No. 24070380)
INSTITUTE FOR JUSTICE
816 Congress Ave., Suite 970
Austin, TX 78701
Telephone: (512) 480-5936
Fax: (512) 480-5937
Email: mvasquez@ij.org
Email: apanju@ij.org

Paul M. Sherman (DC Bar No. 497308)*
INSTITUTE FOR JUSTICE
901 North Glebe Road, Suite 900
Arlington, VA 22203
Telephone: (703) 682-9320
Fax: (703) 682-9321
Email: psherman@ij.org

*Admitted *Pro Hac Vice*

*Attorneys for Plaintiffs Wildtype and UPSIDE*

**CERTIFICATE OF CONFERENCE**

In accordance with Local Rule 7, I certify that Plaintiffs' counsel conferred with opposing

counsel for all Defendants about Plaintiffs' seeking a preliminary injunction, and opposing counsel

indicated that they oppose the relief Plaintiffs request in this motion.

/s/ Marco Vasquez Jr.
Marco Vasquez Jr. (TX Bar No. 24115892)

**CERTIFICATE OF SERVICE**

I certify that on October 17, 2025, I electronically filed the foregoing document with the

Clerk of Court using the CM/ECF system, which will provide electronic service upon all attorneys

of record.

/s/ Marco Vasquez Jr.
Marco Vasquez Jr. (TX Bar No. 24115892)

# Exhibit 1

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

**WILD TYPE, INC. D/B/A WILDTYPE**
AND
**UPSIDE FOODS, INC.,**

    *Plaintiffs,*

v.

**JENNIFER A. SHUFORD**, IN HER
OFFICIAL CAPACITY AS THE COMMISSIONER OF
THE TEXAS DEPARTMENT OF STATE HEALTH
SERVICES; **CECILE ERWIN YOUNG**, IN
HER OFFICIAL CAPACITY AS THE EXECUTIVE
COMMISSIONER OF THE TEXAS HEALTH AND
HUMAN SERVICES COMMISSION; **KEN
PAXTON**, IN HIS OFFICIAL CAPACITY AS THE
ATTORNEY GENERAL OF TEXAS; AND **DELIA
GARZA**, IN HER OFFICIAL CAPACITY AS THE
COUNTY ATTORNEY OF TRAVIS COUNTY,

    *Defendants.*

Civil Action No.
<u>1:25-cv-1408-ADA-ML</u>

---

### DECLARATION OF JUSTIN KOLBECK IN SUPPORT OF
### PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

---

I, Justin Kolbeck, do affirm and state as follows:

1.    I am over the age of 18 and competent to testify on the matters contained

in this declaration.

2.    I am an American citizen and resident of the State of Washington.

3.    I am the founder and chief executive officer at Wild Type, Inc. d/b/a

Wildtype (Wildtype), a start-up company with its principal place of business in

1

San Francisco, California, that specializes in the development and production of cultivated salmon—a type of cultivated meat.

4.      I graduated from the University of California, Berkeley, with a B.A. in Political Science and the Yale School of Management with an MBA.

5.      For over six years, I served as a Foreign Service Officer with the U.S. Department of State.

6.      In 2016, I co-founded Wildtype with Aryé Elfenbein, a cardiologist with a background in stem cell biology who graduated from the Geisel School of Medicine at Dartmouth and was a fellow in cardiovascular medicine at the Yale University School of Medicine.

7.      Wildtype is dedicated to developing and producing cultivated salmon—that is, with real animal cells—in a clean and controlled environment, reducing harm to salmon, as well as environmental costs associated with conventional fishing.  Wildtype's mission is to defend Earth's wild places by inspiring a transition to clean and accessible seafood.

8.      To this day, my goal is to provide alternative sources to produce meat.

9.      To that end, Wildtype creates and sells cultivated salmon—a type of cultivated meat.

10.     Cultivated meat (also known as cultured meat) consists of animal cells, tissues produced from such cells, or food produced using such cells as an ingredient. As used in this declaration and accompanying motion for

preliminary injunction, "cultivated meat" includes cultivated poultry or seafood as well as beef, pork, etc.

11.    Wildtype's cultivated salmon product looks, smells, and tastes like conventional salmon.

12.    Wildtype's cultivated salmon product is derived from harvested salmon cells and propagates those cells in a growth medium.

13.    Wildtype's production facility, which began operations in 2023, is in San Francisco, California.

14.    Wildtype does not produce any products in Texas.

15.    To produce cultivated salmon, Wildtype acquires cells from salmon and stores them in clean and controlled facilities. These cells are later placed inside a cultivator, where they are supplied with oxygen and nutrients that allow the cells to multiply. These cells are also later harvested, prepared, and packaged into a food product that has a similar taste, texture, and appearance as conventional salmon. Wildtype's process includes using a plant-derived scaffold that recreates the texture and structure of conventional salmon.

16.    I regularly speak with people who are interested in trying cultivated meat and have tried cultivated meat, including Wildtype's cultivated salmon product.

17.    For consumers with ethical, environmental, or health concerns regarding conventional meat, Wildtype's cultivated salmon product offers a number of benefits and an alternative food source.

3

18. Wildtype's cultivated salmon product does not require the large-scale slaughter of animals that is necessary for the production of conventional meat.

19. Because Wildtype's cultivated salmon product can be produced without the need to handle salmon at large scale, it reduces the environmental costs associated with producing and transporting salmon, the costs associated with raising, transporting, and slaughtering salmon, and the biodiversity costs of commercial overfishing that can threaten wildlife populations—especially if states allow the cultivated meat industry to develop and scale.

20. Wildtype's cultivated salmon product can increase the United States' food security by supplementing and diversifying food production.

21. Wildtype's cultivated salmon product also offers a variety of potential health benefits over conventional salmon.

22. Wildtype's cultivated salmon product reduces the risk of environmental contamination, as the cultivated salmon product grows under aseptic conditions in clean and controlled environments (unlike conventional salmon, which is either grown in concentrated farming operations or fished from the wild). Wildtype's cultivated salmon product can also be safer than conventional salmon because there are fewer contaminants, such as heavy metals, parasites, or other pathogens in Wildtype's cultivated salmon products. In these ways, Wildtype's cultivated salmon product can mitigate the risks of diseases and infections.

4

23.    Wildtype's cultivated salmon product is just as safe for human consumption as conventional salmon.

24.    Wildtype's cultivated salmon product appeals to those who enjoy trying new food products produced with innovative technology.

25.    Wildtype seeks to appeal to consumers who have ethical concerns around eating seafood—yet still want to enjoy consuming seafood.

26.    Wildtype seeks to appeal to consumers who have no particular concerns with eating seafood, but who find the concept of an innovative product interesting.

27.    I have encountered many consumers who are excited about the prospect of salmon that avoids the ethical and practical downsides of conventional salmon.

28.    Based on these ethical, environmental, and health-related reasons, Wildtype's cultivated salmon product serves as a substitute for, and competes with, conventional meat.

29.    For example, a person who visits a sushi restaurant once a month and normally purchases five rolls of sushi with conventional salmon may purchase less sushi with conventional salmon by purchasing some rolls of sushi with cultivated salmon. That is the case with OTOKO, a sushi restaurant in Austin, Texas, that served Wildtype's cultivated salmon product as part of a multi-course omakase experience before Texas SB 261 went into effect.

30.   Still, cultivated meat is a nascent industry, so regulatory hurdles and sales bans threaten the ability of Wildtype (and the broader industry) to scale and survive. For example, a sales ban decreases Wildtype's revenue, eliminates the ability for consumers to purchase cultivated meat and share their experiences, and threatens continued investments. For another, regulatory hurdles require Wildtype to spend considerable resources to bring its cultivated salmon product to market and maintain legal compliance. These outcomes, in turn, place Wildtype at a competitive disadvantage to conventional meat producers, including seafood producers, as the cost to produce cultivated meat is high and will be difficult to lower without scaling manufacturing.

31.   That being said, Wildtype does not wish to trick anyone into eating its cultivated salmon product; instead, Wildtype wishes only to be allowed to distribute and sell its cultivated salmon product to willing and informed consumers, who should be able to try it for themselves if they wish.

32.   On May 28, 2025, Wildtype completed a pre-market consultation process with the U.S. Food and Drug Administration (FDA). As part of the consultation process, Wildtype submitted its safety assessment for its cultivated salmon and production process, as well as supporting information, to the FDA.

33.   On May 28, 2025, at the end of the pre-market consultation process and the FDA's review, Wildtype received a "no questions" letter from Mark A.

6

Hartman, Director of the FDA's Office of Food Chemical Safety, Dietary Supplements, and Innovation Human Foods Program. A true and correct copy of that "no questions" letter is attached to this Declaration as **Exhibit 1-A**. That "no questions" letter stated that the FDA had "no questions at this time regarding Wildtype's conclusion that foods comprised of or containing cultured salmon cell material resulting from the production process defined in CCC 000005 are as safe as comparable foods produced by other methods."

34.     Along with its "no questions" letter, the FDA also issued a scientific memorandum regarding the safety of Wildtype's cultivated salmon. A true and correct copy of that scientific memorandum is attached to this Declaration as **Exhibit 1-B**.

35.     Since the FDA's greenlight, Wildtype has been subject to routine FDA inspections.

36.     In May 2025, Wildtype began selling its cultivated salmon product in the United States.

37.     In July 2025, Wildtype began selling its cultivated salmon product through OTOKO, a sushi restaurant in Austin, Texas.

38.     OTOKO sold Wildtype's cultivated salmon product as part of OTOKO's multi-course omakase experience up until Texas SB 261 went into effect.

39.     Wildtype received revenue from the sale of its cultivated salmon product to OTOKO.

40.   To date, Wildtype has sold or distributed its cultivated salmon product in states including Oregon, Washington, and California.

41.   Before Texas SB 261 went into effect, Wildtype took six sales trips to Austin, Texas (spanning August 2022 to July 2025) in connection with potential partnerships to sell Wildtype's cultivated salmon product in Texas.

42.   Before Texas SB 261 went into effect, Wildtype spoke with a number of potential customers in Texas that expressed interest in purchasing Wildtype's cultivated salmon product.

43.   Wildtype wants to continue selling and offering to sell its cultivated salmon product in Travis County, Texas, including in Austin, Texas.

44.   As a result of SB 261, Wildtype is suffering ongoing irreparable harm and will continue to suffer irreparable harm until this Court intervenes.

45.   Wildtype can no longer sell or offer to sell its cultivated salmon product in Texas without exposing itself to civil and criminal penalties under Texas SB 261.

46.   Wildtype has stopped selling and offering to sell its cultivated salmon product in Texas because of Texas SB 261.

47.   Wildtype is constrained by Texas SB 261 and fears imminent enforcement of Texas SB 261 based on its past sales of cultivated meat in Texas, its desire to resume those sales in Texas, the statements of Texas legislators and officials regarding Texas SB 261 and its related bill, and the duties and penalties imposed under Texas SB 261.

48.    As a result of Texas SB 261, Wildtype has lost access to a source of revenue that it previously had access to before Texas SB 261 went it effect.

49.    As a result of Texas SB 261, Wildtype has ended its talks with chefs and restaurants in Austin, Texas, who had either previously partnered with Wildtype (like OTOKO) or who were previously interested in a partnership with Wildtype.

50.    Texas SB 261 prevents Wildtype from doing business with, or offering to do business with, chefs, restaurants, and distributors in Texas.

51.    As a result of Texas SB 261, Wildtype is suffering ongoing reputational harm and the loss of consumer goodwill, as statements by Texas legislators and officials before and after the passage of Texas SB 261 falsely imply that there is something wrong with cultivated meat.

52.    As a result of Texas SB 261, Wildtype cannot demonstrate to willing Texas consumers that they have nothing to fear from Wildtype's innovative cultivated salmon product by making that product available for consumers to try and decide for themselves.

53.    As a result of Texas SB 261, Wildtype is having a harder time partnering with potential purchasers (like chefs or restaurants) because the states with bans (like Texas) have closed their borders to the cultivated meat industry, thereby eliminating Wildtype's ability to sell or offer to sell to potential customers in those states.

54. By losing access to business in Texas, Texas SB 261 is making it more difficult for Wildtype to achieve economies of scale that are essential to lowering production costs and making cultivated meat competitive in price to conventional meat. That is because a sales ban decreases Wildtype's revenue, eliminates the ability for consumers to purchase cultivated meat and share their experiences, and threatens continued investments. These outcomes, in turn, place Wildtype at a competitive disadvantage to conventional meat producers, as the cost to produce cultivated meat is high and will be difficult to lower without scaling manufacturing.

55. Wildtype wishes to continue selling and offering to sell cultivated meat in Texas.

56. Wildtype wishes to continue developing business relations with chefs and restaurants located within Texas.

57. Texas SB 261 is contributing to the fragmentation of the interstate market in meat. States like Alabama and Florida have passed similar restrictions targeting the cultivated meat industry.

58. If the Court enjoins Texas SB 261, Wildtype will immediately resume reaching out to chefs and restaurants within Travis County, Texas, including OTOKO, with the goal of selling its cultivated salmon product in the short and longer term. That, in turn, will allow Wildtype to obtain business partnerships in Texas and beyond.

59. To date, Wildtype has not had a single recall of its cultivated salmon product.

60. To date, Wildtype has not received a single health-related complaint from those who have tried Wildtype's cultivated salmon product.

61. Texas has a robust conventional meat industry, which includes seafood like salmon. For example, Texas is one of the nation's largest meat markets.

62. There were no Texas companies that sold cultivated meat within Texas before the enactment of Texas SB 261.

63. I am very familiar with the market for cultivated meat and the companies innovating in this space. To my knowledge, all companies in the United States that are approved to sell cultivated meat products are based outside of Texas.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: ___October 16, 2025_____.


_____
Justin Kolbeck

# Exhibit 1-A



Human Foods Program

Justin L. Kolbeck
Co-Founder & CEO
Wildtype, Inc.
953 Indiana Street
San Francisco, CA 94107

Re: Cell Culture Consultation CCC 000005

Dear Mr. Kolbeck:

This letter concludes Wildtype Inc.'s (Wildtype) consultation with the Food and Drug Administration (FDA, we) regarding a cultured animal cell food product and associated production process, designated as CCC 000005. The subject of CCC 000005 is cultured salmon (*Oncorhynchus kisutch*) cells of the mesenchymal lineage produced by the method described in CCC 000005, and harvested as a cell mass or paste. We will maintain the administrative record associated with CCC 000005 in the Innovative Foods Staff (IFS) in the Office of Food Chemical Safety, Dietary Supplements, and Innovation (OFCSDI) within FDA's Human Foods Program (HFP).

The use of the term "cultured salmon cell material" in this letter is not our recommendation of that term as an appropriate common or usual name for declaring the substance in accordance with FDA's labeling requirements. We note that 21 CFR 102.5(a) outlines general principles that FDA considers when establishing a common or usual name for nonstandardized foods which Wildtype may want to consider. Issues associated with labeling and the common or usual name of a food are under the authority of the Office of Nutrition and Food Labeling (ONFL) in the Nutrition Center of Excellence. IFS did not consult with ONFL regarding the appropriate common or usual name for "cultured salmon cell material."

As part of bringing this consultation to closure, Wildtype submitted to FDA a summary of its safety assessment for the cultured salmon cell material, dated June 27, 2022, as well as supporting, corroborative information in a supplemental, confidential appendix, dated June 3, 2022. FDA accepted this final submission on June 27, 2022. Wildtype provided amendments on January 17, 2023, May 3, 2023, July 28, 2023, January 24, 2024, August 30, 2024, December 11, 2024, April 2, 2025, and April 11, 2025. These communications informed FDA of the steps taken by Wildtype to ensure that this food complies with the legal and regulatory requirements that fall within FDA's jurisdiction. Based on the safety assessment Wildtype has conducted, it is our understanding that Wildtype has concluded that foods comprised of or containing the cultured cellular material resulting from the production process defined in CCC 000005 are as safe as comparable foods produced by other methods and would not contain substances that adulterate the food.

Based on the information Wildtype has presented to FDA, as well as other information available to the agency, we did not identify a basis for concluding that the production process as described in CCC 000005 would be expected to result in food that bears or contains any substance or microorganism that would adulterate the food. We have no questions at this time regarding Wildtype's conclusion that foods comprised of or containing cultured salmon cell material

**U.S. Food and Drug Administration**
**Human Foods Program**
**5001 Campus Drive**
**College Park, MD 20740**
**www.fda.gov**

Page 2 – Mr. Kolbeck

resulting from the production process defined in CCC 000005 are as safe as comparable foods produced by other methods. However, as you are aware, it is Wildtype's continuing responsibility to ensure that foods it markets are safe, wholesome, and in compliance with all applicable legal and regulatory requirements. Should new production procedures, cell lines, or substances employed during production be used that could be relevant to the safety of the food, we strongly recommend that Wildtype contact FDA.

Our evaluation of the nutrients used in the production of the cultured cellular material produced by the method described in CCC 000005 considered only whether the levels of nutrients in the harvested cellular material are safe and not their impact on nutritional quality of the food supply. Companies marketing food products containing cultured salmon cell material are strongly advised to consult with ONFL in the Nutrition Center of Excellence within FDA's HFP to discuss any required or voluntary labeling.

A copy of this letter responding to CCC 000005 and of FDA's scientific memorandum summarizing the information in CCC 000005, as well as the safety narrative submitted by Wildtype, are available to the public at Human Food Made with Cultured Animal Cells Inventory.

Sincerely,

MARK A.
HARTMAN -S

Digitally signed by MARK
A. HARTMAN -S
Date: 2025.05.28 15:03:36
-04'00'

Mark Hartman
Director
Office of Food Chemical Safety, Dietary
Supplements, and Innovation
Human Foods Program

# Exhibit 1-B



**U.S. FOOD & DRUG**
ADMINISTRATION

Human Foods Program

# Memorandum

| | |
|---|---|
| **Date** | May 28, 2025 |
| **From** | Ashley Nazario Toole (Innovative Foods Staff (IFS)) |

Through

| | | |
|---|---|---|
| Daniel Folmer (Division of Additives and Ingredients) | Daniel E. Folmer -S | Digitally signed by Daniel E. Folmer -S Date: 2025.05.28 14:27:16 -04'00' |
| Carolyn Simmons (IFS) | CAROLYN SIMMONS -S (Affiliate) | Digitally signed by CAROLYN SIMMONS -S (Affiliate) Date: 2025.05.29 08:26:10 -05'00' |
| Jianrong (Janet) Zhang (IFS) | Andrew J. Zajac -S | Digitally signed by Andrew J. Zajac -S Date: 2025.05.28 14:38:02 -04'00' |
| Szabina Stice (IFS) | Szabina A. Stice -S | Digitally signed by Szabina A. Stice -S Date: 2025.05.28 14:42:41 -04'00' |
| Katie Overbey (Division of Food Ingredients) | Katie N. Overbey -S | Digitally signed by Katie N. Overbey -S Date: 2025.05.28 14:52:05 -04'00' |
| Stephanie Hice (IFS) | STEPHANIE A. HICE -S | Digitally signed by STEPHANIE A. HICE -S Date: 2025.05.28 14:53:41 -04'00' |

| | |
|---|---|
| **Subject** | Cell Culture Consultation (CCC) 000005, Cultured *Oncorhynchus kisutch* cell material |
| **To** | Administrative File, CCC 000005 |

**Submission Received Date:** June 27, 2022, Disclosable Safety Narrative; June 3, 2022, Supplemental, Confidential Material

**Amendments Received Date:** January 17, 2023; May 3, 2023; July 28, 2023; January 24, 2024; August 30, 2024; December 11, 2024; April 2, 2025; April 11, 2025

**Sponsor:** Wildtype (Wildtype, the firm)

## Summary

- The Food and Drug Administration (FDA, we) evaluated the food that is the subject of CCC 000005 submitted by Wildtype.
- This food is defined as the cell material at harvest, comprised of cultured coho salmon (*Oncorhynchus kisutch*) cells of the mesenchymal lineage, as produced by the method of manufacture described in CCC 000005.

**U.S. Food and Drug Administration**
**Human Foods Program**
**5001 Campus Drive**
**College Park, MD 20740**
**www.fda.gov**

Page 2 - Administrative File, CCC 000005

- The cells used to establish the cell lines are originally isolated from muscle and connective tissue of salmon at the fry stage of development. The isolated cell lines are determined to be of mesenchymal lineage through standard methods validated for their intended purpose, including microscopy and RNA-sequencing. Species identity of master cell banks was verified by *cytochrome c oxidase subunit I* (*COI*) mitochondrial gene sequencing (DNA barcoding).
- The cell lines are established by the selection of mesenchymal progenitors with demonstrated proliferative and differentiation capacity that are then adapted to suspension culture. Cells are proliferated through a seed train to successively increase the volume of the suspension culture.[1]
- The cells are harvested using bowl centrifugation, washed three times with a water and sugar solution, rapidly cooled using blast chillers, and stored frozen with continuous temperature monitoring.
- The harvested cell material, following washing, is described as mesenchymal tissue of coho salmon (*Oncorhynchus kisutch*).[2] Microbial and toxic heavy metal specifications for the harvested cell material are provided.
- We evaluated information about the cell lines, the production process (including cell bank establishment), substances used in the production process, and properties of the harvested cell material, including information available in both the disclosable safety narrative as well as supporting, corroborative information in the supplemental, confidential material.
- Based on the data and information presented in CCC 000005, we have no questions at this time about Wildtype's conclusion that foods comprising or containing cultured coho salmon cell material resulting from the production process defined in CCC 000005 are as safe as comparable foods[3] produced by other methods. Furthermore, at this time we have not identified any information indicating that the production process as described in CCC 000005 would be expected to result in food that bears or contains any substance or microorganism that would adulterate the food.[4]

---

[1] During the cell line establishment process, Wildtype selects for pluripotent cells of the mesenchymal lineage. The firm characterizes the capacity of the primary isolated cells to differentiate into various cell types, including muscle (myocytes), fat (adipocytes), and connective tissue cells (fibroblasts). The firm creates cell banks using undifferentiated cells that exhibit differentiation potential. The banked, undifferentiated cells are used as inputs into the production process. Wildtype does not induce differentiation (i.e., introduce media components to stimulate changes in gene expression profiles, leading to the development of distinct cell types) prior to cell harvest.

[2] Wildtype reports analytical data on the composition of the harvested cell material from several production runs as one element in characterizing the identity of its product to demonstrate the capability to meet or exceed specifications for food contaminants, and to demonstrate the consistency of its production process. Some variations in fatty acids, amino acids, and minerals were observed in the data from these batch analyses of the harvested cell material, relative to a conventional salmon product. In all cases levels were consistent with those found in commonly consumed foods. Wildtype's conclusions regarding the safety of its product are not based on the establishment of exact equivalence of all nutrients.

[3] Wildtype identifies "conventional salmon" as a comparator. In the firm's submission, wild coho salmon (*Oncorhynchus kisutch*) is utilized as a conventional comparator.

[4] Our review did not address other provisions of the Federal Food, Drug and Cosmetic Act.

Page 3 - Administrative File, CCC 000005

## Production Method

Wildtype describes an overall production process involving the establishment of a cell bank that provides a standardized source of cells for food production, and a production process including proliferation of the cells in a seed train followed by harvest of the cell material for subsequent conventional food processing.[5]

Wildtype states that a food safety and quality system is in use during production, and provides information about the following programs and measures that will be used in its production facilities, including:

- A Hazard Analysis and Critical Control Point (HACCP) plan, developed in accordance with 21 CFR 123.6, which addresses hazards specific to seafood products and applicable to Wildtype's production process;
- A current good manufacturing practice (cGMP) program that includes all the items enumerated in 21 CFR 117 subpart B;
- Validated sanitation processes, an environmental monitoring program, and hygienic zoning;
- A supplier approval program;
- An allergen control program;
- Controls for prevention of biological, chemical, and physical hazards;
- Document and records control including material and product specifications;
- A product release system involving quality assurance review for incoming raw materials, intermediate products, and finished food products;
- Batch record review; and
- Traceability of raw materials and finished food products.

Wildtype also notes the use of internal quality assurance and auditing programs, as well as annual cell culture and sanitation employee re-training programs.

An overview of the production process, potential hazards or quality issues at each process step, and management strategy is provided in Table 1 based on the information provided by Wildtype. A more detailed version of this table is provided in the Appendix of this memorandum.

---

[5] Wildtype's June 27, 2022, disclosable safety narrative described a maturation step occurring on a plant-based scaffold made of materials commonly used in food production. In the amendment dated July 28, 2023, the firm subsequently changed its process to remove this maturation step. In the firm's current production process, cells are combined with food ingredients post-harvest, when they are no longer viable. We consider the post-harvest steps of the production process to be outside the scope of the CCC evaluation, which, per the March 2019 Formal Agreement considers cell isolation through the time of harvest. However, we note that Wildtype performs a post-harvest thermal processing step of the finished food product consisting of the harvested cell material and food ingredients, which is identified as a mitigation and control strategy for some adventitious agents identified by the firm as potential hazards during the production process prior to harvest.

Page 4 - Administrative File, CCC 000005

*Table 1: Overview of potential identity, quality, and safety issues*

| Process Step | Potential Issues | Management Strategy |
|---|---|---|
| Cell Isolation | Cell identity; contaminants from source, reagents, or environment | Antibiotics and antifungal application, aseptic procedures, cGMP, hygienic condition, supplier documentation, sterile filtration, sterile rinsing, testing, thermal step, visual observation |
| Establishment of Cell Lines | Cell identity; contaminants from materials or environment; appropriate adaptation to culture | Allergen controls, aseptic procedures, documentation, environmental monitoring, hygienic condition, supply-chain controls, sterile filtration, sterilization, testing, thermal step, visual observation |
| Establishment of Master Cell Bank and Working Cell Bank | Cell identity; contaminants from materials, equipment, or environment; media components | Allergen controls, aseptic procedures, cGMP, documentation, hygienic condition, environmental monitoring, food safety assessment[6], sterilization, supply-chain controls, testing program, thermal step, visual observation |
| Proliferation Phase | Contaminants from materials, equipment, or environment; media components | Allergen controls, aseptic procedures, cGMP, documentation, environmental monitoring, food safety assessment, sterilization, sanitation controls, supply-chain controls, testing program, thermal step, visual observation, X-ray |
| Harvest of Cell Material | Contaminants from materials, equipment, or environment; media components | Allergen controls, aseptic procedures, cGMP, compositional analysis, environmental monitoring, food safety assessment, specifications, sterilization, supply-chain controls, testing program, thermal step, visual observation, washing step, X-ray |

---

[6] "Food safety assessment" indicates evaluation of the use of substances or materials based on commonly established paradigms for evaluating chemical, biochemical, and toxicological data in conjunction with estimates of exposure for their intended use to assess whether such use is consistent with applicable safety standards.

Page 5 - Administrative File, CCC 000005

<u>Cell Banking</u>

Wildtype provides information about the establishment of cell banks used in the subsequent production process. The firm describes cell banking as a three-step, non-recurrent research and development process that occurs upstream of the production process. The cell banks described in the firm's manufacturing process are a collection of cryopreserved cells derived from a single tissue source from a single animal. Wildtype uses a two-tiered strategy in which there is both a primary cell bank (the master cell bank; MCB) and secondary cell banks (the working cell bank; WCB) all derived from a single cell line expansion. The steps involved include:

- Cell isolation
- Establishment of cell lines
- Establishment of MCBs
- Establishment of WCBs

*Cell Isolation*

The cells used to establish the cell banks are mesenchymal cells isolated from skeletal muscle and connective tissue of fry stage coho salmon acquired from a Washington state hatchery.[7] Hereafter, the source is referred to as the "source animal" or "animal source." Reagents used at this stage may include cell culture media, media components, and antibiotics and antifungals.

Potential hazards and quality issues identified by Wildtype at this stage include:

- Source animal health prior to tissue procurement resulting in cells contaminated by adventitious agents such as aquatic microflora[8], pathogenic bacteria[9], viruses[10],

---

[7] Wildtype's June 27, 2022, disclosable safety narrative also described use of a cell line originating from a Canadian institute. In the amendment dated January 17, 2023, the firm noted that its current production process only uses a cell line isolated from the fry stage of development, originating from a Washington state hatchery.

[8] Microorganisms identified by Wildtype as microflora associated with living fish include *Psychrobacter* spp.*, Moraxella* spp.*, Pseudomonas* spp.*, Acinetobacter* spp.*, Shewanella* spp.*, Flavobacterium* spp.*, Cytophaga* spp.*, Aeromonas* spp.*, Corynebacterium* spp., and *Micrococcus* spp. In the June 27, 2022, disclosable safety narrative, Wildtype states that these potential hazards are mitigated in the firm's production process by isolating source cells under sterile conditions and monitoring cell cultures for microbial contamination.

[9] Potential bacteria identified by Wildtype as being associated with fish include *Clostridium botulinum*, *C. perfringens*, various *Vibrio* species, *Plesiomonas shigelloides, Aeromonas hydrophila*, *Listeria monocytogenes*, *Campylobacter jejuni*, *Yersinia enterocolitica*, *Escherichia coli*, *Shigella* spp., and *Salmonella* serovars. In the June 27, 2022, disclosable safety narrative, Wildtype describes its mitigation and control strategies, including performing cell isolation and cell line establishment under aseptic conditions and use of a thermal processing step following harvest.

[10] Potential viruses of concern identified by Wildtype include norovirus and hepatitis A. The firm states that these viruses are predominantly found in shellfish and arise from contaminated water or human handling. In the June 27, 2022, disclosable safety narrative, Wildtype describes its mitigation and control strategies, including performing cell isolation and cell line establishment under aseptic conditions, establishment of employee hygiene practices throughout production, and the use of a thermal processing step following harvest. In the amendment

Page 6 - Administrative File, CCC 000005

parasites[11], prions, or toxic heavy metals (such as arsenic, mercury, cadmium, or lead); and

- Introduction of adventitious agents from human handling or the local environment, including viruses (norovirus, hepatitis A) and bacteria such as *Escherichia coli,* fecal coliforms, *Listeria monocytogenes*, *Salmonella* serovars*, and *Staphylococcus aureus*.

Wildtype provides health documentation from the State of Washington Department of Fish and Wildlife for the animal source. Donor animal health is assessed prior to cell isolation from skeletal muscle and connective tissue, which is performed under aseptic conditions to mitigate microbial, viral, and parasitic contamination. Additionally, the firm states that tissue (i.e., muscle biopsy) specimens are treated with hydrogen peroxide and ethanol prior to cell isolation to control for bacterial contaminants.

Wildtype states that potential adventitious agents (e.g., norovirus, hepatitis A) can enter the production process via contaminated water and human handling. However, the risks associated with these pathogens are mitigated by using EPA-regulated municipal water filtered through 0.2 µm filters, as well as the use of aseptic and cGMP techniques, including the use of laminar flow hoods, gloves, and gowning. The risk of prion transmission is mitigated by isolating cells from skeletal muscle tissue, where prions are not commonly found.

Wildtype screens the isolated cells to select for cells that have desired characteristics, including attachment affinity for uncoated cell culture vessel surfaces and the ability to thrive in various nutrient formulations. Selected cells are characterized with respect to general shape (cellular morphology), proliferative capacity, genetic stability using exome sequencing (i.e., DNA sequencing focusing on the protein-coding regions of the genome) and RNA sequencing over the course of multiple generations, and gene expression patterns. RNA sequencing and reverse transcriptase quantitative polymerase chain reaction (RT-qPCR) to evaluate gene expression patterns of target genes [12] is used to confirm cells are of mesenchymal lineage, which can

---

dated January 17, 2023, Wildtype performed one-time testing on representative batches of harvested cell material and confirmed norovirus and hepatitis A were not detected.

[11] Potential parasites identified by Wildtype as being associated with a variety of marine fish, including salmon, include tapeworms (*Diphyllobothrium* spp.), roundworms (*Anisakis* spp. and *Pseudoterranova* spp.), liver flukes (*Opisthorchis* spp. and *Clonorchis* spp.), lung flukes (*Paragonimus* spp.), intestinal flukes (*Heterophyidae* and *Echinostomatidae*), and protozoa (*Cryptosporidium parvum*, *Cyclospora* spp., and *Giardia* spp.). In the June 27, 2022, disclosable safety narrative, Wildtype describes its mitigation and control strategies, including performing cell isolation and cell line establishment under aseptic conditions, and use of a thermal processing step following harvest.

[12] In the amendment dated April 2, 2025, Wildtype provides details regarding the genetic stability and gene expression profile of its production cell line. The firm performed baseline exome sequencing and gene expression analyses on the production cell line in 2020, which serves as the control for re-sequencing and gene expression analyses performed over multiple passages of cells collected over the course of four years. The firm reports that exome sequencing results over the course of multiple passages revealed no changes in the DNA sequence of the protein-coding region of the genome. FDA notes that exome sequencing does not fully explore the non-coding regions of the genome and may not detect larger structural variations (e.g., deletions, duplications, inversions) that can impact genetic stability. To further assess genetic stability, the firm monitors the phenotypic stability of the cultured cells (i.e., cell growth, viability, metabolism (e.g., cell culture pH)), as well as gene expression levels of the cultured cells to detect statistically significant changes in gene expression levels which may indicate a loss of

Page 7 - Administrative File, CCC 000005

acquire characteristics of muscle (myocytes), fat (adipocytes), and connective tissue cells (fibroblasts) through differentiation. Reagents used at this stage may be cell culture media, media components, and antibiotics and antifungals.

Wildtype describes methods used for originating tissue isolation, including the cell culture media. Cell culture media inputs used during the cell banking and production stages are sourced from suppliers with tightly controlled quality standards. Antibiotics and antifungals are used to support establishment of sterile culture conditions during the development of the cell bank.

*Establishment of Cell Lines*

Wildtype propagates and screens the isolated cells to assess proliferation rate, cell viability, differentiation potential, and the ability to grow in suspension within the cell culture media without the need for attachment to surfaces.

Potential hazards and quality issues identified by Wildtype at this stage include:

- Incorrect source-animal identity resulting in isolated cells of incorrect origin;
- Introduction of adventitious agents from human handling or the local environment, including bacterial (*Mycoplasma* spp., *L. monocytogenes*, *Salmonella* serovars*, S. aureus,* and *Fusobacterium* spp.) and fungal contamination (such as *Aspergillus* spp.); and
- Carry-over of heavy metal contaminants from isolated cells.

Wildtype confirms the species identity of cell lines using DNA barcoding of the *COI* mitochondrial gene, specifically, where *COI* PCR products are Sanger sequenced and aligned to the Barcode of Life database to confirm the cell line species identity as coho salmon (*Oncorhynchus kisutch*).

Wildtype screens for the presence of *Mycoplasma* spp. during cell line establishment using in-house tests, including fluorescent staining, microscopy, and PCR. The firm also screens for additional adventitious agents and for sterility for purposes of quality and safety. The firm discusses details of testing, which is conducted using validated methods by a third-party laboratory using either observation of potential microbial growth under permissive conditions (for aerobic plate count (*S. aureus*), anaerobic plate count (*Fusobacterium* spp.), and fungal growth (*Aspergillus* spp.)) or real-time PCR analysis (for *L. monocytogenes* and *Salmonella* serovars). Third-party toxicological testing using validated methods is conducted to measure the levels of toxic heavy metals, including arsenic, mercury, cadmium, and lead in the harvested cell material at the end of the proliferation stage. Wildtype compares the results of

---

genetic stability. Wildtype's gene expression analyses of the production cell line (*via* RNA sequencing and RT-qPCR over multiple passages) revealed no changes in gene expression levels, providing additional support for the firm's conclusion that the production cell line is genetically stable. The gene expression analyses also support Wildtype's conclusions regarding the cell type identity of its production cell line. Specifically, the firm notes that the expression of myogenic (e.g., *MyoD, Myf5, MyoG, Pax7*) and adipogenic (e.g., *C/EBPβ*) genes in its production cell line is consistent with cells of mesenchymal lineage.

Page 8 - Administrative File, CCC 000005

the third-party microbiological and toxicological tests to the analytical testing results for wild coho salmon (*Oncorhynchus kisutch*).

*Establishment of MCB and WCB*

Wildtype describes its MCB and WCB as a collection of cryopreserved cells derived from muscle and connective tissue sourced from a single salmon at the fry stage of development. Cell lines from a single source are seeded, expanded, washed, and centrifuged to remove residual media. The cell pellet is resuspended in media containing a cryoprotectant and aliquoted to create three lots designated as MCB and two lots designated as WCB.

Potential hazards and quality issues identified by Wildtype at this stage include:

- Use of an unintended cell line due to documentation or handling errors;
- Presence of residual reagents (i.e., cryoprotectants) used during cell line establishment in the harvested cell material;
- Introduction of adventitious agents from the local environment or from animal-derived reagents (e.g., porcine trypsin, fetal bovine serum (FBS), bovine serum albumin (BSA)) used in the establishment of the MCB and WCB.

As described above in the "Establishment of Cell Lines" section, Wildtype verifies the genetic identity of cell lines as coho salmon (*Oncorhynchus kisutch*) using *COI* barcoding prior to cell banking. Records for each cell line are securely maintained and include the cell line name, operator name, and date. Vials of MCBs and WCBs are clearly labeled and color coded and a separate liquid nitrogen storage tank is maintained for each seafood species under development at Wildtype.

Wildtype states that it periodically tests for the presence of the cryoprotectant, dimethyl sulfoxide (DMSO), in the harvested cell material. The firm provides analytical results for a single batch of the harvested cell material, demonstrating that DMSO was below the limit of detection (LOD) of <50 ppm.

Food safety and quality management systems are in place to account for the potential risks associated with the use of animal-derived substances during cell line establishment, including a Supplier Approval Program and vendor verification that animal-derived components test negative for relevant adventitious agents. All bovine-derived substances are verified to be sourced from bovine spongiform encephalopathy (BSE)-free/risk-negligible herds and compliant with 21 CFR 189.5, prohibited cattle materials. The firm notes that the controls in place are adequate to manage contamination risk from sera and any other animal-derived substances that could be used in production.[13]

---

[13] Wildtype provides a description of the process used to verify that animal-derived components used during cell line establishment are free of adventitious agents in the amendment dated April 2, 2025. The firm provides certificates of analysis (COAs) for porcine trypsin and FBS (in the amendment dated April 2, 2025), as well as BSA (in the amendment dated April 11, 2025), demonstrating that the animal-derived components are tested and

Page 9 - Administrative File, CCC 000005

For quality purposes, one vial of every lot that is submitted to Wildtype's MCB is tested by a third-party accredited laboratory for absence of aerobic and anaerobic bacterial growth and fungal growth using sterility testing and anerobic culture conditions. Lots are also screened in-house to detect intracellular *Mycoplasma* spp. contamination prior to submitting new MCB and WCB vials.[14] *Mycoplasma* spp. screens are conducted using fluorescence microscopy and PCR, which are standard and validated methods to detect for the presence of *Mycoplasma* spp. contamination in cell culture.

Production Process

Wildtype provides information about its production process, including:

- The proliferation phase using suspension culture; and
- Cell harvest

Wildtype states that the firm's food safety and quality systems are based on the requirements prescribed in 21 CFR 123.6 with a HACCP plan and in 21 CFR part 117 subpart B, cGMP. The food safety and quality systems are supplemented by the firm's high standards of cleanliness, education, training, and supervision needed by cell culture operations. Wildtype applies allergen controls, including separating MCB and WCBs by species and a label review program to prevent cross-species contamination. Batch records are maintained to provide traceability of every input used during the commercial production process, track corrective actions, and enable quality assurance personnel to verify all quality and safety standards are met prior to release of the finished food product into commerce. Wildtype also states that all incoming raw materials, such as powdered cell culture media, are obtained through a supplier approval program which includes hazard assessments of materials, review of supplier qualifications, incoming materials inspections, supplier performance monitoring (including annual inspections), notice of supplier non-conformance and corrective actions (as applicable), supplier approval checklist, and record keeping. Upon receipt by Wildtype, raw materials are inspected, validated (content and quality attributes), and stored under appropriate conditions. Liquid media is sterilized using an appropriate filter and stored at 2-8 °C. Wildtype states that the firm uses food contact materials that are permitted for their intended use throughout the production process.[15]

---

certified to not contain relevant adventitious agents (e.g., bovine-associated viruses tested per 9 CFR 113.53 (c), porcine-associated viruses tested per 9 CFR § 113.53 (d)), including the prion causative agent of bovine spongiform encephalopathy (BSE).

[14] Sterility of MCB and WCB vials is evaluated by testing for adventitious agents including *Staphylococcus* spp., *Fusobacterium* spp., *Aspergillus* spp., and *Mycoplasma* spp. using methods validated for their intended use.

[15] The production conditions described by the firm would be consistent with food type 1 (nonacid, aqueous products; may contain salt or sugar or both (pH above 5.0)) and conditions of use type D (hot filled or pasteurized below 66 °C). The various food types and conditions of use are described in Appendix V of FDA's "Guidance for Industry: Preparation of Premarket Submissions for Food Contact Substances (Chemistry Recommendations)."

Page 10 - Administrative File, CCC 000005

Wildtype's production process utilizes aseptic techniques or hygienic controls at different steps of the process. The production process is described as consisting of the: (1) proliferation phase using suspension fed-batch culture, and (2) harvest of cell material from bioreactors using bowl centrifugation followed by washing with a water and sugar solution.

Wildtype states that it maintains sterile technique throughout the proliferation and harvest phases. The proliferation phase involves handling cells in small-scale culture vessels or in closed, stainless steel bioreactor systems. Wildtype states that, for smaller-scale culture vessels, any cell passages or sampling are conducted in high-efficiency particulate air-filtered biological safety cabinets by operators trained on appropriate aseptic practices. Cultures in larger suspension bioreactors use aseptic procedures to reduce the risk of introducing contaminants, and stainless-steel culture vessels are sterilized using a combination of validated standard operating procedures (SOPs) using cleaning agents and high temperature steam. Wildtype notes that the presence of potential adventitious agents of concern (*Salmonella* serovars*, L. monocytogenes*, and *S. aureus*) in culture during the proliferation phase would negatively affect the production capacity of the cell culture system, trigger quality control checks, and are inherently self-limiting. Nevertheless, Wildtype uses real-time pH monitoring of cultures in smaller-scale culture vessels and bioreactors to detect the presence of microbial contamination. Cultures that experience a pH above 7.8 or below 7.1 are determined to be at risk for contamination and subjected to further screening including microscopy. If an adventitious agent is detected, the cell culture is immediately sterilized and discarded.

After the proliferation phase is complete, cells are harvested under sterile conditions and stored at low temperatures (frozen at ≤-20 °C). Wildtype also states that an environmental monitoring program is in place to assess the effectiveness of overall hygienic practices in the manufacturing facility.

*Proliferation Phase Using Suspension Culture*

One or more vials of frozen cells from the WCB are thawed and placed in sterile culture medium in a small vessel under sterile conditions. Following multiple rounds of cell division and growth (proliferation), the cells are transferred to larger vessels (passaging). This process, under continued sterile conditions, is repeated with increasingly larger vessels to accumulate the desired quantity of cells (i.e., a seed train). The seed train cultures are agitated so that the cells are suspended in a homogeneous mixture within the liquid culture medium inside the vessel. Wildtype states that all vessels are either pre-sterilized single-use, food grade plastic, or reusable vessels that can be cleaned and sterilized between uses.

Wildtype identifies potential hazards associated with this production stage including:

- Use of an unintended cell line from another species due to documentation or handling errors;
- Introduction of adventitious agents via contaminated culture media components or inadequate sterilization of bioreactors;
- Introduction of adventitious agents present in the local environment of the production facility during passaging from one vessel to another;
- Introduction of metal fragments produced by metal-to-metal contact in bioreactor; and

Page 11 - Administrative File, CCC 000005

- Introduction of media components that could persist in the cell material through proliferation and washing at harvest, thus being present as residues in the harvested cell material.

Wildtype manages the risk associated with the first hazard by utilizing a two-tiered preventive control plan. First, cell lines derived from different species are maintained in separate liquid nitrogen storage tanks sufficiently labeled as a precaution to prevent potential errors during the cryopreservation step. Second, when removing cryovials for thaw, two individuals independently certify that the storage tank and cryovial species match and are the correct species for production. Seed train operators review the two written certifications and sign off that the species thawed matches the production target species before moving cell lines into production.

Wildtype manages the risks associated with the next two hazards, introduction of adventitious agents (bullets two and three above), through the sterile procedures and monitoring programs discussed above in the "Production Process" section and through third-party testing of the harvested cell material and the finished food product (e.g., the harvested cell material mixed with food ingredients). Preventive controls associated with the introduction of metal fragments and other foreign material include visual inspection and X-ray screening of the finished food product. Safety considerations associated with the introduction of media components that could persist in the harvested cell material are discussed below in the section, "Substances Used in the Production Process."

*Cell Harvest*

Wildtype states that at the end of proliferation, cells are collected from the bioreactor via bowl centrifugation and washed three times with a water and sugar solution. After washing, cells are frozen and stored in a ≤-20 °C freezer ahead of post-harvest processing steps.

The potential hazards identified by the firm associated with this production stage include:

- Introduction of adventitious agents during the cell culture process; and
- Media components that could be present as residues after washing.

Wildtype manages risks associated with the introduction of adventitious agents (e.g., *Salmonella* serovars, *Listeria* spp., *S. aureus*) by practicing aseptic technique, employing cGMPs, and through the adventitious agent tests and specifications discussed in the "Characterization of the Harvested Cell Material" section. Furthermore, Wildtype performs a post-harvest thermal processing step on the finished food product to inactivate potential adventitious agents, mitigating the risks of their introduction at prior steps in the production process. Wildtype provides data and information demonstrating the effectiveness of the post-harvest thermal processing step which is an important process control identified in the firm's HACCP plan.

Safety considerations associated with the use of media components that could be present as residues after washing are discussed in the subsequent section, "Substances Used in the Production Process."

Page 12 - Administrative File, CCC 000005

## Substances Used in the Production Process

Wildtype provides information about the substances used during its production process in the form of cell culture media and other components, including:

- nutrients used to support primary cell metabolism;
- substances to manage properties of the culture medium;
- substances intended to support cell proliferation during culture; and
- substances used to harvest the cell material.

For each substance, Wildtype provides information about the identity and the basis for its safety conclusion, and in certain cases information about estimated consumer exposure.[16]

The firm's cell culture medium is described as containing substances required for growth, including amino acids, nucleotides, energy substrates (e.g., sugars), fatty acids, vitamins, minerals, trace elements, and salts. Additional substances identified by Wildtype during the production phase (i.e., proliferation and harvest) include emulsifiers and surfactants, antioxidants, a growth factor, and a wash solution (i.e., a water and sugar solution).[17] The firm explains that most of these substances are already widely consumed by humans as part of the U.S. food supply and notes that many are present in commonly consumed, commercially available conventional salmon. The firm states that the non-nutrient substances listed above are largely removed from the harvested cell material by washing[18], and that residual levels in the product do not present concerns given the available safety information and existing use or presence in the U.S. food supply. No antibiotic or antifungals are used during the proliferation and harvest stages of the production process.

Wildtype describes the firm's general framework for evaluating substances intended for use during the proliferation and harvest stages of production, including whether substances used during proliferation and harvest are currently authorized by FDA for use in human food as a result of a food additive regulation or effective food contact notification, or FDA evaluation of a generally recognized as safe (GRAS) notice. The firm also considered prior use or natural presence in conventional food and anticipated dietary exposure. In particular, Wildtype discusses the firm's intended use of media supplements to support proliferation and metabolism of cells in culture, specifically, a recombinant salmon growth factor and a non-

---

[16] A complete list of these substances was provided to FDA as supporting, corroborative information in the supplemental, confidential material.

[17] Wildtype informed FDA of updates to substances used during proliferation and harvest in the amendment dated August 30, 2024. At FDA's request, the firm provided a complete list of all substances used during the production process to FDA in a December 11, 2024, amendment to the supplemental, confidential material.

[18] Wildtype provides exposure estimates (i.e., estimated daily intakes (EDIs)) for substances used in the production process as supporting, corroborative information in the supplemental, confidential material. In the August 30, 2024, amendment Wildtype provided updated theoretical EDIs based the conservative assumption that the concentration of substances in the harvested cell material is the same as the level of the substance in the cell culture medium. Analytical EDIs are based on the residual levels of substances in three, non-consecutive batches of harvested cell material.

Page 13 - Administrative File, CCC 000005

proteinogenic amino acid, respectively. The firm also publicly discloses data and information regarding a substance, methyl-β-cyclodextrin, for which the intended uses are not addressed by an existing, authorizing regulation, effective food contact notification, FDA evaluation of a GRAS notice, or another authorization, including the identity, toxicological studies or other relevant safety data, and estimates of consumer exposure informed by batch analysis of its harvested cell material. In addition to its discussion on the relevant safety-related information of these components of the cell culture medium, the firm also considered the estimated intake level derived from its analytical data from the harvested cell material for each component with reference to levels present in one or more currently consumed comparator foods. This information provided by Wildtype is described in more detail below.

Recombinant growth factors

In the amendment dated August 30, 2024, Wildtype states that Fibroblast Growth Factor 2 (FGF2), also known as basic fibroblast growth factor, is the only growth factor used in the firm's current production process. Other functional proteins described in Wildtype's June 27, 2022, submission (i.e., insulin, insulin-like growth factor (IGF), albumin, and transferrin) are no longer used in the production process.

Wildtype states that the use of FGF2 in production is necessary to replace biological sources that would ordinarily be available to animal cells *in vivo,* that the gene sequence is derived from salmon, and that this protein is highly conserved in humans and in animals that are consumed by humans. Wildtype's assessment of the firm's intended uses considered several factors, including:

- published information on the levels of FGF2 in serum from healthy men and women;
- published information on the stability of growth factors;
- analytical data on the presence of FGF2 in Wildtype's cultured cell material after harvest and post-harvest processing;
- a published non-oral study of human recombinant FGF2; and
- the physiological ranges of this protein in conventional seafood.

As part of the firm's material input safety assessment, Wildtype notes that its assessment of the available scientific literature indicates that growth factors are generally recognized as having low stability and degrade quickly with temperature fluctuations, both heating and freezing, indicating that Wildtype's post-harvest thermal processing and blast chilling steps will denature and deactivate residual FGF2. The firm discusses a modification to FGF2 which enhances thermostability of the protein at temperatures used for cell growth, but references published studies indicating that the modified, thermostable FGF2 would be inactivated by both proteases in the cell culture medium and at higher temperatures in the range Wildtype uses for its post-harvest thermal processing step. Moreover, Wildtype provides data supporting

Page 14 - Administrative File, CCC 000005

that FGF2 is not detected in its finished food product (i.e., a ready-to-eat coho salmon product).[19]

Wildtype referenced a non-oral one-month study conducted in dogs that reported a no observed adverse effect level (NOAEL) of >480 mg/kg body weight (bw)/d for recombinant human FGF2, which shares homology with, but is not identical to, the recombinant salmon FGF2 used by the firm. No recombinant proteins derived from the human genome are used in the firm's production process.

The firm cites data reporting that the peak concentration of FGF2 in rainbow trout is 10-100 ng/mL and <4.0 ng/L and <10.8 ng/L in men and women, respectively. Wildtype further states that, given the firm's production process and the naturally occurring levels, FGF2:

- exposure from the harvested cell material is infinitesimally small compared to total circulating FGF2 levels in humans (<11 and <29.7 ng, in men and women, respectively);
- is present in the harvested cell material at lower levels to those found in foods derived from fish muscle tissue, such as chinook salmon or rainbow trout;
- would be present at very low or undetectable levels in the finished food product after conventional food processing; and
- would likewise be broken down by both heat (e.g., cooking) and gastric fluids.

<u>Substances to manage properties of the culture media</u>

Methyl-β-cyclodextrin is a cyclic oligosaccharide with a hydrophobic cavity that is used in cell culture to increase the solubility of non-polar substances such as fatty acids and cholesterol. Methyl-β-cyclodextrin is not the subject of an existing U.S. food ingredient authorization or GRAS notice evaluated by FDA, nor does it have publicly available safety data. However, the firm notes that methyl-β-cyclodextrin shares high structural similarity to β-cyclodextrin, a compound for which there is extensive published safety data that may be used to read-across to methyl-β-cyclodextrin. Wildtype notes that β-cyclodextrin is used in various foods, is the subject of GRAS notice 000074, and had safety data establishing an acceptable daily intake (ADI) of 5 mg/kg bw/d. Wildtype analyzed the concentration of methyl-β-cyclodextrin in its harvested cell material and reported an EDI of <0.22 mg/kg bw/d based on analytical data. FDA asked the firm to consider whether its use of methyl-β-cyclodextrin, combined with levels of β-cyclodextrin found in the diet, would exceed the ADI for this substance. The firm noted that the EDI for β-cyclodextrin at the 90th percentile is 0.15 mg/kg bw/d, and that addition of methyl-β-cyclodextrin from Wildtype's harvested cell material would result in a cumulative EDI of <0.37 mg/kg bw/d, which is substantially lower than the ADI of 5 mg/kg bw/d for β-cyclodextrin.

---

[19] Wildtype conducted testing on its finished food product (i.e., a ready-to-eat coho salmon product) to validate its conclusion regarding the anticipated residual level of the thermostable FGF2 protein used in the firm's production process. All results were consistent with the conclusion that this protein would be present at low to undetectable levels in the firm's finished food product.

Page 15 - Administrative File, CCC 000005

Nutrients used to support primary cell metabolism

Wildtype considered relevant data and information on substances used to support primary cell metabolism, including available toxicological data, presence in foods, and presence in the firm's harvested cell material. The firm reports that these substances are present in the harvested cell material at levels comparable to those found in conventional salmon, or at levels found in other commonly consumed foods while also being well below reference exposure values identified by various regulatory bodies that assess the safety of food, or both.

## Characterization of Harvested Cell Material

Identity

As described above, during cell line establishment Wildtype selects for and banks pluripotent, mesenchymal cells and uses *COI* mitochondrial gene sequencing to verify the species identity of the MCB as coho salmon (*Oncorhynchus kisutch*). The firm also implements cell bank inventory controls (i.e., separating MCB vials for different species in different liquid nitrogen dewars, WCB vial inventory controls, and two-person checks and sign-off) to ensure that the correct WCB vials are used as inputs in the production process. The firm verifies the species identity of the harvested cell material as coho salmon (*Oncorhynchus kisutch*) using *COI* mitochondrial gene sequencing. Wildtype examines cultured cells during the proliferation phase of the production process to ensure that cell growth rate, size, and morphology conform to expected, well-characterize phenotypic parameters (i.e., growth rate ±35% or less than the average expected growth rate; cell size ±25% deviation from expected diameter of 11-18 μm; expected cell shape (uniform, spherical, and without membrane irregularities)). The firm examines the harvested cell material to ensure the cells demonstrate the expected phenotypic characteristics.

Wildtype does not routinely verify the cell type identity of the harvested cell material using gene expression or cell marker analyses (e.g., RT-qPCR, immunofluorescence); however, the firm verifies that its production cell line is comprised of cells that express mesenchymal lineage genes, as described in the previous section "Establishment of Cell Lines." The firm acknowledges that it is theoretically possible for cells to undergo spontaneous differentiation during the proliferation stage of the production process. Wildtype states that, should spontaneous differentiation occur during the production process, the presence of spontaneously differentiated cells in the harvested cell material would not pose a safety concern, considering that mesenchymal lineage cell types (i.e., fat, muscle, connective cells) are regularly found in conventional salmon. To support its conclusions regarding the cell type identity of the harvested cell material, the firm states that, to date, it has not observed spontaneously differentiated cells in the harvested cell material. Further, the firm explains that spontaneous differentiation, while theoretically possible, is unlikely to occur during the production of the harvested cell material for several reasons: first, given the fact that terminal differentiation leads to proliferative arrest (i.e., the end of cell division), spontaneous differentiation would slow the growth rate and would be readily detected; second, as noted above, the firm has yet to observe spontaneously differentiated cells in its harvested cell material.

Page 16 - Administrative File, CCC 000005

<u>Adventitious Agents and Contaminants</u>

Wildtype describes compositional analysis and characterization of the harvested cell material. The compositional analyses of the harvested cell material include major nutrients (proteins and amino acids, fats, carbohydrates, minerals, and vitamins), and some residues of media components. Wildtype provides information and specifications for adventitious agent and toxic heavy metals that could potentially be present in the harvested cell material and presents results from three independent batches demonstrating conformance with the stated specifications.[20] Data was concurrently generated using wild-caught coho salmon as a comparator.

Wildtype provides microbial specifications for each batch of harvested cell material, including:

- Aerobic plate count (<100 colony-forming units (CFU/g)
- Yeast/mold (<20 CFU/g)
- *Enterobacteriaceae* (<20 CFU/g)
- Total coliforms (<100 CFU/g)
- *Escherichia coli* (<20 CFU/g)
- *Escherichia coli* O157:H7 (not detected in 25 g)
- *Campylobacter* spp. (not detected in 25 g)
- *Salmonella* serovars (not detected in 25 g)
- *Listeria* spp. (not detected in 25 g)
- *Staphylococcus aureus* (<20 CFU/g)[21]
- *Bacillus cereus* (<100 CFU/g)
- *Clostridium perfringens* (<10 CFU/g)
- *Clostridium botulinum* (not detected in 8 g)

Microbial testing was performed using methods validated for their intended purposes.

Wildtype provides specifications for toxic heavy metals that are commonly considered in conventional food manufacturing and could potentially be present as contaminants in the harvested cell material.[22] Toxic heavy metal specifications for each batch of harvested cell material include:

---

[20] In the amendment dated April 2, 2025, Wildtype commits to testing each batch of harvested cell material for adventitious agents and toxic heavy metals and states that it will notify FDA in a supplement to CCC 000005 should it make changes to its testing regime.

[21] Wildtype addresses the potential for production of *S. aureus* and *C. botulinum* toxins in its production process. In the amendment dated July 28, 2023, the firm performed one-time testing on representative batches of harvested cell material and confirmed these toxins were not detected. The firm states that testing for the presence of *S. aureus* and *C. botulinum* were selected because the organisms are a necessary precursor to the associated toxins. Wildtype also notes that it performs routine pH monitoring and microscopy during the early stages of the production process and further mitigates the potential for contamination via cGMP during the production process.

[22] Wildtype provides the same toxic heavy metal specifications for the finished food product.

Page 17 - Administrative File, CCC 000005

- Arsenic (<50 ppb)[23]
- Lead (<20 ppb)
- Mercury (<20 ppb)
- Cadmium (<20 ppb)

<u>Composition</u>

Wildtype conducted a compositional analysis of three independent batches of the harvested cell material, including proximates, amino acids, vitamins, and minerals.[24] Proximates include moisture, protein, fat, ash, and carbohydrate content, and the firm provided specifications ranges for proximates in the harvested cell material. As a point of reference, the firm provides nutrition data from a U.S. Department of Agriculture (USDA) database on conventional salmon products.[25] The harvested cell material was washed with a water and sugar solution, resulting in moisture content that was somewhat higher in the firm's independent batches relative to the conventional coho salmon reference data. The total fat content was lower in the harvested cell material (1.13%-1.75%) versus the conventional coho salmon comparator (5.93%). The total amino acid content and individual amino acids were lower in the harvested cell material relative to the conventional coho salmon comparator, which the firm notes is likely due to the absence of protein-rich extracellular structures that are found in conventional salmon products. The relative levels of minerals were similar between the harvested cell material and conventional coho salmon, with modest decreases in the levels of iron, magnesium, potassium, and selenium in the harvested cell material.

Wildtype provides compositional analyses for its finished food product (i.e., a ready-to-eat coho salmon product) for reference.

**FDA's Evaluation**

FDA evaluated the information provided by Wildtype with respect to the established cell lines, cell banks, substances used in the production process, and properties of the harvested cell material that collectively are the subject of CCC 000005. The primary focus of FDA's evaluation is the information on which the firm relies to conclude that the harvested cell material is safe for use as food and does not contain substances or microorganisms that would adulterate the food.

---

[23] In the amendment dated December 11, 2024, Wildtype reduced its specification for arsenic to <50 ppb.

[24] As noted in the previous section, "Substances Used in the Production Process," in the amendment dated August 30, 2024, Wildtype notified FDA of updates to its production process, including the use of animal-component free medium supplemented with a recombinant salmon FGF2. The firm provides analytical data for proximates (moisture, total fat, protein, ash, carbohydrates), vitamins, minerals, toxic heavy metals, trace metals, and fatty acids for three non-consecutive batches of harvested cell material in the amendment dated August 30, 2024.

[25] Wildtype provides comparator data for conventional salmon products from the USDA FoodData Central in the amendment dated December 11, 2024. Notably, comparator data from the USDA FoodData Central entry for "Fish, salmon, coho, farmed, raw" (FDC ID 173715) is available for moisture, protein, ash, carbohydrates, minerals, and some fatty acids. *Trans* fat comparator data from data from "Fish, salmon, coho, farmed, raw" (FDC ID 173715) was not available, and, as such, the firm provides *trans* fat comparator data for "Fish, salmon, sockeye, raw" (FDC ID 173691) and "Fish, salmon, pink, raw" (FDC ID 175138).

Page 18 - Administrative File, CCC 000005

Wildtype provides information on the establishment of the cell lines used to produce the food that is the subject of CCC 000005. FDA considered the information on the source and lineages of the cell lines, the culture adaptation process, the processes used to immortalize the cell lines (selection of cells based on attachment affinities and nutritional conditions), and the harvested cell material. We also considered the information provided by Wildtype with respect to the observed behavior of the cell lines in culture, the genetic capacity of animal cells to produce toxins or other potentially harmful substances, and the viability of cells following harvest.

The information reported was consistent with salmon cells that displayed enhanced replicative capacity under *in vitro* conditions. However, once removed from the protected and controlled environment of the bioreactor the cells die quickly, removing any replicative capacity. Subsequent food processing (such as cooking) would further break down cellular structures and contents. Digestion after consuming food made from the harvested cell material would also break down any residual cellular structure. No information presented by the firm or otherwise available to us indicated any mechanism by which the harvested cell material, once rendered non-living, heated, consumed, and digested, would retain any replicative capacity or the ability to induce replicative capacity in living cells exposed to this material.

Wildtype notes the harvested cell material will present the same allergenicity concerns to consumers who may be allergic to conventional salmon. The firm states that it will address concerns regarding allergenicity of the harvested cell material through product labeling.

In summary, we did not identify any properties of the cells as described that would render them different from other animal cells with respect to safety for food use.

Regarding the production process, FDA considered the data and information pertaining to the firm's hazard analysis for each phase in the production process and its rationales for risk-based preventive controls, including Wildtype's assessment of potential sources for introduction of adventitious agents, and the corresponding mitigation and control strategies for each hazard identified. We also considered Wildtype's use of a HACCP plan developed in accordance with 21 CFR 123.6, cGMPs, and supporting programs such as environmental monitoring, sanitation control, supply-chain controls, and other controls. No data and information presented by the firm or otherwise available to us indicated that the selected test strategies would be inadequate to control for the presence of biological, chemical, or physical hazards or to maintain product quality. We note the self-limiting nature of quality failures related to adventitious agent control in the production process. In summary, we did not identify elements of the production process, as described in CCC 000005, that indicate an unaddressed food safety risk resulting from microbial, viral, or other contaminants.

FDA considered the general framework that Wildtype used for evaluating the safety of each substance for its intended use as well as the complete list of substances provided as supporting, corroborative information in the supplemental, confidential material, including the identity, intended use, anticipated dietary exposure, and relevant data on safety and existing authorizations or evaluations in the U.S. We also considered the data and information presented by the firm regarding its assessment of the use of a thermostable, recombinant FGF2 derived from the salmon genome, including the intended use level, anticipated digestive fate, and corroborative analytical data regarding residual presence of the recombinant salmon FGF2 used in the production process in its finished food product. Furthermore, FDA considered that

Page 19 - Administrative File, CCC 000005

the analytical data-based EDI of <0.22 mg/kg bw/d for methyl-β-cyclodextrin is well below the ADI of 5 mg/kg bw/d for the structurally similar, well-studied β-cyclodextrin, supporting the safety of methyl-β-cyclodextrin, a substance new to the U.S. human food supply. We note that the substances described by Wildtype have no intended technical or functional effect in the harvested cell material and if present are expected to be at minimal levels.

We did not identify any substance uses that would lead us to question Wildtype's conclusion regarding the safety of its food given available information, existing uses or authorizations in food, and anticipated exposure. We noted moderately lower levels of several nutritional components relative to conventional salmon (discussed above in the "Characterization of the Harvested Cell Material" section); however, the harvested cell material, which is the subject of CCC 000005, is expected to be mixed with food ingredients to produce the finished food product. Therefore, the nutritional composition of the finished food product containing the harvested cell material will depend on the type and amount of other ingredients in the product. Regarding the use of any food contact materials throughout the production process, we note that the production conditions described by the firm during culture for food production and immediately subsequent to harvest are consistent with food type 1 (nonacid, aqueous products; may contain salt or sugar or both [pH above 5.0]) and conditions of use type D (hot filled or pasteurized below 66 °C) save for post-harvest storage (conditions F or G for refrigeration or frozen storage, respectively). Thus, any food contact materials authorized for these conditions would be appropriate.[26]

FDA reviewed the data and information that was provided on the identity and composition of the harvested cell material, including batch test data for constituents and contaminants, and specifications. We considered the analytical data provided by Wildtype on the composition of the harvested cell material from several production runs as one element in characterizing the identity of its product, as evidence of the firm's ability to conform to its stated specifications for food contaminants, and as relevant information in evaluating the relationship between the production process described in CCC 000005 and the properties of the harvested cell material produced through that process. We evaluated the firm's specifications for toxic heavy metals to ensure they were as low as reasonably possible and were consistent with levels that are considered safe in food.

We also considered information relating to compositional analysis. We did not consider the establishment of exact equivalence of all nutrients and components relative to a particular conventional comparator as a necessary component of Wildtype's safety conclusion, nor did we interpret the analytical data provided by the firm as definitive nutritional information regarding either harvested cell material produced through the process defined in CCC 000005 or food products that contain this material.

---

[26] As noted earlier, the various food types and conditions of use are described in Appendix V of FDA's "Guidance for Industry: Preparation of Premarket Submissions for Food Contact Substances (Chemistry Recommendations)."

Page 20 - Administrative File, CCC 000005

**Conclusions**

Based on our evaluation of the data and information that Wildtype provides in CCC 000005, as well as other information available to FDA, we did not identify a basis for concluding that the production process as described would be expected to result in food that bears or contains any substance or microorganism that would adulterate the food. We have no questions at this time about Wildtype's conclusion that foods comprised of, or containing, the harvested cell material resulting from the production process defined in CCC 000005 are as safe as comparable foods produced by other methods.

ASHLEY E.
NAZARIO-
TOOLE -S

Digitally signed by
ASHLEY E.
NAZARIO-TOOLE -S
Date: 2025.05.29
10:35:14 -05'00'

Ashley Nazario Toole

Page 21 - Administrative File, CCC 000005

## Appendix: Summary of potential identity, quality, and safety issues

| Process Step | Potential Issues | Management Strategy |
|---|---|---|
| Cell Isolation | Cell line identification, cells from different line or species inadvertently used | cGMP, supplier documentation |
| Cell Isolation | Carryover of adventitious agents such as bacteria, fungi, viruses, parasites, and prions from source animal | Animal health documentation, antibiotics and antifungal application, cGMP, sterile filtration, testing, thermal step |
| Cell Isolation | Introduction of adventitious agents during isolation | Antibiotic solution, aseptic procedures, hygienic condition, sterile rinsing, testing, thermal step, visual observation via gross inspection and microscopy |
| Cell Isolation | Introduction of contaminants in laboratory reagents | Sterilization, supply-chain controls, thermal step, visual monitoring (SOPs) |
| Cell Isolation | Facility environment contamination | Aseptic procedures, hygienic condition, thermal step |
| Establishment of Cell Lines | Cell line identification, cells from different line or species inadvertently used | Color-coded label, PCR testing |
| Establishment of Cell Lines | Cells do not display expected growth profile; genetic instability | Exome sequencing, gene expression analyses, testing, monitoring doubling time |
| Establishment of Cell Lines | Contamination with adventitious agents | Aseptic procedures, cGMP, hygienic conditions, sterilization, testing, use of antimicrobials, thermal step, visual observation via pH check and microscopy |
| Establishment of Cell Lines | Introduction of adventitious agents from media components | Sterile filtration, supply-chain controls, testing, thermal step, visual monitoring |
| Establishment of Cell Lines | Introduction of microbial toxins (e.g., histamine) | Testing |
| Establishment of Cell Lines | Introduction of chemical hazards | Allergen controls, cGMP, document control and training, sanitation controls, supply-chain controls |
| Establishment of Cell Lines | Introduction of physical hazards | cGMP, sanitation controls, sterile filter, supply-chain controls, visual monitoring, X-ray |
| Establishment of Cell Lines | Facility environment contamination | Aseptic procedures, environmental monitoring, hygienic condition, sanitation controls |
| Establishment of MCB and WCB | Cells from different line or species inadvertently used | PCR testing, color-coded label |
| Establishment of MCB and WCB | Genetic instability | Exome sequencing, gene expression analyses, monitoring doubling time |

Page 22 - Administrative File, CCC 000005

| Establishment of MCB and WCB | Introduction of adventitious agents | Aseptic procedures, cGMP, environmental monitoring, sterilization, testing, visual observation via pH check and microscopy |
|---|---|---|
| Establishment of MCB and WCB | Contamination with adventitious agents from original animal source | Testing |
| Establishment of MCB and WCB | Contamination with adventitious agents from culture media components | Aseptic procedures, cGMP, environmental monitoring, sanitation controls, sterile filter, supply-chain controls, testing |
| Establishment of MCB and WCB | Introduction of chemical hazards | Allergen controls, cGMP, document control and training, sanitation controls, supply-chain controls, testing |
| Establishment of MCB and WCB | Introduction of physical hazards | cGMP, sanitation controls, sterile filter, supply-chain controls, visual monitoring, X-ray |
| Establishment of MCB and WCB | Facility environment contamination | Aseptic procedures, environmental monitoring, hygienic condition, sanitation controls |
| Proliferation Phase (Cell Thaw, Seed Train, and Proliferation) | Inadvertent introduction of cryoprotectant | Food safety assessment, testing |
| Proliferation Phase | Cells from different line or species inadvertently used | Dedicated storage tanks for cell lines of different species, sign-off procedure, supply-chain controls, testing |
| Proliferation Phase | Phenotypic stability | Monitoring cell density and cell metabolism |
| Proliferation Phase | Introduction of adventitious agents during proliferation phase | Aseptic procedures, cGMP, environmental monitoring, sanitation controls, testing, thermal step, visual monitoring |
| Proliferation Phase | Contamination with adventitious agents from media components | Supply-chain controls, testing, thermal step |
| Proliferation Phase | Contamination with adventitious agents through inadequate sterilization of vessels and transferring between vessels | cGMP, environmental monitoring, sanitation controls, testing, thermal step |
| Proliferation Phase | Introduction of media components that could persist as residues in harvested cells | Food safety assessment |
| Proliferation Phase | Introduction of media components that could accumulate in the cells before harvest | Compositional analysis at harvest, food safety assessment |
| Proliferation Phase | Introduction of chemical hazards | Allergen controls, cGMP, sanitation controls, supply-chain controls |

Page 23 - Administrative File, CCC 000005

| Proliferation Phase | Introduction of physical hazards | cGMP, sanitation controls, supply-chain controls, sterile filter, visual monitoring, X-ray |
| Proliferation Phase | Facility environment contamination | Aseptic procedures, environmental monitoring, hygienic condition, sanitation controls |
| Harvest of Cell Material | Presence of adventitious agents from culture process | Culture monitoring, specifications, testing, thermal step |
| Harvest of Cell Material | Migration of contaminants from food contact materials | Use of authorized food contact materials |
| Harvest of Cell Material | Presence of residual media components after harvest | Analytical testing, food safety assessment, wash steps |
| Harvest of Cell Material | Presence of elemental contaminants (metals) after harvest | Specifications, testing |
| Harvest of Cell Material | Introduction of chemical hazards | Allergen controls, cGMP, document control and training, sanitation controls, supply-chain controls |
| Harvest of Cell Material | Introduction of physical hazards | cGMP, sanitation controls, supply-chain controls, sterile filter, visual monitoring, X-ray |
| Harvest of Cell Material | Facility environment contamination | Aseptic procedures, environmental monitoring, hygienic condition, sanitation controls |

# Exhibit 2

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

WILD TYPE, INC. D/B/A WILDTYPE AND
UPSIDE FOODS, INC.,

     *Plaintiffs*,

v.

JENNIFER A. SHUFORD, IN HER OFFICIAL CAPACITY
AS THE COMMISSIONER OF THE TEXAS DEPARTMENT
OF STATE HEALTH SERVICES; CECILE ERWIN YOUNG,
IN HER OFFICIAL CAPACITY AS THE EXECUTIVE
COMMISSIONER OF THE TEXAS HEALTH AND HUMAN
SERVICES COMMISSION; KEN PAXTON, IN HIS
OFFICIAL CAPACITY AS THE ATTORNEY GENERAL OF
TEXAS; AND DELIA GARZA, IN HER OFFICIAL
CAPACITY AS THE COUNTY ATTORNEY OF TRAVIS
COUNTY,

     *Defendants*.

Civil Action No.
<u>1:25-cv-1408-ADA-ML</u>

---

## DECLARATION OF UMA VALETI IN SUPPORT OF
## PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

---

I, Uma Valeti, do affirm and state as follows:

1.    I am over the age of 18 and competent to testify on the matters contained in this declaration.

2.    I am an American citizen and resident of California.

3.    I am a trained, licensed cardiologist with a background in cardiac biology. I earned a medical degree at the Jawaharlal Institute of Postgraduate Medical Education and Research in Pondicherry, India. I later completed Internal Medicine residency programs at Wayne State and SUNY Buffalo, and completed three fellowships at the Mayo Clinic in Cardiology, Interventional Cardiology, and Advanced Cardiovascular

Imaging. I am currently an adjunct faculty in Cardiovascular Medicine at Stanford University.

4.    I am also the founder and chief executive officer at UPSIDE Foods, Inc. (UPSIDE), a start-up company with its principal place of business in Emeryville, California, that specializes in the development and production of cultivated meat.

5.    I have always enjoyed eating meat. But I have also long been concerned about various ethical, environmental, and health issues that accompany eating meat—issues relating to the killing and harming of animals, as well as the environmental costs of large-scale animal operations.

6.    While training to become a physician in the 1990s, I was inspired to think of ways to produce alternatives to conventional meat so that people could have a choice of eating meat while protecting life.

7.    For a time, I ran the student kitchen at my medical school—a job that included making trips to the slaughterhouse to purchase hundreds of pounds of meat. I found the slaughterhouse disturbing, which added further to my concerns regarding meat consumption and production. I couldn't help but think there must be a better way.

8.    As a cardiologist, I familiarized myself with ongoing efforts to grow tissues for medical use. In the process, it occurred to me that similar techniques could be used to grow meat without the need to slaughter animals and without many of the environmental costs associated with conventional meat.

9.    These experiences led me on a journey that culminated in 2015, when I founded a company called Memphis Meats, Inc., which has since been renamed to UPSIDE Foods, Inc. UPSIDE is dedicated to developing and producing real meat—that

is, with real animal cells—in a clean and controlled environment, skipping any need to harm an animal, as well as any need to impose environmental costs associated with livestock.

10.    To this day, my goal is to provide alternative sources to produce meat.

11.    To that end, UPSIDE creates and sells cultivated meat products, including cultivated chicken.

12.    Cultivated meat (also known as cultured meat) consists of animal cells, tissues produced from such cells, or food produced using such cells as an ingredient. As used in this declaration and accompanying motion for preliminary injunction, "cultivated meat" includes cultivated poultry or seafood as well as beef, pork, etc.

13.    One of UPSIDE's products is a cultivated chicken product that looks, cooks, and tastes, like a conventional boneless, skinless chicken cutlet.

14.    UPSIDE's cultivated chicken product is derived from harvested animal cells and replicates those cells in a growth medium to produce tissue.

15.    UPSIDE's production facility is in Emeryville, California.

16.    UPSIDE does not produce any products in Texas.

17.    To produce cultivated meat, UPSIDE acquires animal cells from an animal and stores them in clean and controlled facilities. The cells from which UPSIDE's product is produced were initially extracted from a poultry carcass. These cells are later placed inside a cultivator, where they are supplied with oxygen and nutrients that allow the cells to multiply. These cells are also later harvested, prepared, and packaged into food products that have a similar taste, texture, and appearance as conventional meat.

18.    I regularly speak with people who are interested in trying cultivated meat and have tried cultivated meat, including UPSIDE's cultivated chicken product.

19.    For consumers with ethical, environmental, or health concerns regarding conventional meat, UPSIDE's cultivated meat offers a number of benefits and an alternative food source.

20.    UPSIDE's cultivated meat does not require the large-scale slaughter of animals that is necessary for the production of conventional meat.

21.    Because UPSIDE's cultivated meat can be produced without the need to handle livestock at large scale, it reduces the environmental costs associated with producing and transporting animal feed, as well as the costs associated with raising, transporting, and slaughtering livestock (which themselves are a source of greenhouse gas emissions)—especially if states allow the cultivated meat industry to develop and scale.

22.    UPSIDE's cultivated meat can increase the United States' food security by supplementing and diversifying food production.

23.    UPSIDE's cultivated meat also offers a variety of potential health benefits over conventional meat. In particular, cultivated meat limits the risk of environmental contamination, as the cultivated meat grows under constant control and supervision (unlike meat that grows inside an animal's body) in clean and controlled environments (rather than in tight spaces with many animals and their waste). UPSIDE's cultivated meat, for example, is not exposed to animal waste from slaughter, thus reducing the risk of contamination by microorganisms or other environmental hazards. In these ways, UPSIDE's cultivated meat can mitigate the risks of diseases and infections.

24.    UPSIDE's cultivated meat is at least as safe for human consumption as conventional meat.

25.    UPSIDE's cultivated meat appeals to those who enjoy trying new food products produced with innovative technology.

26.    UPSIDE seeks to appeal to consumers who have ethical concerns with eating meat—yet still want to enjoy meat.

27.    UPSIDE seeks to appeal to consumers who have no particular concerns with eating meat, but who find the concept of an innovative product interesting.

28.    I have encountered many consumers who are excited about the prospect of real meat that avoids the ethical and practical downsides of conventional meat.

29.    Based on these ethical, environmental, and health-related reasons, UPSIDE's cultivated meat serves as a substitute for, and competes with, conventional meat.

30.    For example, a restaurant patron may purchase less conventional chicken if given the opportunity to try and purchase UPSIDE's cultivated chicken.

31.    Still, cultivated meat is a nascent industry, so regulatory hurdles and sales bans threaten the ability of UPSIDE (and the broader industry) to scale and survive. For example, a sales ban decreases UPSIDE's revenue, eliminates the ability for consumers to purchase cultivated meat and share their experiences, and threatens continued investments. For another, regulatory hurdles require UPSIDE to spend considerable resources to bring products to market. These outcomes, in turn, place UPSIDE at a competitive disadvantage to conventional meat producers, as the cost to

produce cultivated meat is high and will be difficult to lower without scaling manufacturing.

32.     That being said, UPSIDE does not wish to trick anyone into eating its product; instead, UPSIDE wishes only to be allowed to distribute and sell its cultivated chicken product to willing and informed consumers, who should be able to try it for themselves if they wish.

33.     In November 2022, UPSIDE completed a pre-market consultation process with the U.S. Food and Drug Administration (FDA). As part of the consultation process, UPSIDE submitted its safety assessment for its cultivated chicken and production process, as well as supporting information, to the FDA.

34.     On November 16, 2022, at the end of the pre-market consultation process and the FDA's review, UPSIDE received a "no questions" letter from Kristi Muldoon-Jacobs, Acting Director of the FDA's Office of Food Additive Safety and Center for Food Safety and Applied Nutrition. A true and correct copy of that "no questions" letter is attached to this Declaration as **Exhibit 2-A**. That "no questions" letter stated that the FDA had "no questions at this time regarding UPSIDE's conclusion that foods comprised of or containing cultured chicken cell material resulting from the production process defined in CCC 000002 are as safe as comparable foods produced by other methods."

35.     Along with its "no questions" letter, the FDA also issued a scientific memorandum regarding the safety of UPSIDE's cultivated chicken. A true and correct copy of that scientific memorandum is attached to this Declaration as **Exhibit 2-B**.

36.     Since the FDA's greenlight, UPSIDE has been subject to continuous FDA oversight and routine FDA audit.

37.     On June 14, 2023, the United States Department of Agriculture-Food Safety and Inspection Service (USDA-FSIS) approved UPSIDE's product label for its cultivated chicken product.

38.     On June 21, 2023, UPSIDE received a USDA-FSIS Grant of Inspection, allowing UPSIDE to begin selling its cultivated chicken product in interstate commerce under federal inspection. As a result, UPSIDE has USDA inspectors onsite during its production operations.

39.     In July 2023, UPSIDE began selling its cultivated chicken product in the United States. To date, UPSIDE has sold or distributed its cultivated chicken product in states including Texas, Alabama, and California.

40.     In March 2024, UPSIDE distributed its cultivated chicken product at an event during the South by Southwest conference in Austin, Texas.

41.     In March 2024, UPSIDE also sold its cultivated chicken product to a West Lake Hills, Texas, resident. UPSIDE received revenue from this sale.

42.     Before Texas SB 261 went into effect, UPSIDE spoke with chefs in Austin, Texas, who were previously interested in a partnership with UPSIDE.

43.     Before Texas SB 261 went into effect, UPSIDE had conversations with supermarket chains in Texas regarding interest in selling UPSIDE's cultivated chicken products.

44.     UPSIDE wants to continue selling and offering to sell its cultivated meat products in Travis County, Texas, including in Austin, Texas.

7

45.    As a result of SB 261, UPSIDE is suffering ongoing irreparable harm and will continue to suffer irreparable harm until this Court intervenes.

46.    UPSIDE can no longer sell or offer to sell its cultivated chicken product in Texas without exposing itself to civil and criminal penalties under Texas SB 261.

47.    UPSIDE has stopped selling and offering to sell its cultivated chicken product in Texas because of Texas SB 261.

48.    UPSIDE is constrained by Texas SB 261 and fears imminent enforcement of Texas SB 261 based on its past sales of cultivated meat in Texas, its desire to resume those sales in Texas, the statements of Texas legislators and officials regarding Texas SB 261 and its related bill, and the duties and penalties imposed under Texas SB 261.

49.    As a result of Texas SB 261, UPSIDE has lost access to the whole of Texas 'as a source of revenue that it previously had access to before Texas SB 261 went it effect.

50.    As a result of Texas SB 261, UPSIDE has ended its sales talks with supermarket chains in Texas, who were previously interested in a partnership with UPSIDE.

51.    Texas SB 261 prevents UPSIDE from doing business with, or offering to do business with, chefs, restaurants, and distributors in Texas.

52.    As a result of Texas SB 261, UPSIDE is suffering ongoing reputational harm and the loss of consumer goodwill, as statements by Texas legislators and officials before and after the passage of Texas SB 261 falsely imply that there is something wrong with cultivated meat.

53.     As a result of Texas SB 261, UPSIDE cannot demonstrate to willing Texas consumers that they have nothing to fear from UPSIDE's innovative cultivated chicken product by making that product available for consumers to try and decide for themselves.

54.     As a result of Texas SB 261, UPSIDE will have a harder time partnering with meat distributors nationwide, who prefer to carry products they may sell across the whole country.

55.     As a result of Texas SB 261, UPSIDE is having a harder time partnering with potential purchasers (like chefs, restaurants, or supermarket chains) because the states with bans (like Texas) have closed their borders to the cultivated meat industry, thereby eliminating UPSIDE's ability to sell or offer to sell to potential customers in those states.

56.     By losing access to business in Texas, Texas SB 261 will make it more difficult for UPSIDE to achieve economies of scale that are essential to lowering production costs and making cultivated meat competitive in price to conventional meat. That is because a sales ban decreases UPSIDE's revenue, eliminates the ability for consumers to purchase cultivated meat and share their experiences, and threatens continued investments. These outcomes, in turn, place UPSIDE at a competitive disadvantage to conventional meat producers, as the cost to produce cultivated meat is high and will be difficult to lower without scaling manufacturing.

57.     UPSIDE wishes to continue selling and offering to sell cultivated meat in Texas.

58.    UPSIDE wishes to continue developing business relations with chefs, restaurants, and distributors located within Texas.

59.    Texas SB 261 is contributing to the fragmentation of the interstate market in meat and chicken. States like Alabama and Florida have passed similar restrictions targeting the cultivated meat industry.

60.    If the Court enjoins Texas SB 261, UPSIDE will immediately resume reaching out to chefs, restaurants, and distributors within Travis County, Texas, with the goal of selling its cultivated chicken product in the short and longer term. That, in turn, will allow UPSIDE to obtain business partnerships in Texas and beyond.

61.    To date, UPSIDE has not had a single recall of its cultivated chicken product.

62.    To date, UPSIDE has not received a single health-related complaint from those who have tried UPSIDE's cultivated chicken product.

63.    During the recent Texas legislative session, I testified in the House Health subcommittee on HB1431, which was a companion bill to Texas SB 261, spoke with Texas legislators about cultivated meat, and shared UPSIDE's cultivated meat with Texas legislator's offices and staffers.

64.    Texas has a robust conventional meat industry, which includes poultry. For example, Texas is one of the nation's largest meat markets.

65.    There were no Texas companies that sold cultivated meat within Texas before the enactment of Texas SB 261.

66.     I am very familiar with the market for cultivated meat and the companies innovating in this space. To my knowledge, all companies in the United States that are approved to sell cultivated meat products are based outside of Texas.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: _____ *October 16, 2025* _____.

_____
Uma Valeti

# Exhibit 2-A



Nicole Berzins
Director, Regulatory Affairs
UPSIDE Foods, Inc.
804 Heinz Ave.
Berkeley, CA 94710

Re: Cell Culture Consultation Notification File: CCC 000002

Dear Ms. Berzins:

This letter concludes UPSIDE Foods Inc.'s (UPSIDE) consultation with the Food and Drug Administration (FDA, we) regarding a cultured animal cell food product and associated production process, designated as CCC 000002. The subject of CCC 000002 is cultured chicken (*Gallus gallus*) cells with characteristics of muscle and connective tissue, produced by the method described in CCC 000002, and harvested as multicellular tissue for use as human food. We will maintain the administrative record associated with CCC 000002 in the Office of Food Additive Safety (OFAS) in the Center for Food Safety and Applied Nutrition.

Our use of the term "cultured chicken cell material" in this letter is not our recommendation of that term as an appropriate common or usual name for declaring the substance in accordance with the United States Department of Agriculture (USDA), Food Safety and Inspection Service's (FSIS) labeling requirements. Under the March 2019 Formal Agreement, FSIS has oversight of issues associated with labeling and the common or usual name for cultured animal cell human foods that incorporate livestock or poultry cells.

As part of bringing this consultation to closure, UPSIDE submitted to FDA a summary of its safety assessment for the cultured chicken cell material, dated October 1, 2021, as well as supporting, corroborative information in a supplemental confidential appendix dated September 23, 2021. FDA accepted this final submission on October 6, 2021. UPSIDE provided amendments on March 30, 2022, September 16, 2022, September 30, 2022, and November 9, 2022. These communications informed FDA of the steps taken by UPSIDE to ensure that this food complies with the legal and regulatory requirements that fall within FDA's jurisdiction. Based on the safety assessment UPSIDE has conducted, it is our understanding that UPSIDE has concluded that foods comprised of or containing the cultured cellular material resulting from the production process defined in CCC 000002 are as safe as comparable foods produced by other methods and would not contain substances that adulterate the food.

On July 29, 2016, the National Bioengineered Food Disclosure Law (Public Law 114-216) charged the USDA's Agricultural Marketing Service with developing a national

Page 2 – Ms. Berzins

mandatory system for disclosing the presence of bioengineered material in human food. Producers, distributors, and marketers of foods that contain cultured chicken cell material as defined by the production process described in CCC 000002 are responsible for complying with any USDA requirements relevant to the labeling of their products.

Based on the information UPSIDE has presented to FDA, as well as other information available to the agency, we did not identify a basis for concluding that the production process as described in CCC 000002 would be expected to result in food that bears or contains any substance or microorganism that would adulterate the food. We have no questions at this time regarding UPSIDE's conclusion that foods comprised of or containing cultured chicken cell material resulting from the production process defined in CCC 000002 are as safe as comparable foods produced by other methods. However, as you are aware, it is UPSIDE's continuing responsibility to ensure that foods it markets are safe, wholesome, and in compliance with all applicable legal and regulatory requirements, including those administered by FSIS. Should new production procedures, cell lines, or substances employed during production be used that could be relevant to the safety of the food, we strongly recommend that UPSIDE consult with FDA to ensure that food resulting from any modified production process is in compliance with all applicable laws and regulations.

A copy of this letter responding to CCC 000002 and of FDA's scientific memorandum summarizing the information in CCC 000002, as well as the safety narrative submitted by UPSIDE, are available to the public at https://www.cfsanappsexternal.fda.gov/scripts/fdcc/?set=AnimalCellCultureFoods.

Sincerely,

Kristi L. Muldoon Jacobs -S    Digitally signed by Kristi L. Muldoon Jacobs -S
Date: 2022.11.16 10:59:17 -05'00'

Kristi Muldoon-Jacobs, Ph.D.
Director, Acting
Office of Food Additive Safety
Center for Food Safety
  and Applied Nutrition

cc: Melissa Hammar
Acting Director, Regulations Development Staff
USDA/FSIS/OPPD/RDS
USDA South Building
Room 6067
1400 Independence Ave. SW
Washington, DC 20250-3700

# Exhibit 2-B



_____

# Memorandum

| | |
|---|---|
| **Date** | November 14, 2022 |
| **From** | Jeremiah Fasano (Division of Science and Technology) |

Through     Daniel Folmer (DST)         Daniel E. Folmer -S    Digitally signed by Daniel E. Folmer -S Date: 2022.11.14 12:44:24 -05'00'

Jianrong (Janet) Zhang (DST)    Jianrong Zhang -S    Digitally signed by Jianrong Zhang -S Date: 2022.11.14 12:56:31 -05'00'

Kotaro Kaneko (DFI)    Kotaro J. Kaneko -S    Digitally signed by Kotaro J. Kaneko -S Date: 2022.11.14 23:52:46 -05'00'

Katie Overbey (DFI)    Katie N. Overbey -S    Digitally signed by Katie N. Overbey -S Date: 2022.11.15 10:44:49 -05'00'

Stephanie Hice (DFI)    Stephanie A. Hice -S    Digitally signed by Stephanie A. Hice -S Date: 2022.11.15 10:47:30 -05'00'

| | |
|---|---|
| **Subject** | Cell Culture Consultation (CCC) 000002, Cultured *Gallus gallus* cell material |
| **To** | Administrative File, CCC 000002 |

**Submission Received Date** October 1, 2021

**Amendments Received Date:** March 30, 2022; September 16, 2022; September 30, 2022; November 9, 2022

**Sponsor:** UPSIDE Foods, Inc. (UPSIDE, the firm)

# Summary

- The Food and Drug Administration (FDA, we) evaluated the food that is the subject of CCC 000002 submitted by UPSIDE.
- This food is defined as the cell material at harvest, comprised of cultured *Gallus gallus* cells, with characteristics of myocytes and fibroblasts, in the form of sheets of cells, as produced by the method of manufacture described in CCC 000002.
- The cell lines are originally isolated from either adult chickens or mid-stage fertilized chicken eggs. The isolated cell lines are phenotypically characterized using standard methods validated for their intended purpose, including microscopy and immunostaining.
- The cell lines are established by selection of myoblast and fibroblast cells with demonstrated differentiation capacity that are then adapted to suspension culture. Immortalization is achieved either through selection in culture or through introduction of a cisgene expressing chicken telomerase reverse transcriptase (TERT).

Page 2 - Administrative File, CCC 000002

- The cells are cultured by first increasing total cell numbers in a suspension culture proliferation phase, followed by a subsequent adherent differentiation phase in which the cells are induced to assume characteristics of muscle cells supported by both specific medium factors as well as surface contact.
- The cells are harvested in the form of sheets of cells washed from the surface of the culture vessel into a collection basin, followed by subsequent washing and moisture adjustment in a temperature-controlled environment.
- The harvested material, following washing, is described as a coherent tissue of chicken (*Gallus gallus*) cells, similar in composition and nutritional characteristics to conventional poultry products.[1] Microbial and toxic heavy metal specifications are provided. Species identity and cell identity were verified in the final product using an enzyme-linked immunosorbent assay (ELISA).
- We evaluated information about the cell lines, the production process (including cell bank establishment), substances used in the production process, and properties of the harvested cell material, including information available in both the safety assessment as well as supporting, corroborative information in a confidential supplementary appendix.
- Based on the data and information presented in CCC 000002, we have no questions at this time about UPSIDE's conclusion that foods comprised of or containing cultured chicken cell material resulting from the production process defined in CCC 000002 are as safe as comparable foods[2] produced by other methods. Furthermore, at this time we have not identified any information indicating that the production process as described in CCC 000002 would be expected to result in food that bears or contains any substance or microorganism that would adulterate the food.[3]

## Production Method

UPSIDE describes an overall production process involving the establishment of a cell bank that provides a standardized source of cells for food production, and a cell culture food production process including proliferation or multiplication of the cells, differentiation of the cells to

---

[1] UPSIDE provided some analytical data on the composition of the harvested cell material from several production runs as one element in characterizing the identity of their product, in order to demonstrate the capability to meet or exceed specifications for food contaminants, and to demonstrate the consistency of their production process. Some variations in mineral, metal content, and somewhat higher levels of folate and cholesterol were observed in the data from these batch analyses of the harvested cell material, relative to a conventional poultry product. In all cases levels were within the range of those found in commonly consumed foods. UPSIDE's conclusions regarding the safety of their harvested cell material are not based on the establishment of exact equivalence of all nutrients and components relative to a particular conventional comparator.

[2] UPSIDE identifies "conventional poultry meat from a chicken carcass" as a comparator. In the firm's submission, skinless chicken breast is the most common comparator. Some analyses also include other chicken components.

[3] Our review did not address other provisions of the Federal Food, Drug and Cosmetic Act (FD&C Act).

Page 3 - Administrative File, CCC 000002

acquire characteristics of muscle, and harvest or collection of the cell material for subsequent conventional food processing.

UPSIDE states that a food safety and quality system is in use during production, and provides information about the following programs and measures that will be used in its production facilities, including:

- A current good manufacturing practice (cGMP) program that includes all the items enumerated in 21 CFR 117 subpart B;
- Validated sanitation processes and an environmental monitoring program;
- A supplier approval program;
- Document and records control including material and product specifications;
- Controls for prevention of biological, chemical, and physical hazards;
- A product release system involving quality assurance review for incoming raw materials, intermediate products, and finished products;
- Batch record review; and
- Traceability of raw materials and finished products.

UPSIDE also notes the importance of use of supporting programs such as internal auditing, risk-based sampling of raw materials and products, and sanitary design of equipment and tools to ensure accessibility for clearing and minimization of harborage areas. Crisis Management with Product Recall, Food Defense & Food Fraud programs, and Employee Training programs are also included.

An overview of the production process, potential hazards or quality issues at each process step, and management strategy is provided in Table 1 based on the information provided by UPSIDE. A more detailed version of this table is provided in an Appendix of this memorandum.

Page 4 - Administrative File, CCC 000002

### *Table 1: Overview of potential identity, quality, and safety issues*

| Process Step | Potential Issues | Management Strategies |
|---|---|---|
| Cell Isolation | Cell identity; contaminants from source, reagents, or environment | Antibiotics, aseptic procedures, documentation, sterilization, supplier management, testing program |
| Establishment of Cell Lines | Cell identity; contaminants from materials or environment; appropriate adaptation to culture; introduced genetic material and expression product | Aseptic procedures, documentation, genetic sequencing, food safety assessment[4], process and environmental monitoring, sterilization, supplier management, testing program |
| Establishment of Master Cell Banks (MCB) | Cell identity; contaminants from materials or environment; appropriate adaptation to culture | Aseptic procedures, documentation process and environmental monitoring, sterilization, supplier management, testing program |
| Proliferation Phase | Contaminants from materials, equipment, or environment; media components | Aseptic procedures, documentation, food safety assessment, process and environmental monitoring, sterilization, supplier management, testing program |
| Differentiation Phase | Contaminants from materials, equipment, or environment; media components | Aseptic procedures, documentation, food safety assessment, process and environmental monitoring, sterilization, supplier management testing program |
| Harvest of Cell Material | Contaminants from materials, equipment, or environment; media components | Compositional analysis, controlled temperature conditions, food safety assessment, specifications, sterilization, supplier management, testing program, washing |

---

[4] "Food safety assessment" indicates evaluation of the use of substances or materials based on commonly established paradigms for evaluating chemical, biochemical, and toxicological data in conjunction with estimates of exposure for their intended use to assess whether such use is consistent with applicable safety standards.

Page 5 - Administrative File, CCC 000002

# Cell Banking

UPSIDE provides information about the establishment of cell banks used in the subsequent cell culture food production process. UPSIDE defines a cell bank in the firm's manufacturing process as a collection of cryopreserved cells derived from a single tissue source in a single animal. UPSIDE uses a common system in which there is both a primary cell bank (the master cell bank; MCB) and secondary cell banks (the manufacturing working cell bank; MWCB) each derived from a subset of cells stored in the MCB. The steps involved include:

- Cell isolation
- Establishment of cell lines
- Establishment of MCBs
- Establishment of one or more MWCBs

# Cell Isolation

The cells used to establish the cell banks are isolated either from adult chickens destined for human consumption (a myoblast cell line derived from muscle tissue) or from mid-stage fertilized chicken eggs (a fibroblast-like cell line derived from skin tissue). Hereafter, the two sources are referred to collectively as the "source animal" or "animal source." Reagents used at this stage may include materials of bovine or porcine origin (serum and trypsin, respectively), in addition to cell culture media, media components, and antibiotics and antimycotics.

Potential hazards and quality issues identified by UPSIDE at this stage include:

- Incorrect source animal identity resulting in isolated cells of incorrect origin;
- Source animal health prior to tissue procurement resulting in cells contaminated by adventitious agents such as bacteria or viruses;
- Introduction of adventitious agents from contaminated non-animal sourced reagents or the local environment, including *Mycoplasma* spp., *Listeria monocytogenes*, *Salmonella* serovars, pathogenic *Escherichia coli*, *Enterobacteriaceae*, and *Campylobacter* spp.; and
- Introduction of adventitious agents from animal-derived reagents (e.g., bovine serum).

UPSIDE documents all processing steps from animal sourcing to cell isolation. Animal source documentation includes records identifying time and place of harvest, and any relevant inspection of the animal ante- or post-mortem. Records for each cell line include animal source documentation, methods used for originating tissue isolation, subculturing history, and substances used, including cell culture media or culture substrate. Bovine sera are verified to be sourced from bovine spongiform encephalopathy (BSE)-free/risk-negligible herds. Animal-derived raw materials are tested for species-specific adventitious agents. If trypsin is sourced from porcine origin, UPSIDE tests for porcine viruses that could survive in human cells. Antibiotics and antimycotics are used to support establishment of sterile culture conditions for subsequent steps in development of the cell bank.

# Establishment of Cell Lines

UPSIDE screens the isolated cells to select for, or induce, individual cells that have desired characteristics, including the ability to exhibit a stable phenotype with repeated, linear growth (cell immortalization), the ability to acquire characteristics of muscle cells (myoblasts) or connective tissue cells (fibroblasts) through differentiation, the ability to grow in suspension within the cell culture media without the need for attachment to surfaces ("suspension adaptation"), and following suspension adaptation, verification that the cells can grow on solid substrates and produce an intact/integral cell culture product.

The cell lines described in CCC 000002 exhibit cell immortalization due either to spontaneous immortalization through selection in culture or due to induced immortalization through the introduction of a constitutively expressed TERT protein. Suspension adaptation is achieved using standard methods of media support and selection. Reagents used at this stage may include materials of bovine or porcine origin (bovine serum and trypsin, respectively), in addition to cell culture media, media components, and antibiotics and antimycotics.

Potential hazards and quality issues identified by UPSIDE at this stage include:

- Introduction of adventitious agents from contaminated non-animal sourced reagents or the local environment, including *Mycoplasma* spp., *L. monocytogenes*, *Salmonella* serovars, pathogenic *E. coli*, *Enterobacteriaceae*, and *Campylobacter* spp.;
- Introduction of adventitious agents from animal-derived reagents (e.g., bovine serum);
- Phenotypic changes or loss of stability in cell lines;
- Residual bacterial selection genes not removed at completion of genetic engineering process; and
- Unintended effects of genetic engineering and/or adaptation to culture (pleiotropy and off-target effects).

Animal-derived raw materials are tested for species-specific adventitious agents as well as environmental adventitious agents that may have been introduced during cell culture. Bovine sera are verified to be sourced from BSE-free/risk-negligible herds. If trypsin is sourced from porcine origin, UPSIDE tests for porcine viruses that could survive in human cells. UPSIDE monitors viable cell density and cell viability (percent viability) as the cells adapt to suspension cell culture. Adapted cell lines are documented, expanded, and cryopreserved before progressing to the next stage in the manufacturing process.

UPSIDE states that cell lines under development are tested for adventitious agents including *Mycoplasma* spp., *L. monocytogenes*, *Salmonella* serovars, *E. coli*, *Enterobacteriaceae*, and *Campylobacter* spp. UPSIDE also states that cell lines are tested for sterility, including aerobic plate count, as well as yeast and mold.

To verify successful genetic integration and stability of the inserted TERT cisgene, UPSIDE determines the insertion location in the genome, the number of copies present, and the absence of extraneous DNA (including antibiotic resistance genes and other vector backbone

components) through polymerase chain reaction (PCR)-based methods. UPSIDE also confirms the desired phenotype resulting from the expression product of the inserted gene and its stability by monitoring growth and viability of immortalized cell lines.

UPSIDE discusses the TERT cisgene expressed in one of the cell lines that is the subject of CCC 000002. The protein expressed by this gene is a component of the telomere enzymatic complex,[5] which is responsible for the maintenance and lengthening of telomeres. The gene is already present in the chicken genome and is expressed in some chicken cells, including muscle cells. [6] UPSIDE uses constitutive expression of this protein to enable immortalization of the firm's cell lines in culture. UPSIDE states that TERT protein activity is subject to the constraints of normal cellular control mechanisms, and that cells expressing the introduced TERT protein exhibit similar growth requirements, cell-cycle checkpoints, and karyotypic stability to comparator cells.

UPSIDE discusses the features of immortalization generally and as they relate to the cell lines described in CCC 000002. UPSIDE notes that there are multiple ways to induce high levels of cell replication, including the methods described above used by the firm as well as a method historically used in research to study unregulated cell proliferation, known as transformation. UPSIDE describes cell transformation as an aberrant cellular state in which cells gain an unrestricted growth ability and resistant to normal cellular process to regulate cell replication in a local physiological context. UPSIDE contrasts cell transformation with the firm's immortalization strategies which they state do not result in features of transformation such as unregulated growth. UPSIDE notes that even transformed cells would not be expected to pose a food safety hazard[7]; however, the firm, as a quality control measure, nevertheless monitors

---

[5] The telomere enzymatic complex is present in most eukaryotes including common agricultural species such as chicken.

[6] The TERT gene is present in most eukaryotes. Highest expression and activity are typically observed in replicating cells such as germ cells and embryonic cells. Expression in differentiated cells and tissues is rarer and less consistent, but does occur, as in the muscle cell example cited by UPSIDE.

[7] A hypothetical hazard could be associated in some way with the consumption of cells with enhanced proliferative capacity. However, once removed from the protected and controlled environment of the bioreactor, the cells would be expected to lose their proliferative capacity. Subsequent food processing (such as cooking) would further break down cellular structures and contents. Digestion after consuming food made from this cell material would also break down any residual cellular structure. FDA notes that dysregulation of telomerase activity in human cells has been observed as an aspect of the process of tumorigenesis. However, any residual TERT protein present in food would be rendered nonfunctional by heat processing (cooking) and subsequent gastrointestinal digestion by the consumer, and thus would be incapable of exhibiting its expected physiological function in a telomere enzymatic complex. Further, the food will be in contact with the gut lumen and any residual TERT protein present in the food matrix would not be in the correct biological context (embedded in a complex in the nuclear compartment) to influence proliferative activity even in a hypothetical scenario where it was not rendered non-functional by heat and digestion.

its immortalized cultures for two parameters (response to cues for differentiation as well as expected rates of growth) to detect any spontaneous transformation events.

UPSIDE discusses the potential for genetic engineering to result in unintended effects on the phenotype of the cell, and notes that naturally occurring transgenic events (e.g., via endogenous retroviral fragments) take place routinely in poultry without noticeable adverse effects[8]. UPSIDE also notes that while plants and microorganisms rely on toxin production for defense, this is not a common strategy for animals. Thus, animals traditionally consumed as food do not have a latent genetic capacity to produce endogenous toxins.

## Establishment of MCB

UPSIDE states that individual cell lines displaying the desired properties described in the previous section are prepared for storage in an MCB, which is defined by UPSIDE as a collection of cryopreserved cells derived from a single tissue source from a single animal.

Potential hazards and quality issues identified by UPSIDE at this stage include:

- Use of an unintended cell line from another species due to documentation or handling errors;
- Use of cell lines that that do not exhibit desired growth characteristics;
- Contamination with microorganisms, zoonotic viruses, or other adventitious agents from the original animal source of cells; and
- Introduction of adventitious agents from animal-derived reagents (e.g., bovine serum) used in cell line establishment.

UPSIDE confirms the species identity of the cell lines in the MCB by PCR analysis of mitochondrial DNA for cytochrome c oxidase. UPSIDE also measures parameters related to cell growth to confirm stability of the immortalized phenotype. Finally, using a direct aliquot of the primary cell bank, UPSIDE tests for the presence of aerobic bacteria (i.e., aerobic plate count), yeast and mold, *Mycoplasma* spp., *Enterobacteriaceae*[9], *E. coli*, *Campylobacter* spp., *Salmonella* serovars, and *L. monocytogenes*, as well as bovine, porcine, and avian viruses identified by the firm as of potential concern (discussed further below). UPSIDE notes that human pathogens of clinical importance associated with conventional chicken include *E. coli*, *Campylobacter* spp., *Salmonella* serovars, and *L. monocytogenes*. Since specifications for these major pathogens are limited to "non-detect" results, UPSIDE does not further evaluate

---

[8] UPSIDE states, for example, that integrated exogenous DNA in the form of retroviral fragments in the chicken genome are routinely passed vertically from one generation to another and that they are endemic in poultry consumed as food, without known pleiotropic or other deleterious effects that would indicate a food safety concern.

[9] A large family of Gram-negative bacteria that includes such microorganisms as *Salmonella* serovars, *E. coli*, *Klebsiella* spp., and *Shigella* spp.

Page 9 - Administrative File, CCC 000002

for specific pathogen serovars (e.g., *E. coli* O157:H7). UPSIDE also screens for additional adventitious agents and for sterility for purposes of quality and safety. UPSIDE discusses details of testing, which is conducted using validated methods by a third-party laboratory using either observation of potential microbial growth under permissive conditions (for aerobic plate count, yeast, and mold) or real-time PCR analysis (for *Mycoplasma* spp., *Enterobacteriaceae*, *E. coli*, *Campylobacter* spp., *Salmonella* serovars, *L. monocytogenes*, and certain viruses).

UPSIDE describes an adventitious agent testing plan that includes a component specifically addressing potential viral contamination. The firm notes that current food safety practices for the production and harvest of conventional meat products have proven sufficient to mitigate risks associated with transmission of zoonotic diseases from animal tissues to consumers, and viruses that may be endemic within animal populations consumed as food are typically innocuous to humans. UPSIDE also notes that lytic or latent viral infections in cultured cells would negatively affect the production capacity of the cell culture system, trigger quality control checks, and are thus inherently self-limiting. Notwithstanding these considerations, UPSIDE seeks to manage any potential viral risk both through selecting low-risk substances for use in the production process and through testing during production (including cell line development, cell bank establishment, and final harvest).

UPSIDE describes the design of a viral testing panel based on both the species which the virus can infect as well as the potential for exposure to viral agents. Here, UPSIDE focuses on testing for avian viruses that can cross the avian-human species barrier as well as certain mammalian viruses that are capable of infecting avian cells. Viruses in the second category are identified based on the animal-derived substances from other mammalian species that are used at any stage of production (e.g., porcine trypsin). UPSIDE states that this testing occurs both prior to cell bank establishment and during production.

## Establishment of the MWCB

UPSIDE states that each MWCB is established directly from one or more aliquots of the MCB which are expanded by serial subculture. UPSIDE does not reevaluate the MWCB for adventitious agents prior to qualification given that it is derived from the MCB and that the production process is a highly controlled, aseptic process. However, for quality purposes, the MWCB is tested for sterility and *Mycoplasma* spp. prior to banking since a production run will fail if the starting seed cells are not sterile. UPSIDE describes the records that will document the creation of each MWCB, including information about the MCB aliquots used and testing results.

## Cell Culture Food Production Process

UPSIDE provides information about its cell culture food production process, including:

- The proliferation phase using suspension culture;
- The differentiation and maturation phase using adherent culture; and
- Cell harvest.

Page 10 - Administrative File, CCC 000002

UPSIDE states that the firm's food safety and quality systems are based on the requirements of 21 CFR part 117 and Global Food Safety Initiative-benchmarked standards, including the establishment of a facility food safety plan. Batch records will be maintained to provide traceability of all raw materials used, operations, and testing during the production process. UPSIDE also states that all incoming dry powdered culture media as well as raw materials used for culture media undergo testing and verification appropriate to the specific media component and are stored under appropriate conditions. Liquid media is sterilized with an appropriate filter and stored at 2-8 °C. UPSIDE states that the firm uses appropriate and authorized food contact materials throughout the production process.[10]

UPSIDE states that the production process is a highly controlled, aseptic process. The production process is monitored to support cell growth via a control system that supplies media that (1) delivers nutrients, (2) removes cell waste, and (3) facilitates gas exchange. UPSIDE explains that the controlled system and environment are similar to industrial food culture fermentation systems. Sterile procedures are used at all stages of cell culture. UPSIDE states that, for smaller-scale culture vessels, any cell passages or sampling are conducted in high-efficiency particulate air-filtered biological safety cabinets by operators trained on appropriate aseptic practices. Cultures in larger suspension bioreactors use aseptic procedures to reduce the risk of introducing contaminants, and stainless-steel culture vessels and transfer lines are sterilized using high temperature steam. UPSIDE states that cultures are periodically sampled and tested using a qualified assay to detect any contamination by adventitious agents. UPSIDE also states that an environmental monitoring program is in place to assess the effectiveness of overall hygienic practices in the manufacturing facility.

## Proliferation Phase Using Suspension Culture

One or more vials of frozen cells from the MWCB are thawed and placed in sterile culture medium in a small vessel under sterile conditions. Following multiple rounds of cell division and growth (proliferation), the cells are transferred to a larger container (passaging). This process, under continued sterile conditions, is repeated with increasingly larger vessels to accumulate the desired quantity of cells (i.e., a seed train). The seed train cultures are agitated so that the cells are suspended in a homogeneous mixture within the liquid culture medium inside the vessel. UPSIDE states that all vessels are either pre-sterilized single-use, food grade plastic, or reusable vessels that can be cleaned and sterilized between uses.

UPSIDE identifies potential hazards associated with this production stage including:

- Introduction of adventitious agents via contaminated culture media components or inadequate sterilization of bioreactors;

---

[10] The production conditions described by the firm would be consistent with food type 1 (nonacid, aqueous products; may contain salt or sugar or both (pH above 5.0) and conditions of use type D (hot filled or pasteurized below 66 °C). The various food types and conditions of use are described in Appendix V of FDA's "Guidance for Industry: Preparation of Premarket Submissions for Food Contact Substances (Chemistry Recommendations)."

Page 11 - Administrative File, CCC 000002

- Introduction of adventitious agents present in the local environment of the production facility during passaging from one vessel to another;
- Introduction of media components that could persist in the cell material through proliferation, differentiation, and washing at harvest, thus being present as residues in the harvested cell material; and
- Direct bioaccumulation of media components in the cell material at later stages of proliferation.

UPSIDE manages risk associated with the first two hazards through the sterile procedures and monitoring programs discussed at the beginning of the section "Cell Culture Food Production Process." Safety considerations associated with the last two hazards are discussed in the subsequent section, "Substances Used in Cell Culture Food Production Process."

## Differentiation and Maturation Using Adherent Culture

Undifferentiated cells from the seed train are passaged to a new culture vessel where they are encouraged to differentiate and assume characteristics of muscle cells (myocytes) and connective cells (fibrocytes) through adherence to the surface of the culture vessel and through introduction of additional medium components. UPSIDE notes that some continued cell division as well as increased individual cell mass (hypertrophy) and cell differentiation are expected during this phase. UPSIDE also states that during this phase the surface-adherent cells also adhere to each other to form a multicellular tissue.

UPSIDE identifies potential hazards associated with this production stage including:

- Introduction of adventitious agents via contaminated culture medium components or inadequate sterilization of bioreactors;
- Introduction of adventitious agents present in the local environment of the production facility during passaging from one vessel to another; and
- Introduction of media components that could be present as residues after washing of cell material in subsequent harvest step; and
- Direct bioaccumulation of persistent media components in the cell material.

UPSIDE manages risk associated with the first two hazards through the sterile procedures and monitoring programs discussed at the beginning of the section "Cell Culture Food Production Process." Safety considerations associated with the last two hazards are discussed in the subsequent section, "Substances Used in Cell Culture Food Production Process."

## Harvest of Cell Material

UPSIDE states that at the end of the maturation phase, the adherent cell material is removed from the culture vessel, collected in a wash basin, and washed to remove remaining culture media from the extracellular matrix. UPSIDE describes the wash solution as a sterile dilute phosphate-buffered saline (PBS) solution, commonly used in a wide variety of research,

clinical, and food applications.[11] After washing, the PBS solution is drained. UPSIDE states that analytical testing of the washed product indicates that the wash step does not introduce any additional phosphorus, potassium, or sodium. The moisture level is then reduced to render the material suitable for consumer product formulation. After harvest, the cells are no longer held in a warmed, aerated, and nutrient-rich environment. Cell viability is no longer maintained, and the cells are converted to non-living material prior to conventional food processing.

UPSIDE identifies potential hazards associated with this production stage including:

- Introduction of adventitious agents present in the local environment of the production facility during removal, washing, and transfer to receptacles for further conventional food processing;
- Migration of contaminants from food contact materials in the growth vessel; and
- Persistence of residual media components after washing of the harvested material.

Safety considerations associated with this last hazard are discussed in the subsequent section, "Substances Used in Cell Culture Food Production Process."

UPSIDE states that the harvested product is maintained in clean equipment under cold processing conditions for moisture adjustment and storage. UPSIDE notes that an environmental monitoring program assesses the effectiveness of the overall hygienic practices in the manufacturing facility and provides necessary information to prevent possible microbial contamination of food products. Samples of the product are periodically taken and tested using a qualified assay to inspect for contamination. UPSIDE also states that the firm uses appropriate and authorized food contact materials throughout the production process.[12]

## Substances Used in Cell Culture Food Production Process

UPSIDE provides information about the substances used during its cell culture food production process in the form of cell culture media and components; including:

- nutrients used to support cell primary metabolism,
- substances to manage properties of the culture media,
- substances intended to support cell proliferation and differentiation during culture, as well as

---

[11] PBS is comprised of potassium chloride, potassium phosphate, sodium phosphate, and sodium chloride, with sodium chloride representing the major component.

[12] The production conditions described by the firm would be consistent with food type 1 (nonacid, aqueous products); may contain salt or sugar or both (pH above 5.0) and conditions of use type F or G (refrigerated or frozen storage). Any food contact substances authorized for use with food type 1 and conditions of use type F or G may be used.

Page 13 - Administrative File, CCC 000002

- a cisgenic protein expressed in the cells and intended to support proliferation during culture.

For each substance, UPSIDE provides information about the identity and the basis for its safety conclusion, and in certain cases information about estimated consumer exposure. [13]

UPSIDE describes the firm's proprietary cell culture medium as containing substances commonly found in food including amino acids, fatty acids, sugars, nucleotides, trace elements, and vitamins, and states that these substances are metabolized and used for the fundamental nutritional requirements of the cells. Additional substances identified by UPSIDE during the production phase of cell culture include emulsifiers and surfactants, antioxidants, bovine serum albumin, growth factors,[14] and wash buffers. UPSIDE notes that most of these substances are widely used in traditional food production technologies such as microbial fermentation and algal cell culture. UPSIDE states that the components mentioned above are largely removed from the cell material by washing prior to conventional food processing, that residual levels in the product do not present concerns given available toxicological information and existing use in the food supply, and that they have no technical or functional effect in the finished food. UPSIDE also states that no antibiotics or antifungal agents are used during proliferation or differentiation phases of cell culture.

UPSIDE describes the firm's general framework for evaluating its intended use of a culture medium constituents, including consideration of existing authorizations, prior use in or presence in food, and anticipated dietary exposure. In particular, UPSIDE discusses the firm's intended use of recombinant proteins used to support proliferation or differentiation in culture.[15] UPSIDE states that the firm uses such proteins in production to replace biological sources that would ordinarily be available to animal cells *in vivo*, that the gene sequences are derived from agricultural species, and that these proteins are among those commonly present in animals that are consumed by humans. UPSIDE's assessment of the firm's intended uses considered several factors including:

- the residual presence of these proteins in foods from commonly consumed agricultural species;

---

[13] A complete list of these substances was provided to FDA as supporting, corroborative information in a confidential, supplementary appendix.

[14] UPSIDE describes a version of the production process that also uses bovine serum as a source of growth factors, a common practice in research settings. UPSIDE notes that the components of bovine serum, a derivative of bovine blood, are present as a residue in conventional meat products due to residual blood in the carcass. As noted elsewhere, UPSIDE uses bovine serum that is filter-sterilized and obtained from animals originating from BSE-free or risk-negligible countries.

[15] UPSIDE provides a complete list of these recombinant proteins as supporting, corroborative information in a confidential, supplementary appendix shared with FDA.

Page 14 - Administrative File, CCC 000002

- published information on the stability of growth factors; [16]
- published data indicating absence of bioactivity through the oral route;
- analytical data on the presence of these growth factors both in UPSIDE's cultured cell material after harvest and in a conventional comparator (ground chicken meat, whole muscle meat from a chicken leg, and skin from a chicken leg); and
- analytical data on stability of these growth factors subjected to cooking temperatures.

UPSIDE states that all growth factors used in the process described in CCC 000002 are present[17] in commercially available chicken products.[18] None of the proteins are derived from a major food allergen. UPSIDE notes that their assessment of the available scientific literature indicates that growth factors are generally recognized as having low stability, and do not exhibit bioactivity via the oral route. UPSIDE further states that, given the firm's production process, these proteins:

- are present in the harvested cell material at levels similar to those found in foods derived from animal muscle tissue, such as chicken meat;
- would be present at very low or undetectable levels in finished foods after conventional food processing; and
- would likewise be broken down by both heat (e.g., cooking) and gastric fluids in the gastrointestinal tract of the consumer.

As previously noted, with respect to the specific harvested cell material described in CCC 000002, UPSIDE states that, based on the firm's testing using appropriate assays in raw and cooked samples of both store-bought chicken and UPSIDE's harvested material, these factors are thermolabile and are typically not detected at any level following cooking. Proprietary data provided by UPSIDE corroborates these statements. [19]

---

[16] UPSIDE notes that *in vitro* digestibility studies would typically be appropriate for further characterization of proteins that differ slightly from their endogenous counterparts (e.g., slight amino acid differences or differences in post-translational modification) or have been directly modified for stability or activity; however, none of the proteins used by UPSIDE meet these criteria. UPSIDE therefore concludes that *in vitro* digestibility studies are not needed. Further, in light of the poor stability of the proteins when subjected to conventional food processing (e.g., cooking) and gastric fluids in the gastrointestinal tract of the consumer, UPSIDE states that any *in vitro* digestibility studies would be corroborative.

[17] UPSIDE defines the identity of these proteins in this regard with respect to protein function or homology, rather than species origin (e.g., bovine or avian). UPSIDE notes that these proteins are highly conserved among vertebrates, and in some cases identical in amino acid sequence. The firm thus considers the proteins used in their process to be equivalent in a practical sense to those present in conventional chicken products from a food safety perspective.

[18] The exception is the previously noted alternative production process that uses bovine serum.

[19] UPSIDE conducted some analytical tests to provide additional support for their conclusions regarding anticipated residual levels of the recombinant proteins used in the firm's culture process in both raw and cooked

UPSIDE discusses the TERT cisgene expressed in one of the cell lines that is the subject of CCC 000002. As discussed in the previous section, "Establishment of Cell Lines," the protein expressed by this gene is a component of the telomere enzymatic complex, which is responsible for the maintenance and lengthening of telomeres. UPSIDE states that the protein is non-toxigenic, is not an allergen, is not heat-stable or resistant to digestion, and would be digested and metabolized like any other food protein upon consumption.

As discussed in the previous section, "Substances Used in Cell Culture Food Production Process," UPSIDE states that the firm uses appropriate and authorized food contact materials throughout the production process.[20]

## Characterization of Harvested Cell Material

UPSIDE describes characterization of the harvested cell material through compositional analysis, verification of species identity, and markers for muscle cell differentiation. Species verification relies on a commercially available validated ELISA test for chicken proteins in cooked meat.[21] Presence of muscle cell characteristics in the food are assessed by a positive test for the expression of the tropomyosin protein, which is a major characteristic structural protein of muscle cells. The compositional analyses[22] of the harvested cell material includes major nutrients (protein and amino acids, fats, carbohydrates, minerals, and vitamins), and some residues of media components. UPSIDE provides information on potential contaminants including: aerobic plate count, mold, yeast, coliforms, *E. coli*, *Enterobacteriaceae*, *Salmonella* serovars, *Enterobacter cloacae* complex, and certain viruses (influenza type A and B); as well as toxic heavy metals (lead, arsenic, cadmium, and mercury), based on the analysis of three

---

samples. All results were consistent with the conclusion that these proteins would be detectable at very low levels under certain conditions in both conventional poultry products and in the firm's product, but would be rendered undetectable by post-slaughter or post-harvest aging of the material as well as by cooking. The range of levels reported in the dataset overlapped for UPSIDE's product and the conventional comparator, but with some limited indication (given the sample size) that levels in UPSIDE's freshly harvested cell material may trend higher than in the conventional comparator. UPSIDE stated that given the low level of stability exhibited by these proteins, ongoing breakdown would be expected in any particular sample depending on duration after harvest or slaughter (e.g., samples of freshly harvested cell material or slaughtered chicken tissue relative to a commercial sample purchased at retail), consistent with their observations.

[20] As previously noted, the production conditions described by the firm would be consistent with food type 1 (nonacid, aqueous products); may contain salt or sugar or both (pH above 5.0) and conditions of use type D (hot filled or pasteurized below 66 °C) save for post-harvest storage (conditions F or G for refrigeration or frozen storage, respectively).

[21] As discussed in the previous section, "Establishment of MCB," species identity is also established at the cell bank stage through mitochondrial DNA sequencing of the cytochrome c oxidase gene, used as a common reference gene for this purpose.

[22] The production process defined in CCC 000002 may use or omit bovine serum as a source of growth factors in the cell culture food production phase. In the firm's submission, UPSIDE provides compositional data on material produced with and without serum. The firm notes that results from analysis of serum-based production are similar to the serum-free product.

Page 16 - Administrative File, CCC 000002

nonconsecutive production runs. UPSIDE states that all microbial and viral tests were negative at the limit of detection, and that toxic heavy metals are below levels that would result in safety concerns. Data was concurrently generated using conventional ground chicken. UPSIDE states that all analytical methods are validated for their intended purpose. UPSIDE provides specifications for the harvested cell material, including specifications for microbial detection: total plate count (<100 colony forming units (CFU)/g), *Enterobacteriaceae* (<10 CFU/g), and *Salmonella* serovars (not detected in 25 g)[23]; as well as toxic heavy metals: lead (≤0.1 ppm), cadmium (<2 ppm), mercury (<2 ppm), and arsenic (<1 ppm).

As a point of reference, UPSIDE also presented nutrition data from a U.S. Department of Agriculture (USDA) database on skinless light meat chicken and on an aggregate of data on light and dark muscle products from chicken, including those with and without skin.[24] Protein and amino acid results were found to be similar; UPSIDE attributes this to the expression of genetically defined muscle proteins as a dominant feature of the cell material in each case. UPSIDE reports higher levels[25] of some components (including iron, potassium, phosphorus, folate, and cholesterol), relative to values reported in USDA data.[26] UPSIDE notes that some form of folate is an essential nutrient for cells in culture to support key aspects of primary metabolism including nucleotide synthesis, amino acid synthesis, and methylation. UPSIDE states that nutrient composition for the food is within expected and safe ranges.

## FDA's Evaluation

FDA evaluated the information provided by UPSIDE with respect to the established cell lines, cell banks, substances used in the production process, and properties of the harvested cell material that collectively are the subject of CCC 000002. The primary focus of FDA's evaluation is the information on which the firm relies to conclude that the harvested cell material is safe for use as food and does not contain substances or microorganisms that would adulterate the food.

UPSIDE provides information on the establishment of the cell lines used to produce the food that is the subject of CCC 000002. FDA considered the information on the source and lineages of the cell lines, the culture adaptation process, the processes used to immortalize the cell lines (selection and genetic engineering), and the final differentiation of the cells. We also considered the information provided by UPSIDE with respect to the observed behavior of the

---

[23] UPSIDE states that the analyses for *Enterobacteriaceae* and *Salmonella* serovars are only performed on production runs of the finished product that exceed the specification for aerobic plate count.

[24] This aggregate measure of "All USDA chicken (no organs)" includes data from 27 different published samples including light meat with and without skin, dark meat with and without skin, ground raw, and other chicken samples for roasting or stewing, but did not include data for skin only or chicken organs.

[25] Observed only in serum-free harvested cell material with respect to iron and potassium.

[26] These values are within ranges observed in other commonly consumed foods.

Page 17 - Administrative File, CCC 000002

cell lines in culture, the genetic capacity of animal cells to produce toxins or other potentially harmful substances, and the viability of the cells following harvest.

The information reported was consistent with chicken-derived cells that displayed enhanced replicative capacity under *in vitro* conditions and could be induced to exhibit characteristics of myocytes under appropriate stimulus. However, once removed from the protected and controlled environment of the bioreactor the cells would quickly die, removing any replicative capacity. Subsequent food processing (such as cooking) would further break down cellular structures and contents. Digestion after consuming food made from this cell material would also break down any residual cellular structure. No information presented by the firm or otherwise available to us indicated any mechanism by which this cellular material, once rendered non-living, heated, consumed, and digested, would retain any replicative capacity or the ability to induce replicative capacity in living cells exposed to this material.

Finally, while ectopic expression of egg protein allergens was a theoretical possibility given that each cell contained the complete chicken genome including genetic code for the relevant egg proteins, there was neither evidence of such expression nor a basis for anticipating it based on the selective pressures and engineered protein used.

In summary, we did not identify any properties of the cells as described that would render them different from other animal cells with respect to safety for food use.

Regarding the production process, FDA considered the information on hazard analysis for each production step and rationales for risk-based preventive controls described by the firm, including UPSIDE's assessment of potential sources of adventitious agents, the significance of the risk posed by each, and the corresponding design of testing strategies for controlling these risks. We also considered UPSIDE's use of cGMPs and supporting programs such as sanitation control, supply management system and environmental monitoring. No information presented by the firm or otherwise available to us indicated that the selected test strategies would be inadequate to control for the presence of adventitious agents or to maintain product quality. We note the self-limiting nature of quality failures related to microbial or viral control in the production process. In summary, we did not identify elements of the process as described that indicate an unaddressed food safety risk resulting from microbial, viral, or other contaminants.

FDA considered the general framework that UPSIDE used for evaluating the safety of each substance for its intended use as well as the complete list of substances provided as supporting, corroborative material in a confidential supplementary appendix, including the identity, intended use, anticipated dietary exposure, and relevant data on safety and existing authorizations. We also considered the information presented by UPSIDE regarding the firm's assessment of the use of recombinant growth factors, including the identity and use of growth factors that are also present in conventional chicken meat, the intended use level, anticipated digestive fate, and corroborative analytical data on residual presence in the cultured cell material. We note that the substances described by UPSIDE have no intended effect in the harvested cell material and if present are expected to be at minimal levels.

We did not identify any substance uses that would lead us to question UPSIDE's conclusion regarding the safety of its food given available information, existing uses or authorizations in food, and anticipated exposure. We noted moderately elevated levels of several nutritional components relative to conventional chicken meat (discussed below); however, the information available to us from UPSIDE and from other sources indicates that these components are being used to support primary metabolism in cell culture rather than for inappropriate or indiscriminate food fortification. Regarding the use of any food contact materials throughout the production process, we note that the production conditions described by the firm during culture for food production and immediately subsequent to harvest are consistent with food type 1 (nonacid, aqueous products); may contain salt or sugar or both (pH above 5.0) and conditions of use type D (hot filled or pasteurized below 66 °C) save for post-harvest storage (conditions F or G for refrigeration or frozen storage, respectively). Thus, any food contact materials authorized for these conditions would be appropriate.

FDA reviewed the information that was provided on the identity and composition of the harvested cell material, including genetic and cellular identity, batch test data for constituents and contaminants, and specifications. We considered the analytical data provided by UPSIDE on the composition of the harvested cell material from several production runs as one element in characterizing the identity of their product, as evidence of the firm's ability to conform to their stated  specifications for food contaminants, and as relevant information in evaluating the relationship between the production process described in CCC 000002 and the properties of the harvested cell material produced through that process. We evaluated the firm's specifications for toxic heavy metals to ensure they were as low as reasonably possible and were consistent with food safety. We also considered information relating to micronutrients that could indicate excessive accumulation of nutrients from the culture medium and potentially represent inappropriate fortification. We note that batch data indicates several nutritional components, including iron, potassium, phosphorus, and cholesterol were elevated either in serum-free or in all cultured cell material compared to comparator data from conventional chicken, but that none of these levels were sufficient to pose a safety concern and did not appear to be the result of intentional manipulation of the medium. The batch data also indicated elevated folate levels relative to conventional ground chicken, because of its use in culture to support primary metabolism of the cells. FDA has previously authorized fortification of several foods with folic acid through 21 CFR 172.345. The level of folate found in UPSIDE's product is much lower than levels of folic acid authorized by this regulation; the bioavailability of folate is significantly lower than that of folic acid, that a variety of other commonly consumed foods contain comparable levels of folate, and that the level is a result of nutritional support for cells in culture experiencing high metabolic demand. In all cases, levels were within the range of those found in commonly consumed foods. We did not identify the establishment of exact equivalence of all nutrients and components relative to a particular conventional comparator as a necessary component of UPSIDE's safety conclusion, nor did we interpret the analytical data provided by the firm as definitive nutritional information regarding either harvested cell material produced through the process defined in CCC 000002 or food products that contain this material.

## Conclusions

Based on our evaluation of the data and information that UPSIDE provides in CCC 000002, as well as other information available to FDA, we did not identify a basis for concluding that the production process as described would be expected to result in food that bears or contain any substance or microorganism that would adulterate the food. We have no questions at this time about UPSIDE's conclusion that foods comprised of, or containing, cultured chicken cell material resulting from the production process defined in CCC 000002 are as safe as comparable foods produced by other methods.

Jeremiah M.
Fasano -S

Digitally signed by
Jeremiah M. Fasano -S
Date: 2022.11.15
10:52:10 -05'00'

Jeremiah Fasano

## Appendix: Summary of potential identity, quality, and safety issues

| Process Step | Potential Issue | Management Strategy |
|---|---|---|
| Cell Isolation | Cell source (animal health, species-specific considerations) | Documentation |
| | Cells from different line or species inadvertently used | Documentation, visual observation of morphology |
| | Carryover of adventitious agents such as bacteria, fungi, viruses, parasites, and prions during isolation | Animal health documentation, antibiotics application, testing program |
| | Introduction of contaminants in laboratory reagents | Supplier management program, sterilization |
| | Introduction of contaminants from animal-derived reagents (e.g., bovine serum, trypsin) | Sterilization, BSE-free certification, testing program |
| | Facility environment contamination | Aseptic procedures, antibiotics, testing program |
| Establishment of Cell Lines | Cells from different line or species inadvertently used | Genetic testing |
| | *Mycoplasma* spp. and other adventitious agent contamination | Testing program |
| | Introduction of contaminants in laboratory reagents | Supplier management program, sterilization |
| | Cells do not display expected growth profile | Measure and discard |
| | Unintended effects of immortalization | Monitor growth and viability, hazard analysis, food safety assessment |
| | Contamination with adventitious agents such as bacteria, fungi, viruses, parasites, and prions from original source | Hazard analysis, testing program |
| | Animal-derived reagent (e.g., bovine serum, trypsin) contamination | Sterilization, BSE-free certification, testing program |
| | Facility environment contamination | Aseptic procedures, antibiotics, testing program |
| | Introduction of TERT cisgene | Food safety assessment |

Page 21 - Administrative File, CCC 000002

| Process Step | Potential Issue | Management Strategy |
|---|---|---|
| Establishment of Cell Lines | Presence of residual unintended material from genetic engineering | Sequencing to confirm removal |
| Establishment of MCB | Contamination during transfer | Aseptic procedures, sterilization, environmental monitoring |
| | Cells from different line or species inadvertently used | Genetic testing |
| | Cells do not display expected growth profile | Measure and discard |
| | Contamination with adventitious agents such as bacteria, fungi, viruses, parasites, and prions from original source | Testing program |
| | Animal-derived reagents (e.g., bovine serum, trypsin) contamination | Sterilization, BSE-free certification, testing program |
| | Contamination with adventitious agents from culture media components | Sterilization, batch records |
| | Facility environment contamination | Environmental monitoring |
| Proliferation Phase | Contamination during transfer | Aseptic procedures, sterilization, environmental monitoring, culture monitoring |
| | Contamination with adventitious agents from culture media components | Supplier program, sterilization, batch records, culture monitoring |
| | Animal-derived reagent (e.g., bovine serum, trypsin) contamination | Sterilization, BSE-free certification, testing program, culture monitoring |
| | Contamination with adventitious agents through inadequate sterilization of bioreactors | Validated sanitation processes and environmental monitoring, equipment design, culture monitoring |
| | Facility environment contamination during transfer of cells between bioreactors | Validated sanitation processes and environmental monitoring, culture monitoring |

Page 22 - Administrative File, CCC 000002

| Process Step | Potential Issue | Management Strategy |
|---|---|---|
| Proliferation Phase | Introduction of media components that could persist as residues in harvested cells | Food safety assessment |
| | Introduction of media components that could accumulate in the cells before harvest | Food safety assessment, compositional analysis at harvest |
| Differentiation Phase | Contamination during transfer | Aseptic procedures, sterilization, environmental monitoring, culture monitoring |
| | Contamination with adventitious agents from culture media components | Supplier program, sterilization, batch records, culture monitoring |
| | Contamination with adventitious agents through inadequate sterilization of bioreactors | Validated sanitation processes and environmental monitoring, equipment design, culture monitoring |
| | Facility environment contamination during transfer of cells between bioreactors | Validated sanitation processes and environmental monitoring, culture monitoring |
| | Introduction of media components that could persist as residues in harvested cells | Food safety assessment, testing |
| | Introduction of media components that could accumulate in the cells before harvest | Food safety assessment, compositional analysis at harvest |
| Harvest of Cell Material | Presence of bacterial or viral contaminants from culture process | Culture monitoring, testing, specifications |
| | Migration of contaminants from food contact materials | Use of authorized food contact materials, supplier program |
| | Presence of residual media components after harvest | Wash steps, food safety assessment, testing program |
| | Presence of elemental contaminants (toxic heavy metals) after harvest | Testing program, specifications |

Page 23 - Administrative File, CCC 000002

| Process Step | Potential Issue | Management Strategy |
|---|---|---|
| Harvest of Cell Material | Facility environment contamination | Equipment cleaning procedures, environmental monitoring, controlled temperature conditions |