UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | |
|---|---|
| WILD TYPE, INC. D/B/A WILDTYPE and UPSIDE FOODS, INC., <br><br>        *Plaintiffs*, <br><br> v. <br><br> JENNIFER A. SHUFORD, in her official capacity as the Commissioner of The Texas Department of State Health Services; CECILE ERWIN YOUNG, in her official capacity as the executive commissioner of The Texas Health and Human Services Commission; KEN PAXTON, in his official capacity as the Attorney General of Texas; and DELIA GARZA, in her official capacity as the County Attorney of Travis County, <br><br>        *Defendant*. | CIVIL ACTION NO. 1:25-CV-01408-ADA-ML |

**STATE DEFENDANTS' RESPONSE TO
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

Table of Authorities ........................................................................................................... iii

Introduction ......................................................................................................................... 1

Factual Background ............................................................................................................. 2

    I.   The History of Cultured Meat ................................................................................. 2

    II.  The Texas Legislature enacted SB 261 to protect the health and safety of Texans and ensure that Texas can enact a comprehensive regulatory framework for the sale of cell-cultured protein in Texas. ......................................................................... 3

    III. Plaintiffs' business and impact on the market ........................................................ 7

Legal Standard ..................................................................................................................... 8

Argument .............................................................................................................................. 9

    IV. Plaintiffs are unlikely to succeed on the merits of their challenge to SB 261. ..... 9

        A. Plaintiffs are unlikely to succeed on their claim that SB 261 violates the dormant Commerce Clause. .................................................................................... 9

            1.  SB 261 is facially neutral. ............................................................................ 9

            2.  SB 261 was not enacted with a discriminatory purpose. ........................... 10

            3.  SB 261 does not operate with discriminatory effect against interstate commerce .................................................................................................. 14

            4.  SB 261 nonetheless passes heightened scrutiny ....................................... 16

        B. UPSIDE is unlikely to succeed on its claims that SB 261 is preempted by federal law. ....................................................................................................................... 18

            1.  The Court lacks subject matter jurisdiction over UPSIDE's § 1983 preemption claims .................................................................................... 19

2.  UPSIDE lacks a cause of action to pursue its preemption claims under both § 1983 and *Ex parte Young.*     19

            3.  The PPIA's Ingredients and Facilities Clauses do not preempt SB 261 ............... 23

               a.  The Ingredients Clause does not preempt SB 261. ................................... 23

               b.  The Facilities Clause does not preempt SB 261 ........................................ 25

               c.  Fifth Circuit precedent supports finding SB 261 is not preempted. .......... 27

    V.  The remaining factors favor denial of a preliminary injunction. ......................... 27

Conclusion .......................................................................................................................... 29

Certificate of Service .......................................................................................................... 30

TABLE OF AUTHORITIES

**Cases**

*AbbVie, Inc. v. Fitch*,
  152 F.4th 635 (5th Cir. 2025) ................................................................ 8

*Alexander v. Sandoval*,
  532 U.S. 275 (2001) ........................................................................... 22

*Allstate Ins. Co. v. Abbott*,
  495 F.3d 151 (2007) ...................................................................... passim

*Am. Trucking Ass'ns, Inc. v. Alviti*,
  14 F.4th 76 (1st Cir. 2021) ................................................................ 13

*Am. Trucking Ass'ns, Inc. v. Rhode Island Tpk. & Bridge Auth.*,
  123 F.4th 27 (1st Cir. 2024) ......................................................... 10, 15

*Armour & Co. v. Ball*,
  468 F.2d 76 (6th Cir. 1972) ...................................................... 23, 24, 25

*Ass'n des Éleveurs de Canards et d'Oies du Quebec v. Bonta*,
  33 F.4th 1107 (9th Cir. 2022) ............................................................. 23

*Ass'n des Éleveurs de Canards et d'Oies du Quebec v. Becerra*,
  870 F.3d 1140 (9th Cir. 2017) ........................................................ 23, 24

*Beleno v. Lakey*,
  306 F. Supp. 3d 930 (W.D. Tex. 2009) ................................................. 19

*Bell v. Health-Mor, Inc.*,
  549 F.2d 342 (5th Cir. 1977) ........................................................ 18, 22

*Book People, Inc. v. Wong*,
  91 F.4th 318 (5th Cir. 2024) ...................................................... 27, 28, 29

*Camps Newfound/Owatonna, Inc. v. Town of Harrison, Me.*,
  520 U.S. 564 (1997) ........................................................................... 15

*Comptroller of the Treasury of Md. v. Wynne*,
  575 U.S. 542 (2015) ........................................................................... 13

*Dep't of Revenue of Ky. v. Davis*, 553 U.S. 328, 338 (2008) ....................... 17

*Empacadora de Carnes de Fresnillo, S.A. de C.V., v. Curry*,
  476 F.3d 326 (5th Cir. 2007) ............................................................... 27

*Enter. Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana*,
  762 F.2d 464 (5th Cir. 1985) ................................................................ 8

*Exxon Corp. v. Governor of Md.*,
  437 U.S. 117 (1978) ........................................................................... 15

*Freedom From Religion Found., Inc. v. Mack*,
  4 F.4th 306 (5th Cir. 2021) ................................................................ 20

*Freedom From Religion Found., Inc. v. Mack*,
  49 F.4th 941 (5th Cir. 2022) ............................................................... 20

*Gonzaga Univ. v. Doe*,
  536 U.S. 273 (2002) ........................................................................... 21

*Hardin v. Houston Chron. Pub. Co.*,
  572 F.2d 1106 (5th Cir. 1978) (per curiam) ............................................................. 8

*Harrison v. Young*,
  48 F.4th 331 (5th Cir. 2022) ................................................................................... 19

*Hooks v. Landmark Indus., Inc.*,
  797 F.3d 309 (5th Cir. 2015) .................................................................................. 18

*In re Davis*,
  170 F.3d 475 (5th Cir. 1999) .................................................................................. 12

*Johansen v. Trico Marine Int'l, Inc.*,
  No. CV H-07-3767, 2008 WL 11390861 (S.D. Tex. Aug. 29, 2008) ........................ 20

*Jones v. Tex. Dep't of Crim. Just.*,
  880 F.3d 756 (5th Cir. 2018) .................................................................................... 8

*Maine v. Taylor*,
  477 U.S. 131 (1983) ............................................................................................... 17

*Maria S. v. Garza*,
  No. 1:13-CV-108, 2015 WL 4394745 (S.D. Tex. July 15, 2015) ............................. 20

*Medina v. Planned Parenthood S. Atl.*,
  606 U.S. 357 (2025) ............................................................................................... 21

*Melot v. Bergami*,
  970 F.3d 596 (5th Cir. 2020) .................................................................................. 20

*Mock v. Garland*,
  75 F.4th 563 (5th Cir. 2023) .................................................................................... 8

*Nat'l Ass'n of Optometrists & Opticians LensCrafters, Inc. v. Brown*,
  567 F.3d 521 (9th Cir. 2009) ............................................................................ 14, 15

*Nat'l Meat Ass'n v. Harris*,
  565 U.S. 452 (2012) ............................................................................................... 26

*New Energy Co. of Ind. v. Limbach*,
  486 U.S. 269 (1988) ................................................................................................. 9

*Or. Waste Sys., Inc. v. Dep't of Env't Quality of State of Or.*,
  511 U.S. 93 (1994) ............................................................................................ 16, 17

*Pennhurst State Sch. & Hosp. v. Halderman*,
  465 U.S. 89 (1984) ................................................................................................. 19

*Quern v. Jordan*,
  440 U.S. 332 (1979) ............................................................................................... 19

*Tenn. Wine & Spirits Retailers Ass'n v. Thomas*,
  588 U.S. 504 (2019) ................................................................................................. 9

*Tesla, Inc. v. La. Auto. Dealers Ass'n*,
  113 F.4th 511 (5th Cir. 2024) ................................................................................. 12

*Trump v. CASA, Inc.*,
  606 U.S 831 (2025) ................................................................................................ 14

*Turtle Island Foods Inc. v. Abbott*,
  No. 1:23-CV-1032-DII, 2024 WL 5659990 (W.D. Tex. Sept. 23, 2024) ................. 11

iv

*United States v. O'Brien*,
   391 U.S. 367 (1968) ........................................................................................ 12

*UPSIDE Foods, Inc v. Simpson*,
   No. 4:24CV316-MW/MAF, 2024 WL 5274483 (N.D. Fla. Oct. 11, 2024) ........................ 23, 26

*UPSIDE Foods, Inc. v. Simpson*,
   No. 4:24cv316-MW/MAF, 2025 LEXIS 10381 (N.D. Fla. Apr. 25, 2025) .................... 22, 24, 25

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
   429 U.S. 252 (1977) ........................................................................................ 11

*White Buffalo Ventures, LLC v. Univ. of Texas at Austin*,
   420 F.3d 366 (5th Cir. 2005) ............................................................................. 18

*Will v. Mich. Dep't of State Police*,
   491 U.S. 58 (1989) .......................................................................................... 20

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) ...................................................................................... 27, 29

## Constitutional Provisions & Statutes

21 U.S.C. § 451 ................................................................................. 21, 24, 25

21 U.S.C. § 467c .......................................................................................... 22

21 U.S.C. § 473 ............................................................................................ 21

21 U.S.C. §§ 451–473 .................................................................................... 25

42 U.S.C. § 1983 .......................................................................................... 20

Cal. Penal Code § 599f ................................................................................... 26

Fla. Stat. § 500.452 ....................................................................................... 26

Tex. Health & Safety Code § 431.002(5-a) ...................................................... 24, 25

Tex. Health & Safety Code § 431.02105(a) ................................................... passim

## Rules & Regulations

Act of May 2, 2023, 88th Leg., R.S., ch. 32, 2023 Tex. Gen. Laws 82, 82–86 ............................ 11

## Constitutional Provisions

Tex. Const. art. IV, § 1 ................................................................................... 19

U.S. Const. art. I, § 8, cl. 3 ............................................................................... 9

Defendants Jennifer A. Shuford, in her official capacity as the Commissioner of the Texas Department of State Health Services; Cecile Erwin Young, in her official capacity as the Executive Commissioner of the Texas Health and Human Services Commission; and Ken Paxton, in his official capacity as the Attorney General of Texas (collectively, State Defendants), hereby file this Response to Plaintiffs' Motion for Preliminary Injunction.

## Introduction

*"We don't need our dinner plate to be turned into a scientific experiment."*[1]

This litigation centers around the fledgling industry of cell-cultured protein products— more commonly referred to as lab-grown "meat." Plaintiffs Wildtype and UPSIDE are both California-based companies that produce and are attempting to sell cell-cultured protein. But because this is a novel product, Texas, as well as several other states, has seen fit to delay the introduction of cell-cultured protein into the market for a myriad of reasons. Chief among those reasons is the reality that information regarding the health and safety of cell-cultured protein is scant at best.

In the 2025 Legislative session, Texas legislators introduced and ultimately passed SB 261, which bans the sale of cell-cultured protein within Texas's borders for a period of two years, during which time the Legislature may carefully consider the health and safety implications of this product and begin to construct a more comprehensive regulatory framework in the 2027 Legislative session. Dissatisfied with their inability to immediately expand their businesses into Texas, Plaintiffs sued, using the dormant Commerce Clause and the Supremacy Clause of the Constitution as weapons to strike down this otherwise unoffensive law. Their first step in doing so is to ask this Court for a preliminary injunction.

The Court should not take the bait. Plaintiffs have little chance of succeeding on the merits of their claims. As a matter of principle, the federal judiciary should not be used as a weapon to strike down any economic regulation with which Plaintiffs disagree. Moreover, Plaintiffs' alleged

---

[1] Debate on Tex. SB 261 on the Floor of the House, 89th Leg., R.S., at 7:46:07-7:46-14 (May 24, 2025) (Rep. Gerdes) (tape available at https://house.texas.gov/videos/22257).

harm is entirely speculative and impossible to measure. A preliminary injunction is thus inappropriate, and their motion, ECF No. 21, should be denied.

**Factual Background**

## I. The History of Cultured Meat

In December 2020, Singapore became the first county in the world which allowed cell-cultivated meat to be sold to consumers.[2] Until June 2023, Eat Just was the only company permitted to sell cultivated meat to consumers and only in one country: Singapore.[3] Today, the United States and Singapore are the only countries which allow cell-cultivated meat products to be sold to consumers.[4]

In November 2022, UPSIDE received a "No Questions" Letter (NQL) from the U.S. Food and Drug Administration (FDA), marking the first time the FDA issued a NQL for cell-cultured protein products.[5] In June 2023, two companies, GOOD Meat and UPSIDE Foods, received approval from the U.S. Department of Agriculture (USDA) and FDA to sell their cultivated meat to U.S. consumers.[6]

Just months after receiving approval to sell it, UPSIDE's cell-cultivated chicken product came under public scrutiny. The San Francisco Chronical published an article stating that "San Francisco's only restaurant offering chicken meat made from cells cultivated in a bioreactor will no longer serve the item. UPSIDE's products recently came under scrutiny after Bloomberg published a piece in which former unidentified employees cast doubt on the quality of the company's chicken."[7] Reports indicated that "UPSIDE [was] just growing meat described as

---

[2] Cong. Research Serv., *Cell-Cultivated Meat: An Overview*, R47697 (9/19/2023) https://www.congress.gov/crs-product/R47697 (approving Eat Just's GOOD Meat cell-cultivated chicken for sale).

[3] Megan Poinski, Cultivated meat to enter US market with full USDA approval for Eat Just and Upside Foods, FOODDIVE, (June 21, 2023), https://www.fooddive.com/news/us-approves-cultivated-meat-eat-just-upside-foods/653509/.

[4] Cong. Research Serv., *Cell-Cultivated Meat: An Overview*, R47697 (9/19/2023) https://www.congress.gov/crs-product/R47697.

[5] Memorandum from Jeremiah Fasano to Administrative File, CCC 000002, at 19 (Nov. 14, 2022), https://www.fda.gov/media/163261/download.

[6] Laura Reiley, *Cell-Cultured Chicken Gets the Final Green Light from USDA*, Wash. Post (June 21, 2023), https://www.washingtonpost.com/business/2023/06/21/usda-cultivated-meat-approval/.

[7] Mario Cortez, *S.F. Michelin-starred restaurant was first to serve lab-grown meat. Now it's Off the Menu*, San Francisco

'skin-type cells' with higher cholesterol and lead content than real chicken, and that the bioreactors used to produce cultivated cells were a 'contamination nightmare' because they were too complex to clean."[8] "Both UPSIDE Foods . . . and Eat Just (and its Good Meat subsidiary) received the last of a series of approvals from the FDA and USDA last June 21 for their chicken products, but neither appears close to getting their products on the market."[9]

On May 28, 2025, Wildtype received a NQL from the FDA.[10] On June 3, 2025, Wildtype became "the third" company "with full approval to sell" to U.S. Consumers.[11] Less than a month after receiving FDA sales approval, Wildtype released a statement stating its cell-cultivated salmon product was on the menu at one restaurant in Texas.[12]

## II. The Texas Legislature enacted SB 261 to protect the health and safety of Texans and ensure that Texas can enact a comprehensive regulatory framework for the sale of cell-cultured protein in Texas.[13]

Faced with the possibility of this suspect product being sold within its borders, the Texas Legislature decided to take prompt action. And so in the 2025 Legislative Session, the Legislature introduced and ultimately passed SB 261 into law. Public health and safety was the common thread throughout the creation of SB 261. While Plaintiffs' baselessly claim evidence that SB 261 promoted public health or safety was "[a]bsent from the debate[,]"ECF No. 21 at 18, the simple fact remains that the vast majority of testimony at the Senate and House Committee hearings on SB 261 and related bills concerned protecting the public's health and safety.

CHRON. (Feb. 2, 2024), https://www.sfchronicle.com/food/restaurants/article/upside-foods-dominique-crenn-18644572.php (reporting Upsides's products had "recently c[o]me under scrutiny" after "former unidentified employees cast doubt on the quality of the company's chicken").

[8] *Id.*

[9] Dave Fusaro, *Cultured Meat Hits 'Pause,'* FOOD PROCESSING (May 3, 2024) https://www.foodprocessing.com/business-of-food-beverage/article/55036885/cultured-meat-hits-pause.

[10] Memorandum from Ashley Toole to Administrative File, CCC 000005, at 20 (May 28, 2025), https://www.fda.gov/media/186753/download.

[11] *Statement from AMPS on Wildtype Becoming the First Cultivated Fish Available for Sale in the World– Approved and Available Now in US restaurants*, ASS'N FOR MEAT POULTRY & SEAFOOD INNOVATION, (June 3, 2025), https://ampsinnovation.org/statement-from-amps-on-wildtype-becoming-the-first-cultivated-fish-available-for-sale-in-the-world-approved-and-available-now-in-us-restaurants/.

[12] *We're coming to Texas*, WILDTYPE (June 20, 2025), https://www.wildtypefoods.com/news/blog/otoko (announcing that on July 17th, a single salmon dish will be available on the menu at a local Austin restaurant).

[13] Quoted legislative statements were transcribed by the undersigned counsel after listening to the videos and are an accurate representation of the statements made to the best of the undersigned's ability.

The Senate Committee heard testimony on SB 261 which was almost entirely focused on the health and safety impacts of cell-cultivated protein. For example, one witness testified that "as these new 'meat experiences' emerge, significant concerns exist, as chairman Perry outlined, to the continued growth—continued concern, about the long-term safety and effects on humans." [14] "Because these products are so new there has been no long-term research. Studies that can provide safety and measures have not yet been performed." [15] However, research that has been performed has shown potential negative consequences to consuming cell-cultivated protein. For example,

> [r]esearch shows that lab grown cells are prone to becoming contaminated with microplastics during the production process which can disrupt human cell membranes. Furthermore, it is the use of antibiotics during the production that raises fears about antibiotic resistance. There are also a few unsolved questions regarding how some of these genetic improved cells might have once behaved when ingested by humans. [16]

Texas is not alone in its cautious approach to cell-cultivated protein. The Senate heard testimony that other nations and sister states are pursuing bans and calling for research to address concerns regarding safety of lab-grown meat. [17]

Texans know the environmental and health impacts of conventional meat, but the same cannot be said for cell-cultivated protein. Former Texas State Representative Dan Gattis testified regarding the disparity between the "natural, well-tested and well-regulated" natural protein industry and the lab-grown meat industry which "cannot make any of those claims." [18] Rep. Gattis testified that recent "studies have shown that the environmental impact of lab-grown meat is likely to be much higher than traditional beef production with the potential for harm ranging from four to twenty-five times that of traditional beef production." [19] "I don't want to return to a day when

---

[14] Hearings on SB 261 Before the Senate Committee on Water, Agriculture, and Rural Affairs, 89th Leg., R.S., at 3:17:45–3:18:10 (Mar. 31, 2025) (Carl Ray Polk) (tape available at https://senate.texas.gov/videoplayer.php?vid=21497&lang=en).
[15] *Id.*
[16] *Id.* at 3:18:10–3:18:38.
[17] *Id.* at 3:19:00–3:19:54.
[18] *Id.* at 3:21:15–3:21:26.
[19] *Id.* at 3:22:10–3:22:27.

it is 'buyer beware.'"[20] "First and foremost, cell cultured proteins pose safety concerns and they also work to undermine public trust in the security of traditional proteins . . . ."[21]

The Senate Committee explicitly considered whether SB 261 promotes public health and safety. Senator Kolkhorst asked, "We are making progress on . . . [the] Make America Healthy Again [movement] . . . .We are trying to purge ourselves of chemicals . . . . Giving people a chance to really have healthy foods, I mean, do you all see the lab-grown meat as part of the MAHA movement or against it?"[22] "I would see the lab grown meat as against it."[23] Rep. Gattis further replied:

> In a time when we are trying to rid our food of all sorts of added products, dyes, and all of those types of things and understanding finally what their impact really is to our ultimate health, you have a group of companies that is going to be the quintessential top of the manufactured food product highly processed . . . . You will see it is in our food lunch program, then you have marginalized communities that get fed this type of product that we do not understand the long-term implications aspect of it. *We don't want our military or our children to be a lab experiment.*[24]

Even opposition to the bill focused chiefly on the health and safety implications of natural meat and lab grown meat:

> Our seafood is not getting any cleaner. If we are going to make America healthy again, we need to take mercury, other heavy metals, sea lice, microplastics, parasites, antibiotics and all kind of contaminants out of our food system . . . . Recently, a guest was chowing down on cultivated sushi and told us that she is pregnant and loves finally not worrying about heavy metals in fish. I have taken care of patients who were hospitalized for mercury poisoning. Healthy people who just loved eating fish. As doctors, we tell parents to feed their children fish, it is good for them but not too much. Because of the heavy metals.[25]

A researcher, testifying in opposition, argued that "if there is concern about microplastics in cell cultured meat, then we ought to look and see if we can compare the concentration of microplastics in cell cultured meat product to that of conventional beef."[26] A representative for Good Food

---

[20] *Id.* at 3:23:20–3:23:26.
[21] *Id.* at 3:24:24–3:24:32.
[22] *Id.* at 3:26:00–3:26:52 (Sen. Kolkhorst).
[23] *Id.* at 3:26:51–3:26:52 (Dan Gattis).
[24] *Id.* at 3:26:52–3:27:16, 3:28:36–3:28:51 (emphasis added).
[25] *Id.* at 3:34:10–36, 3:35:18–3:35:40 (Dr. Aryé Elfenbein, founder of Wildtype).
[26] *Id.* at 3:37:44–3:38:00. (Samuel Sumner Peabody IV).

testified, "On safety, which I know is a *big concern*, cell cultivated meat, as folks mentioned, is highly regulated by both USDA and FDA . . . . [T]here is just concerns about *overregulation* here."[27] Chairman Perry rejected the indication that lab-grown meat is welcoming to regulation, "You are all hat and no cattle, when you tell us you are okay with regulation and labeling, but yet your sister company is suing over labeling . . . . So, I am not buying that."[28] When Representative Stan Gerdes introduced SB 261's companion bill, HB 1431, to the Committee on Public Health, the first substantive question was regarding the health implications if lab-grown meat was "consumed by humans, or what kind of effect on our body it would be?"[29] Rep. Gerdes indicated that "the results are not in on it yet."[30]

The only question those opposed to the bill asked to DSHS was "Do you know of any reason why this would be a health risk—a public safety, a public health risk."[31] While DSHS did not have the necessary information, Dan Gattis responded directly during his testimony minutes later, "The concern, to answer representative Bucy, what are the long-term implications, what are the long-term effects? We don't know. We really don't."[32] Further testimony explained that the FDA approval process for lab-grown meat is less rigorous than other fields:

> [This] is not the FDA approval discussed in some of the other bills earlier today where we are talking about trials required to be conducted, long-term trials and tests and then, ultimately, approval. The approval process that these cell-cultured meats go through is basically what is called a "no questions letter" from the FDA meaning "okay this is what you want to do, we don't have any more further questions." They pass that? They pass. This is not the situation where we have long term studies, long term tests, how does the human body, does it utilize this in a different way than natural meats? *We don't know the answer.* What are the potential implications or safety concerns with regard to production? All those different stages of production, we don't necessarily know all the answers behind that. That is the

---

[27] *Id.* at 3:39:21–3:39:50 (Tamar Lieberman, representing Good Food).
[28] *Id.* at 3:41:20–3:41:35 (Chairman Perry).
[29] Hearings on HB 1431 Before the House Committee on Public Health, 89th Leg., R.S., at 4:20:18–4:21:15 (Apr. 7, 2025) (Question from Rep. Shofner to Rep. Gerdes) (tape available at https://house.texas.gov/videos/21658).
[30] *Id.* at 4:20:45–4:20:48.
[31] *Id.* at 4:22:28–4:22:51 (Rep. Bucy III).
[32] *Id.* at 4:29:38–4:29:54 (Dan Gattis).

basic issue that we have got. We have a brand new novel concept that we are wanting
to put out there basically in my mind, *utilizing our citizens as test subjects*.[33]

In response, Rep. Bucy III agreed that Texas needs to "know more about this before we have kids
eating it."[34] Rep. Schofield echoed similar concerns, "It would be one thing if we found a new
animal and 'okay we are going to have this meat.' We are talking about creating something that
didn't exist before and talking about feeding it to people."[35]

### III. Plaintiffs' business and impact on the market

Cell-cultivated meat is not a popular or widespread product. "The global market for
cultured meat is currently estimated to be worth USD 0.27 billion in 2025."[36] In contrast, chicken
nugget and sandwich sales at McDonalds alone total "$25 billion in annual sales."[37] In terms of
global revenue, Plaintiffs' products make up hardly a drop in the bucket.

Furthermore, Plaintiffs' products do not compete with the beef industry. Founder and
CEO of UPSIDE Foods admitted as much at the House Committee Hearing when he said: "We
are not even selling beef, by the way; we are selling chicken right now."[38] Indeed, UPSIDE Foods
and Wildtype have only minor commercial contacts with Texans, none of which include selling
beef-like products. UPSIDE Foods alleges only a single sale of its "cultivated chicken product to a
West Lake Hills, Texas, resident." ECF No. 21 at 13. Besides this one-time sale, UPSIDE's only
other contact within Texas are allegations that it "has spoken" with "potential customers" and
has "had conversations with chefs" in Texas. *Id.* at 19.

Wildtype knew its product would soon be prohibited in Texas before it began selling its
product in Texas. Almost immediately upon receiving its NQL, Wildtype rushed to ensure that its
product was sold in Texas before SB 261 went into effect. On the same day that SB 261 was signed

---

[33] *Id.* 4:29:55–4:30:58 (emphasis added).

[34] *Id.* at 4:32:50–4:32:55.

[35] *Id.* at 4:45:00–4:45:13 (Rep. Schofield).

[36] Cultured Meat Market Overview, ROOTSANALYSIS (2025), https://www.rootsanalysis.com/reports/cultured-meat-market.html.

[37] Grace Dean, *McDonald's says its chicken options are now just as popular as beef,* BUSINESS INSIDER, (Feb. 6, 2024, 7:51 AM CT), https://www.businessinsider.com/mcdonalds-chicken-sandwiches-nuggets-business-as-big-as-beef-burgers-2024-2.

[38] Hearings on HB 1431 Before the House Committee on Public Health, 89th Leg., R.S., at 4:55:10–4:55:16 (Apr. 7, 2025) (Uma Valeti, Founder of UPSIDE Foods) (tape available at https://house.texas.gov/videos/21658).

into law by the Governor,[39] Wildtype announced that it would be "coming to Texas."[40] OTOKO, an Austin, Texas restaurant, placed a single item with "Wildtype Salmon" on its menu on July 17, 2025.[41]

**LEGAL STANDARD**

"[A] preliminary injunction is an extraordinary and drastic remedy which should not be granted unless the movant *clearly carries the burden of persuasion*." *AbbVie, Inc. v. Fitch*, 152 F.4th 635, 642 (5th Cir. 2025) (emphasis added). To obtain a preliminary injunction, it is the movant's burden to establish: (1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction is not issued, (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public interest. *Jones v. Tex. Dep't of Crim. Just.*, 880 F.3d 756, 759 (5th Cir. 2018) (*Byrum v. Landreth*, 566 F.3d 442, 445 (5th Cir. 2009)). The government's and the public's interests merge when the government is a party. *Mock v. Garland,* 75 F.4th 563, 577 (5th Cir. 2023) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)). A preliminary injunction "must be the product of reasoned application of the four factors held to be necessary prerequisites." *Enter. Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana,* 762 F.2d 464, 472 (5th Cir. 1985) (quoting *Fla. Med. Ass'n v. H.E.W.,* 601 F.2d 199, 202 (5th Cir. 1979)). "The movant has the heavy burden of persuading the district court that all four elements are satisfied." *Hardin v. Houston Chron. Pub. Co.*, 572 F.2d 1106, 1107 (5th Cir. 1978) (per curiam). "[I]f the movant does not succeed in carrying its burden on any one of the four prerequisites, a preliminary injunction may not issue and, if issued, will be vacated on appeal." *Enter. Int'l, Inc.*, 762 F.2d at 472.

---

[39] S.J. of Tex. 89th Lege., at 3862 (June 2, 2025) (reporting that SB 261 was signed by the Governor on June 20, 2025).
[40] *We're coming to Texas*, WILDTYPE (June 20, 2025), https://www.wildtypefoods.com/news/blog/otoko.
[41] *See id.* (announcing that Wildtype salmon will be on the menu at OTOKO "Starting July 17").

**ARGUMENT**

**IV. Plaintiffs are unlikely to succeed on the merits of their challenge to SB 261.**

    **A. Plaintiffs are unlikely to succeed on their claim that SB 261 violates the dormant Commerce Clause.**

Plaintiffs first claim for relief finds its roots in the so-called "dormant Commerce Clause", which limits state and local laws "aimed at giving a competitive advantage to in-state businesses." *Tenn. Wine & Spirits Retailers Ass'n v. Thomas*, 588 U.S. 504, 531 (2019). The dormant Commerce Clause stems from a negative reading of the Commerce Clause, U.S. Const. art. I, § 8, cl. 3, and "prohibits economic protectionism—that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors[,]" *New Energy Co. of Ind. v. Limbach*, 486 U.S. 269, 273–74 (1988).

"A statute violates the dormant Commerce Clause where it discriminates against interstate commerce either facially, by purpose, or by effect." *Allstate Ins. Co. v. Abbott*, 495 F.3d 151, 160 (2007). Here, SB 261 does none of these. To begin, SB 261 is facially neutral: it prohibits the sale of cell-cultured protein in Texas regardless of whether it is produced or sold by a Texas producer or an out-of-state producer. Plaintiffs concede as much. ECF No. 21 at 21–22. Likewise, SB 261 does not burden interstate commerce in purpose or effect. It simply prohibits the sale of a certain nascent product for two years until the Legislature can better assess that product's health risks and create a proper regulatory framework for its distribution and sale. But even assuming *arguendo* that SB 261 burdens interstate commerce, it is narrowly tailored to achieve a legitimate local purpose, thus surviving heightened scrutiny. As a result, Plaintiffs are unlikely to succeed on the merits of their claim.

        **1. SB 261 is facially neutral.**

Plaintiffs correctly point out that SB 261 is facially neutral. ECF No. 21 at 21–22. It makes no distinction between in-state and out-of-state producers of cell-cultured protein products. Tex. Health & Safety Code § 431.02105(a). If a Texas-based company were to manufacture such products, they too would be precluded from offering for sale any cell-cultured protein within the

9

state and thus would be treated exactly the same as any out-of-state producer. *See id.* And so as the party challenging an otherwise facially neutral statute under the dormant Commerce Clause, Plaintiffs must therefore "prove that the statute has a substantial (i.e., beyond de minimis) competitive effect on nonstate interests." *Am. Trucking Ass'ns, Inc. v. Rhode Island Tpk. & Bridge Auth.*, 123 F.4th 27, 39 (1st Cir. 2024) (citing *Exxon Corp. V. Governor of Md.*, 437 U.S. 117, 126 (1978)). Plaintiffs are unlikely to do so.

### 2. SB 261 was not enacted with a discriminatory purpose.

Because SB 261 is facially neutral, Plaintiffs must show that SB 261 substantially discriminates against interstate commerce, either by purpose or effect. *See Allstate Ins. Co.*, 495 F.3d at 160. Plaintiffs claim that SB 261 was enacted with a discriminatory purpose. ECF No. 21 at 24. The Supreme Court has identified several factors that Courts should examine when determining whether the Legislature purposefully discriminated when passing a law, and the Fifth Circuit has adopted these factors when considering claims under the dormant Commerce Clause. *Allstate Ins. Co.*, 495 F.3d at 160 (citing *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266–68 (1977) (*Arlington Heights*)). These factors are:

> (1) whether a clear pattern of discrimination emerges from the effect of the state action; (2) the historical background of the decision, which may take into account any history of discrimination by the decisionmaking body; (3) the specific sequence of events leading up the challenged decision, including departures from normal procedures; and (4) the legislative or administrative history of the state action, including contemporary statements by decisionmakers.

*Id.* (citing *Arlington Heights*, 429 U.S. at 266–68). Plaintiffs address only one of these factors in their argument, and in doing so gloss over the finer points of the caselaw related to the dormant Commerce Clause. This failure is fatal to Plaintiffs' argument at this stage.

*First*, Plaintiffs do not show any "pattern of discrimination" that emerges from SB 261's effects. *Id.* And indeed, they cannot do so. SB 261 treats all manufacturers of cell-cultured protein products the same. Whether the products are manufactured in Texas or elsewhere, those products cannot be sold in Texas. Nor does the statute, or any other Texas statute for that matter, preclude out-of-state producers of conventional meat from selling conventional meat in Texas. In short,

SB 261 precludes the sale of a certain product and does not treat the sale of that product differently based on the seller's domicile. *See Allstate Inc. Co.*, 495 F.3d at 161. As such, this factor weighs against Plaintiffs' argument for discriminatory purpose.

That all cell-cultured protein companies are based outside of Texas is immaterial. This industry is infinitesimally small, and not in high demand amongst consumers. SB 261 cannot demonstrate a pattern of discrimination because the sample size of companies is so small that no pattern can emerge. And, as discussed earlier, a similar (theoretical) company producing cell-cultured protein inside of Texas would be subject to the same ban.

*Second*, Plaintiffs have not shown evidence that tends to show a history of discrimination against cell-cultured protein products. This is intuitive. Since the cell-cultured protein industry is a nascent one, it would be all but impossible to show that Texas has a history of discriminating against such products. And while Texas has enacted laws in recent legislative sessions to regulate the sale and advertisement of meat-adjacent protein products, *see* Act of May 2, 2023, 88th Leg., R.S., ch. 32, 2023 Tex. Gen. Laws 82, 82–86, such laws likewise do not discriminate based on domicile.[42]

*Third*, Plaintiffs have not given any indication that the sequence of events leading up to the passage of SB 261 lends credence to their theory of intentional discrimination. *Allstate Ins. Co.*, 495 F.3d at 161. Indeed, there is no evidence before the Court that the Legislature made any departures from normal procedure in its passage of SB 261, nor are there any other procedural irregularities in the record.

*Fourth*, the Court should look at the legislative history behind the challenged law. *Id.* at 161; *Arlington Heights*, 429 U.S. at 266–68. Here, Plaintiffs point to statements made by members of the Legislature about the purported purpose of SB 261. These do not, however, carry Plaintiffs'

---

[42] Plaintiffs cite *Turtle Island Foods, Inc. v. Abbott* to support their position, *see* ECF No. 21 at 23, but this case is neither dispositive nor binding. Here, the Court found that the plaintiffs had pled enough facts plausible to survive a motion to dismiss for failure to state a claim—a low bar—but noted that more factual development was necessary to determine whether the Legislature had acted with a discriminatory purpose. *Turtle Island Foods Inc. v. Abbott*, No. 1:23-CV-1032-DII, 2024 WL 5659990, at *11–12 (W.D. Tex. Sept. 23, 2024).

case. "[T]he stray protectionist remarks of certain legislators are insufficient to condemn this statute." *Allstate Ins. Co.*, 495 F.3d at 161. "What motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it[.]" *United States v. O'Brien*, 391 U.S. 367, 384 (1968); *see also In re Davis*, 170 F.3d 475, 480 (5th Cir. 1999) ("Isolated statements of individual legislators represent neither the intent of the legislature as a whole nor definitive interpretations of the language enacted by Congress."). This point notwithstanding, Plaintiffs twist and misconstrue statements by individual legislators and witnesses to imply some sort of untoward purpose meant to hinder out-of-state economic interests. *Allstate Insurance Co.* is instructive here. In *Allstate*, the Fifth Circuit found that much of the evidence cited by legislators as evidence of "discrimination" against out-of-state companies was nothing more than "evidence of a legislative desire to treat differently two business forms[.]" *Allstate Inc. Co.*, 495 F.3d at 161. And here, like in *Allstate*, the Legislature sought to treat differently two types of business—one selling conventional meat and the other selling a protein product that self-identifies as meat.

Perhaps the most persuasive point in *Allstate* is that the Legislature did not show preference based on domicile but rather based on business form. *Id.* This is a line that the Court should not break. States have broad discretion in determining what structures of business can operate within their respective borders and, by extension, what products can be sold within their borders. *See id.*; *cf. Tesla, Inc. v. La. Auto. Dealers Ass'n*, 113 F.4th 511, 530–31 (5th Cir. 2024), cert. denied sub nom. *Lala v. Tesla, Inc.*, 145 S. Ct. 2813, 2813 (2025) (noting that Louisiana need not show why it disfavors a vertically integrated business model for automobile sales in the context of an equal protection claim). If Plaintiffs arguments were taken to their logical conclusion, States would have no discretion to limit or regulate items sold within their borders, even if such regulations were based on factors other than the product's domicile or place of origin. This simply cannot be the case—it would strip States of much of their sovereignty.

Plaintiffs also cherry-pick statements and ignore the context of legislative statements to fit their narrative. Indeed, while the legislative record contains statements expressing that the purpose of SB 261 was, in part, to protect the Texas agricultural industry, the record also contains

statements expressing concerns for the health and wellness of Texans. For example, Rep. Gerdes stated that SB 261 was aimed at protecting Texans from becoming a "scientific experiment." [43] He further emphasized that it was his job:

> to protect the folks of Texas and make sure that if things are coming to market, that there is a safeguards in place to make sure it's safe for human consumption. We don't need our dinner plate to be turned into a scientific experiment. [44]

The two-year time limitation on SB 261 underscores the Legislature's compelling health and safety concerns posed by improperly regulated cell-cultured meat. Senator Perry stated that the two-year ban would give the legislature time to "give science and industry groups" to "do the vetting process that they need to do", implying that the Legislature would need to reevaluate the health and safety risks of cell-cultured protein and potentially establish a more comprehensive regulatory framework for this product. [45] Put another way, SB 261 gives the Legislature a couple of years to better understand and more comprehensively regulate an entirely new product, the likes of which society has never before seen. Plaintiffs ignore all of this context to push their narrative.

Last, and assuming *arguendo* that the Court finds that the Legislature acts with a discriminatory purpose, Plaintiffs' claim fails because it does not have any discernable discriminatory effect against out-of-state economic interests. Above all, this is because the dormant Commerce Clause "regulates effects, not motives." *Comptroller of the Treasury of Md. v. Wynne*, 575 U.S. 542, 561 n.4 (2015). The First Circuit has noted this, albeit in dicta, stating that "it is difficult to conceive of a case in which a toll that does not discriminate in effect could be struck down based on discriminatory purpose." *Am. Trucking Ass'ns, Inc. v. Alviti*, 14 F.4th 76, 89 (1st Cir. 2021).

This makes perfect sense. A state law, even if enacted with the purpose of helping a specific industry within a state, may not necessarily discriminate against out-of-state interests in effect. In

---

[43] Debate on Tex. SB 261 on the Floor of the House, 89th Leg., R.S., at 7:46:00–7:46:15 (May 24, 2025) (Rep. Gerdes) (tape available at https://house.texas.gov/videos/22257).
[44] *Id.*
[45] Amendment Proposal to Tex. SB 261 on the Floor of the Senate 89th Leg., R.S., at 3:19:00–3:19:11 (May 12, 2025) (Sen. Perry) (tape available at https://senate.texas.gov/videoplayer.php?vid=22110&lang=en).

fact, such a regulation could even arguably promote such interests. It would be therefore almost inconceivable to strike down a law that, as here,[46] has no discernable substantial effect on purely out-of-state economic interests based on a few legislative statements regarding the motivation behind the bill. Put another way, Plaintiffs seek to wield the federal judiciary—and by extension, the dormant Commerce Clause—as a club to batter any state law with which they disagree. The Court should not indulge this tactic and should instead leave the states free to regulate commerce within their respective borders if the law does not substantially impact interstate commerce, regardless of the motives of individual legislators. *Cf. Trump v. CASA, Inc.*, 606 U.S 831, 858 (2025) (warning of the dangers of embracing an "imperial judiciary").

### 3. SB 261 does not operate with discriminatory effect against interstate commerce.

Plaintiffs cannot succeed on their discriminatory effect claim for two reasons. First, Plaintiff companies are not similarly situated to traditional meat producers. And second, even if SB 261 has some effect on interstate commerce, such effect is not so substantial as to offend the dormant Commerce Clause. State Defendants address each of these arguments in turn.

State Defendants addressed the former—how Plaintiffs are not similarly situated to traditional meat producers and sellers—in their Motion to Dismiss. *See* ECF No. 22 at 11–13. To recap, for a statute to violate the dormant Commerce Clause, a law must discriminate against out-of-state commerce in favor of similarly situated intrastate commerce. *Allstate Ins. Co.*, 495 F.3d at 163. Outside of a few conclusory statements, *see*, *e.g.*, ECF No. 21 at 85; ECF No. 1 ¶¶ 31, 34, 165, 218–19, 224, Plaintiffs make no factual showing that they are similarly situated to conventional meat producers, nor do they show that their products are substantially similar to conventional meat.

Merely "competing in the same market is not sufficient to conclude that entities are similarly situated." *Nat'l Ass'n of Optometrists & Opticians LensCrafters, Inc. v. Brown*, 567 F.3d 521, 527 (9th Cir. 2009) (citing *Gen. Motors Corp. v. Tracy*, 519 U.S. 278, 299 (1997)). Plaintiffs

---

[46] As discussed *infra*, SB 261 does not discriminate in effect against out-of-state interests.

instead need to show how they are similarly situated. *See Exxon Corp. v. Governor of Md.*, 437 U.S. 117, 127 (1978). The Supreme Court has previously allowed statutes to survive dormant Commerce Clause challenges where those statutes have "distinguished between the entities based on their business structures, holding that a state may prevent businesses with certain structures or methods of operation from participating in a retail market without violating the dormant Commerce Clause." *Brown*, 567 F.3d at 527 (citing *Exxon Corp.*, 437 U.S. at 127).

Plaintiffs have not made the requisite showing here. As discussed in State Defendants' Motion to Dismiss, Plaintiffs produce a product distinct and apart from conventional meat that may require additional scrutiny from the state due to health and safety concerns and may even require an entirely new regulatory framework. Plaintiffs likely employ different employees with different backgrounds and specialties than the conventional meat industry and may have unique production and storage needs. In short, and notwithstanding Plaintiffs' conclusory statements to the contrary, there is little evidence that Plaintiffs are similarly situated to conventional meat producers.

But even if Plaintiffs were similarly situated to conventional meat producers and SB 261 discriminated between the two, Plaintiffs' "discriminatory effects" claims would still fail because, the burden placed on those interests is *de minimis*. *See Am. Trucking Associations, Inc. v. Rhode Island Tpk. & Bridge Auth.*, 123 F.4th 27, 39 (1st Cir. 2024) (citing *Exxon Corp*, 437 U.S. at 126) (*Am. Trucking II*). To offend the dormant Commerce Clause, a statute must have a "substantial effect" on interstate commerce. *E.g.*, *Camps Newfound/Owatonna, Inc. v. Town of Harrison, Me.*, 520 U.S. 564, 574 (1997) (citing C & *A Carbone, Inc. v. Clarkstown,* 511 U.S. 383, 391 (1994); *Am. Trucking Associations, Inc.*, 123 F. 4th at 39. A *de minimis* effect is not sufficient to violate the dormant Commerce Clause. *Id.*

Here, SB 261 does not substantially discriminate against interstate commerce. If it does discriminate at all, it implicates, as of now, only a handful of companies that have FDA and USDA

approval to sell cell-cultured protein in the United States.[47] None of these companies have any substantial market share. In fact, there is little evidence that UPSIDE sells any product right now, and Wildtype only distributes to four restaurants nationwide. Even assuming they directly compete with conventional meat producers, which they do not, Plaintiffs and their compatriots make up a fraction of a percent of the nationwide meat market. To underscore this point, cell-cultured protein sales do not even come close to the market share that McDonalds has in selling chicken.

"The global market for cultured meat is currently estimated to be worth USD 0.27 billion in 2025[,]"[48] whereas total yearly sales for *only* McDonalds chicken nuggets and sandwiches are "\$25 billion."[49]. SB 261 only bans cell-cultured protein sales in one state for the next 22 months. Tex. Health & Safety Code § 431.02105(a). Given the infinitesimally small effect that SB 261 could have on the meat-product market as a whole, its effects on out-of-state economic interests would be *de minimis*, if it had any measurable effect at all. As a result, the Court should find that SB 261 does not implicate the dormant Commerce Clause at all, especially given the facts as they currently stand.

### 4. SB 261 nonetheless passes heightened scrutiny.

In the unlikely event that the Court determines that SB 261 operates with a discriminatory purpose and effect, the statute is subject to heightened scrutiny. A state regulation that discriminates against interstate commerce is "*per se* invalid" unless the regulation "advances a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives." *Or. Waste Sys., Inc. v. Dep't of Env't Quality of State of Or.,* 511 U.S. 93, 100–01 (1994). "The burden of justification is so heavy that 'facial discrimination by itself may be a fatal defect.'" *Id.* To establish discrimination sufficient to invoke "the 'strictest scrutiny'", there must be a finding

---

[47] Anay Mridul, *Wildtype Cultivated Salmon Gets FDA Approval, Now on US Menus*, GREENQUEEN (last updated Oct 28, 2025) https://www.greenqueen.com.hk/wildtype-lab-grown-salmon-meat-fda-approved-cultivated-seafood/ ("It is the fourth cultivated protein firm to be allowed to sell in the US, and the third with full approval.").
[48] Cultured Meat Market Overview, ROOTSANALYSIS (2025), https://www.rootsanalysis.com/reports/cultured-meat-market.html.
[49] Grace Dean, *McDonald's says its chicken options are now just as popular as beef,* BUSINESSINSIDER, (Feb. 6, 2024, 7:51 AM CT), https://www.businessinsider.com/mcdonalds-chicken-sandwiches-nuggets-business-as-big-as-beef-burgers-2024-2.

of "differential treatment" as between "in-state and out-of-state" economic activity and that this treatment "benefits the former and burdens the latter." *Id*. at 99, 101. "The point is to effectuat[e] the Framer's purpose to prevent a State from retreating into [the] economic isolation that had plagued relations among the Colonies and later among the States under the articles of Confederation." *Dep't of Revenue of Ky. v. Davis*, 553 U.S. 328, 338 (2008) (internal citations omitted). "Absent discrimination for th[is] forbidden purpose" the *Pike* standard applies. *See id*. at 338. As such, this high scrutiny standard applies when the "regulatory measures [are] designed" to impose differential treatment "to benefit in-state economic interests by burdening out-of-state competitors." *Id*.

As evidenced by the legislative record, *supra* pp. 3–7, Texas legislators and constituents alike were worried about how cell-cultured protein products might affect the health and safety of Texans. They need time to learn about the product, speak to experts, and develop an efficient and comprehensive regulatory framework to best protect the health and safety of Texas citizens.[50] This is certainly a legitimate local purpose. *Maine v. Taylor*, 477 U.S. 131, 151 (1983) (holding that even if legislation obstructs interstate trade, the states retain "broad regulatory authority to protect the health and safety of its citizens."). Any argument to the contrary, or that the Legislature may not perfectly understand the risks involved is unavailing. *See id*. at 148 ("we agree with the District Court that Maine has a legitimate interest in guarding against imperfectly understood environmental risks, despite the possibility that they may ultimately prove to be negligible.") The Texas Legislature has handled regulation of this product in the least restrictive way possible. The Texas Legislature temporarily halted the sale of cell-cultured protein in Texas for a narrow two-year period and plans to reevaluate how best to regulate the product at the next legislative session in 2027. This two-year time limitation is important—it forces the Legislature to take up the issue again as soon as it meets and will force it to decide on how best to regulate cell-cultured protein to preserve the health and safety of Texans. If the Legislature does not take up the issue in the 2027

---

[50] Amendment Proposal to Tex. SB 261 on the Floor of the Senate 89th Leg., R.S., at 3:19:00–3:19:11 (May 12, 2025) (Sen. Perry) (tape available at https://senate.texas.gov/videoplayer.php?vid=22110&lang=en).

legislative session, the ban will expire. Tex. Health & Safety Code § 431.02105(a). Anything less restrictive than SB 261 would not be effective in preserving the health and safety of Texas's citizens while the Legislature evaluates the product. Consequently, even if the Court finds that SB 261 has discriminatory purpose and effect, SB 261 passes heightened scrutiny with flying colors.

**B.  UPSIDE is unlikely to succeed on its claims that SB 261 is preempted by federal law.**

UPSIDE's preemption claims are doomed to failure, and thus they cannot demonstrate a likelihood of success on the merits. A plaintiff does not have a substantial likelihood of success on the merits if the Court lacks subject matter jurisdiction to adjudicate their claims. *See Hooks v. Landmark Indus., Inc.*, 797 F.3d 309, 312 (5th Cir. 2015) (stating cases should be dismissed when the court lacks subject matter jurisdiction). Likewise, a plaintiff does not have a substantial likelihood of success on the merits if they lack a cause of action to bring the claim. *See e.g., Bell v. Health-Mor, Inc.*, 549 F.2d 342, 345 (5th Cir. 1977) (stating if there is no implied private right of action "plaintiffs' claims are subject to dismissal for failure to state a claim upon which relief can be granted.").

Further, findings of federal preemption are the exception, not the rule. *See White Buffalo Ventures, LLC v. Univ. of Texas at Austin*, 420 F.3d 366, 370 (5th Cir. 2005) ("Supremacy Clause analysis is classic 'tie goes to the state' jurisprudence"). "Preemption radically alters the balance of state and federal authority, so the Supreme Court has historically refused to impose that alteration interstitially." *Id.* (citing *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991)). There is a presumption against preemption of state law. *Id.* (citing *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 517–18 (1992)). To prevail on an express preemption claim such as UPSIDE's, a plaintiff must show not only that Congress intended to preempt certain activity, but also that the activity complained of falls within the scope of Congress's preemption. *Id.* ("The fact that Congress has expressly preempted certain activity is plain, but the scope of that express preemption is not.").

Here, UPSIDE does not specify which claim—§ 1983, *Ex parte Young*, or both—it brings to support its motion for preliminary injunction. ECF No. 21 at 27. Regardless, UPSIDE is unlikely

to succeed on the merits of its PPIA preemption claims for a variety of reasons under both claims. First, The Court lacks jurisdiction over UPSIDE's § 1983 preemption claims. Second, UPSIDE lacks a private cause of action to bring its preemption claims. Third, neither the facts nor the law supports a finding of federal preemption on the merits.

### 1. The Court lacks subject matter jurisdiction over UPSIDE's § 1983 preemption claims.

The Court lacks subject matter jurisdiction over UPSIDE's § 1983 preemption claims. The Eleventh Amendment deprives a federal court of jurisdiction over suits against the State of Texas or its officials, regardless of the relief sought, unless sovereign immunity is expressly waived. *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 121 (1984). Neither Congress nor the State of Texas has voluntarily waived Texas's sovereign immunity for § 1983 claims. *See Quern v. Jordan*, 440 U.S. 332, 345 (1979). State Defendants are entitled to sovereign immunity when sued in their official capacities, as UPSIDE has here. Tex. Const. art. IV, § 1 (establishing the Attorney General as an executive officer); *see Harrison v. Young*, 48 F.4th 331, 338 (5th Cir. 2022) (discussing whether an exception to the HHSC Commissioner's sovereign immunity applies); *Beleno v. Lakey*, 306 F. Supp. 3d 930, 942 (W.D. Tex. 2009) (dismissing claims against the DSHS Commissioner as barred by sovereign immunity). Thus, UPSIDE's § 1983 preemption claims are barred by sovereign immunity and UPSIDE cannot be successful on the merits. *See Hooks v. Landmark Indus., Inc.*, 797 F.3d 309, 312 (5th Cir. 2015) (dismissing claims when the court lacks subject matter jurisdiction over them).

### 2. UPSIDE lacks a cause of action to pursue its preemption claims under both § 1983 and *Ex parte Young*.

UPSIDE is unlikely to succeed on the merits of its preemption claims because it lacks a cause of action to pursue them. UPSIDE lacks a cause of action under § 1983 for two reasons. First, state officials are not persons within the meaning of § 1983. Second, the PPIA does not create an individual right enforceable through § 1983. Moreover, UPSIDE lacks a cause of action under both

§ 1983 and *Ex parte Young* because Congress expressly foreclosed private actions to enforce the PPIA. For these reasons, UPSIDE is not likely to succeed on the merits of its preemption claims.

1.    Section 1983 does not provide UPSIDE, or any other private party, a cause of action for its preemption claims because the state officials UPSIDE sues are not persons within the meaning of § 1983. The plain text of § 1983 authorizes redress only against a "person[.]" 42 U.S.C. § 1983. Since state officials, like State Defendants here, are not "persons" within the meaning of the statute, § 1983 does not create a right of action that allows individuals to sue state personnel for violations of their rights. *See Will v. Mich. Dep't of State Police,* 491 U.S. 58, 71 (1989) (citing *Brandon v. Holt*, 469 U.S. 464, 471 (1985)) ("a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office"). While there is a line of caselaw permitting suits under § 1983 against state officials in their official capacity, a recent Fifth Circuit opinion indicates that this is incorrect. *Freedom From Religion Found., Inc. v. Mack*, 4 F.4th 306, 311 (5th Cir. 2021) ("Suits against the State under 42 U.S.C. are doubly dismissible because the State is not a "person" under that statute"). [51] Rather, "the only way to bring an official-capacity claim against an officer of the state is to do so under the equitable cause of action recognized in *Ex parte Young. Id.* (citing *Ex parte Young*, 209 U.S. 123 (1908)). Here, UPSIDE brings §1983 claims against state officials in their official capacities. ECF No. 1 at 5–6. According to *Mack*, § 1983 does not provide a viable route for asserting these claims. *Id*. Because UPSIDE § 1983 is not a viable route for UPSIDE's preemption claims, it is unlikely to succeed on the merits of them.

---

[51] This decision was vacated by a subsequent Fifth Circuit panel for want of appellate jurisdiction to consider the issue. *Freedom From Religion Found., Inc. v. Mack*, 49 F.4th 941, 948 n.4 (5th Cir. 2022). This question is still "open for later consideration." *Id.* The logic underlying the vacated opinion is nonetheless sound and should guide the Court's analysis here. *See Melot v. Bergami*, 970 F.3d 596, 599 n.11 (5th Cir. 2020) ("thoughtful [circuit court] opinion" persuasive even though it had been "vacated as moot on rehearing"); *Maria S. v. Garz*a, No. 1:13-CV-108, 2015 WL 4394745, at *10 n.10 (S.D. Tex. July 15, 2015) ("Thus although the Fifth Circuit's *Bivens* analysis in *Hernandez* was later vacated, the Court may rely on the [its] delineation of *Bivens* law in *Hernandez* to assist in the analysis of Plaintiffs' claim."); *Johansen v. Trico Marine Int'l, Inc.*, No. CV H-07-3767, 2008 WL 11390861, at *8 (S.D. Tex. Aug. 29, 2008) ("reasoning underlying" a vacated "decision remains persuasive authority").

2.      Section 1983 does not provide UPSIDE a cause of action for its preemption claims because § 1983 does not in itself create a right of action and the PPIA does not create a private right enforceable by § 1983. Importantly, § 1983 "merely provides a mechanism for enforcing individual rights 'secured' elsewhere, *i.e.*, rights independently 'secured by the Constitution and laws' of the United States." *Gonzaga Univ. v. Doe*, 536 U.S. 273, 285 (2002) (emphasis in original). As a result, "[o]ne cannot go into court and claim a 'violation of § 1983'—for § 1983 by itself does not protect anyone against anything." *Id.* (emphasis removed) (quoting *Chapman v. Houston Welfare Rights Organization*, 441 U.S. 600, 617 (1979)). To pursue its claims under § 1983, UPSIDE must identify a private right conferred on it by the PPIA. *Id.* "To prove that a statute secures an enforceable right, privilege, or immunity, and does not just provide a benefit or protect an interest, a plaintiff must show that the law in question 'clear[ly] and unambiguous[ly]' uses 'rights-creating terms'" and display an "'unmistakable focus' on individuals like the plaintiff." *Medina v. Planned Parenthood S. Atl.*, 606 U.S. 357, 368 (2025) (quoting *Gonzaga Univ.*, 536 U.S. at 283–84).

UPSIDE identifies no right conferred upon it by the PPIA. This is because there is none. The PPIA does not "'clear[ly] and unambiguous[ly]' use[] 'rights-creating terms'" nor "display an 'unmistakable focus' on individuals like the plaintiff." *Id.*; 21 U.S.C. §§ 451–473. Because the PPIA does not create an enforceable private right, UPSIDE does not have a cause of action under § 1983. *Medina*, 606 U.S. at 368 (quoting *Gonzaga*, 536 U.S. at 283) ("§ 1983 provides a cause of action only for the deprivation of rights, privileges, or immunities, not benefits or interests") (internal quotations omitted). As such, UPSIDE cannot pursue its preemption claims through § 1983 and thus is unlikely to succeed on the merits of such claims.

3.      Even if the PPIA created a privately enforceable right, UPSIDE still lacks a cause of action under both § 1983 and *Ex parte Young* because Congress expressly foreclosed private actions to enforce the PPIA. Plaintiffs cannot utilize § 1983 or *Ex parte Young* as causes of action when Congress has explicitly foreclosed it. *Medina*, 606 U.S. at 368 (citing *Rancho Palos Verdes v. Abrams*, 544 U.S. 113, 120 (2005)) ("a § 1983 action still may not be available if Congress has displaced §1983's general cause of action with a more specific remedy")); *Alexander v. Sandoval*,

532 U.S. 275, 290 (2001) (noting some remedial schemes foreclose private rights of action even when the statute creates an enforceable right). Here, the PPIA's Enforcement Provision expressly forecloses any possibility of a private right of action to enforce the PPIA by providing that enforcement actions may only be brought "by and in the name of the United States." *See* 21 U.S.C. § 467c ("All proceedings for the enforcement or to restrain violations of [the Poultry and Poultry Products Inspection Act] shall be by and in the name of the United States.") (Enforcement Provision). UPSIDE's preemption claims are "enforcement actions" because they attempt to enforce the Ingredient and Facilities requirements against another party via the Supremacy Clause. *See UPSIDE Foods, Inc. v. Simpson*, No. 4:24cv316-MW/MAF, 2025 LEXIS 10381, at *13-14 (N.D. Fla. Apr. 25, 2025) (finding UPSIDE could not bring a preemption claim due to the PPIA's express reservation of enforcement to the United States). Because UPSIDE is not the United States, the PPIA forecloses UPSIDE from bringing such claims. *See* 21 U.S.C. § 467c.

When presented with this exact question, the Northern District of Florida found the PPIA foreclosed private enforcement of the PPIA through § 1983 and *Ex parte Young*. *UPSIDE Foods, Inc*, 2025 LEXIS 10381, at *13, 16. With respect to UPSIDE's § 1983 claims., the Northern District of Florida ruled that "[e]ven assuming that the PPIA grants Plaintiff a privately enforceable right, this Court finds that congressional foreclosure precludes Plaintiff from bringing a section 1983 action to enforce the PPIA." *Id.* at *13. Then, the Northern District of Florida similarly disposed of UPSIDE's *Ex parte Young* claim by stating "Plaintiff cannot circumvent the congressional foreclosure of private enforcement of the PPIA by attempting to invoke this Court's equitable powers." *Id.* at *16. UPSIDE presents no reason this Court should rule differently.

For these reasons, UPSIDE lacks a private right of action to bring its preemption claims. Therefore, UPSIDE cannot prevail on the merits of such claims. *See e.g., Bell v*, 549 F.2d at 345 (stating if there is no implied private right of action "plaintiffs' claims are subject to dismissal for failure to state a claim upon which relief can be granted."). The Courts analysis should end here.

### 3. The PPIA's Ingredients and Facilities Clauses do not preempt SB 261.

When the USDA authorized some cell-cultured protein products for sale and human consumption in the United States, it did not mandate their sale under the PPIA's Ingredients and Facilities clauses. Yet this is precisely what UPSIDE claims. ECF No. 21 at 32–34. Courts across the country have rejected UPSIDE's interpretation of the PPIA's and analogous Ingredients Clauses. *See, e.g., Ass'n des Éleveurs de Canards et d'Oies du Quebec v. Becerra,* 870 F.3d 1140, 1149–50 (9th Cir. 2017) (*Canards I*); *Ass'n des Éleveurs de Canards et d'Oies du Quebec v. Bonta*, 33 F.4th 1107, 1117 (9th Cir. 2022) (*Canards II*) (reaffirming the holding in *Canards I* that federal law does not mandate the sale of a poultry product); *UPSIDE Foods, Inc v. Simpson*, No. 4:24CV316-MW/MAF, 2024 WL 5274483, at *6–8 (N.D. Fla. Oct. 11, 2024) [52] (denying UPSIDE's identical preemption claims and denying UPSIDE's request for preliminary injunction); *cf. Empacadora*, 476 F.3d at 333 (construing the analogous Federal Meat Inspection Act to not prohibit states from banning certain types of meat for sale); *cf Armour & Co. v. Ball*, 468 F.2d 76, 81–85 (6th Cir. 1972) (holding that a Michigan law that imposed heightened requirements for grade 1 sausage that substantially differed from federal standards was expressly preempted as an ingredient requirement inconsistent with federal law). UPSIDE asks this Court to chart a new path and reject the sound reasoning of similar Fifth Circuit case law in favor of UPSIDE's novel interpretation of the PPIA's preemption clause. There is no reason for this Court to do so.

### a. The Ingredients Clause does not preempt SB 261.

The Ingredients Clause does not mandate the sale of cell-cultured chicken protein in Texas. UPSIDE, however, claims that because the USDA authorized the *use* of "cultivated cells" as "physical components" in poultry products, cell-cultivated chicken protein is a mandated "ingredient" under the PPIA, and the Ingredients Clause *forbids* states from banning it. ECF No. 21 at 32–33. In other words, because federal law says cell-cultured protein *can* be sold, it *must* be sold. Neither case law nor the text of the PPIA support this conclusion.

---

[52] This decision is currently on appeal in the Court of Appeals for the Eleventh Circuit. *Upside Foods Inc. v. Fla. Dep't of Agric., et al.*, No. 24-13640.

The Ingredients Clause does not prohibit states from banning a type of poultry product. *See* 21 U.S.C. § 467e (prohibiting conflicting or additional ingredient, marking, or labeling requirements); *Canards I*, 870 F.3d at 1150. Courts across the country agree. *E.g., id.*; *UPSIDE Foods, Inc.*, 2025 LEXIS 10381, at *17–21. "Nothing in the federal law or its implementing regulations limits a state's ability to regulate the *types* of poultry that may be sold for human consumption." *Canards I*, 870 F.3d at 1150. "The fact that Congress established 'ingredient requirements' for poultry products that *are* produced does not preclude a state from banning products" *Id.* "[T]he ban on the sale of a sub-category of poultry is not an 'ingredient requirement' within the meaning of the PPIA." *UPSIDE Foods, Inc.*, 2025 LEXIS 10381, at *21.

The plain language of SB 261 is clear. SB 261 bans a sub-type of product: cell-cultured protein. Tex. Health & Safety Code § 431.02105(a); §§ 431.002(5-a). UPSIDE cannot escape this conclusion by attempting to redefine a product as an ingredient. ECF No. 21 at 32–33 (redefining UPSIDE's product as "being made 'from chicken cells'" and having a "primary ingredient" of "cell-cultivated chicken"). Despite UPSIDE's insistence, ECF No. 21 at 32, nowhere in *Canards I* does the Ninth Circuit say that all "physical components" of a product are "ingredients" which must be included in poultry products under the PPIA. *Canards I*, 870 F.3d at 1147–1148 (distinguishing between an ingredient requirement and the way animals are raised). While clever, these word games ignore the fact that nothing in the PPIA suggests cell-cultivated chicken protein is a required ingredient in any poultry product, much less that Congress intended to require it be permitted in poultry products nationwide. *UPSIDE Foods, Inc.*, 2025 LEXIS 10381, at *20; 21 U.S.C. §§ 451–473.

SB 261 is not analogous to *Armour & Co v. Ball* because *Armour* did not deal with a ban on an entire sub-category or type of product. 468 F.2d at 81–85. In *Ball*, the Sixth Circuit found the Federal Meat Inspection Act's (FMIA) marking, labelling, or ingredient requirements clause preempted a Michigan law that imposed heightened requirements for what could be considered Grade 1 sausage. *Id.* There, the FMIA set standards for what could be included in Grade 1 sausage. *Id.* at 81–82 (explicitly stating what types of meat may be included in Grade 1 sausage). Michigan's

requirements expressly conflicted with the FMIA's requirements. *Id.* (explicitly limiting what types of meat may be included in Grade 1 sausage). As such, the Michigan law was preempted by the FMIA. *Id.* at 84.

Here, unlike in *Ball*, SB 261 does not create an ingredient or labelling requirement, but instead bans a type of product. Tex. Health & Safety Code §§ 431.002(5-a), 431.02105(a). Moreover, the PPIA does not require cell-cultured protein to be an ingredient in any specific product. *See* 21 U.S.C. §§ 451–473. In *Ball*, both Michigan and United States law contained requirements for what constituted Grade 1 sausage. *Bell*, 468 F.2d at 81–82. Because the requirements conflicted, federal law prevailed. *Id.* at 84. Such is not the case here. The PPIA contains nothing requiring cell-cultured protein be permitted as an ingredient in any product. 21 U.S.C. §§ 451–473; *UPSIDE Foods, Inc.*, No. 4:24cv316-MW/MAF, 2025 LEXIS 10381, at *20. That UPSIDE's "product is approved for sale by the USDA does not transform it or its subcomponents into ingredients that the USDA has tacitly recognized as an 'ingredient requirement' in the required make-up of a finished poultry product." *UPSIDE Foods, Inc.*, 2025 LEXIS 10381, at *20–21. UPSIDE presents no reason this Court should be the first to hold otherwise.

### b. The Facilities Clause does not preempt SB 261.

Nor does the Facilities Clause preempt SB 261. UPSIDE claims that by preventing it from "manufacturing, distributing, and selling cultivated chicken," Texas "reaches into" UPSIDE's facility and imposes requirements inconsistent with federal law. ECF No. 21 at 33. This is both factually and legally incorrect. First, SB 261 does not prohibit the manufacture or distribution of cell-cultivated protein. Tex. Health & Safety Code §§ 431.002(5-a), 431.02105(a). SB 261 solely prohibits the *sale* (or offering for sale) of cell-cultured protein. Tex. Health & Safety Code § 431.02105(a). Under SB 261, UPSIDE can manufacture and distribute its cell-cultured protein in Texas, so long as it is not offering it for sale. *See id.* More importantly, however, SB 261's ban on the sale of cell-cultured protein is not preempted by the PPIA's Facilities Clause.

UPSIDE's reliance on *National Meat Association v. Harris* is misplaced. 565 U.S. 452 (2012). In *National Meat Association*, the state imposed a host of requirements inconsistent with federal law on meat producers' operations and used a sales ban to enforce the inconsistent regulatory requirements. *Id.* at 463–46. Unlike, the law in *National Meat Association*, SB 261 does not attempt to reach into UPSIDE's facilities and regulate how it produces its product. *Compare* Cal. Penal Code § 599f (criminalizing specific production, transportation, and treatment acts with respect to nonambulatory animals), *with* Tex. Health & Safety Code § 431.02105(a) (prohibiting the sale of cell-cultured protein in Texas). Texas has not imposed a host of requirements on the production of cell-cultivated protein. *See* Tex. Health & Safety Code § 431.02105(a) (containing no regulatory requirements). Instead, SB 261 is a pure sales ban on cell-cultured protein. *Id.* Unlike in *National Meat Association*, there is no indication SB 261 was passed to enforce other regulatory requirements inconsistent with federal law. *See id.* (containing no regulatory requirements).

When UPSIDE brought this identical claim in Florida, the district court agreed UPSIDE's reliance on *National Meat Association* was misplaced and summarily rejected UPSIDE's Facilities Clause preemption arguments. *UPSIDE Foods, Inc v. Simpson*, No. 4:24CV316-MW/MAF, 2024 WL 5274483, at *8 (N.D. Fla. Oct. 11, 2024). Notably, the Florida statute is broader than SB 261 and expressly prohibits the manufacture and distribution as well as sale of cell-cultivated meat in Florida. Fla. Stat. § 500.452(1) ("It is unlawful for any person to manufacture for sale, sell, hold or offer for sale, or distribute cultivated meat in this state."); Tex. Health & Safety Code § 431.02105(a) ("The offering for sale or sale of cell-cultured protein for human consumption within this state is unlawful and prohibited."). Despite the Florida statute's express ban on manufacturing cell-cultivated protein, the Florida court still found the law was not preempted by the Facilities Clause because a ban on sale, distribution, and manufacture of a product without more, does not constitute a facilities or production requirement. *UPSIDE Foods, Inc*, 2024 WL 5274483, at *8 (citing *Nat'l Meat Ass'n*, 565 U.S. at 463).

### c.  Fifth Circuit precedent supports finding SB 261 is not preempted.

Analogous Fifth Circuit case law supports finding the PPIA does not preempt SB 261. In *Empacadora de Carnes de Fresnillo,* the Court was asked whether the FMIA preempted a state regulation banning a type of meat product for sale. *Empacadora de Carnes de Fresnillo, S.A. de C.V., v. Curry*, 476 F.3d 326, 333 (5th Cir. 2007) (*Empacadora*). The Fifth Circuit held it did not because the FMIA's "preemption clause expressly limits states in their ability to govern meat inspection and labeling requirements" but "in no way limits states in their ability to regulate what types of meat may be sold for human consumption in the first place." *Id.* Here, like the law in *Empacadora*, SB 261 bans a particular type of meat product for sale. Tex. Health & Safety Code § 431.02105(a). UPSIDE admits the FMIA, interpreted in *Empacadora*, is "materially identical" to the PPIA. ECF No. 21 at 29. Thus, it follows that, like in *Empacadora*, SB 261 is not preempted by the PPIA. *Empacadora*, 476 F.3d at 333. UPSIDE makes no attempt to distinguish the present case from *Empacadora* in its Motion for Preliminary Injunction. ECF No. 21. Thus, this Court should follow the reasoning set forth in *Empacadora* and find the PPIA does not preempt SB 261.

## V.  The remaining factors favor denial of a preliminary injunction.

Plaintiffs have not established the remaining factors to show they are entitled to preliminary injunctive relief. In addition to showing a likelihood of success on the merits, a plaintiff seeking preliminary injunctive relief must show "that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008) (citing *Munaf v. Geren*, 553 U.S. 674, 689–90 (2008)). "Where the State is appealing an injunction, its interest and harm merge with the public interest." *Book People, Inc. v. Wong*, 91 F.4th 318, 341 (5th Cir. 2024) (quoting *Veasey v. Abbott*, 870 F.3d 387, 391 (5th Cir. 2017) (per curiam)). Plaintiffs have not shown that they will suffer the requisite harm absent a preliminary injunction nor shown that the balance of the equities weighs in favor of granting preliminary injunctive relief.

Plaintiffs have not shown harm sufficient to justify injunctive relief. "Plaintiffs' risk of irreparable harm must be weighed against any injury the State would sustain." *Id.* (internal

quotation omitted). "When a statute is enjoined, the State necessarily suffers the irreparable harm of denying the public interest in the enforcement of its laws." *Id.* (quoting *Veasey v. Abbott*, 870 F.3d 387, 391 (5th Cir. 2017) (per curiam)). When compared to the irreparable harm the state will suffer if it is prevented from enforcing its laws, Plaintiffs' alleged "loss of revenue" is insignificant. ECF No. 21 at 18–19 (claiming SB 261 caused Plaintiffs to lose access to a source of revenue). Plaintiffs did not lose major revenue streams. Before SB 261, UPSIDE made one sale of its cell-cultivated chicken product to one resident of West Lake Hills, Texas. ECF No. 21 at 87. Wildtype sold its cell-cultivated salmon product to one restaurant in Austin *after* SB 261 was passed.[53] ECF No. at 19.

Plaintiffs' lost business opportunities are speculative. ECF No. 21 at 19 (claiming SB 261 caused Plaintiffs to lose business opportunities). Plaintiffs do not claim they were in the process of contracting with supermarket chains. To be clear, UPSIDE's "lost business opportunities" constitute having "had conversations" with chefs and supermarkets and selling its cell-cultivated chicken product to "*a* Texan." ECF No. 21 at 19 (emphasis added). Wildtype's "lost business opportunities" include having "spoken with potential customers" that had expressed interest and selling its cell-cultivated salmon to one sushi restaurant in Austin that seats 12 people. ECF No. 21 at 19. Such harms are speculative. Plaintiffs provide no evidence to show any of their "conversations" would have been fruitful.

Plaintiffs' lost business opportunities are self-inflicted. ECF No. 21 at 19 (claiming SB 261 caused Plaintiffs to stop seeking business opportunities). SB 261 is a temporary ban on the sale or offering for sale of cell-cultivated protein. Tex. Health & Safety Code § 431.02105(a) (expiring on September 1, 2027). SB 261 does not prevent Plaintiffs from continuing conversations with distributors, building supply chain networks, or even manufacturing facilities in Texas. *Id.* (prohibiting only the sale and offering for sale of cell-cultured protein). As such, Plaintiffs' claim

---

[53] S.J. of Tex. 89th Lege., at 3862 (June 2, 2025) (reporting that SB 261 was signed by the Governor on June 20, 2025); *We're coming to Texas*, WILDTYPE (June 20, 2025), https://www.wildtypefoods.com/news/blog/otoko (announcing that Wildtype salmon will be on the menu at OTOKO "Starting July 17").

that SB 261 caused them to stop pursuing business opportunities are wrong and any harm suffered is due to Plaintiffs' failures, not SB 261.

Likewise, Plaintiffs' falsely claim SB 261 injures their reputations, brings about a loss of consumer goodwill, and "deprives" them of "the ability to allow consumers to try their products and decide for themselves." ECF No. 21 at 20. This is false. First, Plaintiffs offer no facts to support their conclusory claim of reputational harm and loss of consumer goodwill. Second, SB 261 does not prevent Plaintiffs from distributing their food to customers free of charge as UPSIDE has already done. Tex. Health & Safety Code § 431.02105(a) (prohibiting only the sale and offering for sale of cell-cultured protein); ECF No. 21 at 87 (distributing samples at South by Southwest). If Plaintiffs believe their reputations would be improved by allowing people to taste their products, SB 261 allows this.

Plaintiffs' minimal, speculative, and self-inflicted injuries do not outweigh State Defendants' right to enforce its laws. When issuing a preliminary injunction, courts "'must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.'" *Winter*, 555 U.S. at 24 (quoting *Amoco Production Co.,* 480 U.S. 531, 542 (1987)). Here, Plaintiffs may suffer extremely minor economic setbacks, but the State and State Defendants will certainly suffer irreparable harm in the event the State is precluded from enforcing its laws. *Book People, Inc.*, 91 F.4th at 341. In light of Plaintiffs' low likelihood of success on the merits and minimal economic harm, the balance of the equities weighs against granting preliminary injunctive relief.

## Conclusion

For the foregoing reasons, State Defendants respectfully request the Court deny Plaintiffs' Motion for a Preliminary Injunction.

Dated: November 10, 2024

Respectfully submitted,

**KEN PAXTON**
Attorney General of Texas

**BRENT WEBSTER**
First Assistant Attorney General

**RALPH MOLINA**
Deputy First Assistant Attorney General

**RYAN D. WALTERS**
Deputy Attorney General for Legal Strategy

**RYAN G. KERCHER**
Chief, Special Litigation Division

*/s/ Zachary L. Rhines*
**ZACHARY L. RHINES**
Special Counsel
Texas State Bar No. 24116957
zachary.rhines@oag.texas.gov

**ALI M. THORBURN**
Special Counsel
Texas State Bar No. 24125064
ali.thorburn@oag.texas.gov

**BRIAN B. TUNG**
Assistant Attorney General
Texas State Bar No. 24145179
Brian.tung@oag.texas.gov

OFFICE OF THE ATTORNEY GENERAL OF TEXAS
Special Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
(512) 463-2100

**COUNSEL FOR STATE DEFENDANTS**

## CERTIFICATE OF SERVICE

Pursuant to Federal Rule of Civil Procedure 5(a), I hereby certify that on November 10, 2025, a true and correct copy of the above and foregoing document was filed and served electronically via CM/ECF.

MARCO VASQUEZ JR. (TX Bar No. 24115892)
ARIF PANJU (TX Bar No. 24070380)
816 Congress Ave., Suite 970
Austin, TX 78701
Phone: (512) 480-5936
Fax: (512) 480-5937
mvasquez@ij.org
apanju@ij.org

PAUL M. SHERMAN (VA Bar No. 73410)*
901 North Glebe Road, Suite 900
Arlington, VA 22203
Phone: (703) 682-9320
Fax: (703) 682-9321
psherman@ij.org

COUNSEL FOR PLAINTIFFS
WILD TYPE, INC. D/B/A WILDTYPE AND
UPSIDE FOODS, INC.

*/s/ Zachary L. Rhines*
**ZACHARY L. RHINES**
Special Counsel