# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF TEXAS
# AUSTIN DIVISION

| | |
|---|---|
| **WILD TYPE, INC. D/B/A WILDTYPE** AND **UPSIDE FOODS, INC.**, <br><br> *Plaintiffs*, <br><br> v. <br><br> **JENNIFER A. SHUFORD**, in her official capacity as the Commissioner of the Texas Department of State Health Services; **CECILE ERWIN YOUNG**, in her official capacity as the Executive Commissioner of the Texas Health and Human Services Commission; **KEN PAXTON**, in his official capacity as the Attorney General of Texas; and **DELIA GARZA**, in her official capacity as the County Attorney of Travis County, <br><br> *Defendants*. | Civil Action No. 1:25-cv-1408-ADA-ML |

# PLAINTIFFS' REPLY IN SUPPORT
# OF MOTION FOR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................................. i

TABLE OF CITATIONS .............................................................................................................. ii

INTRODUCTION ...........................................................................................................................1

    I.     Defendants misstate significant facts based on unreliable evidence .........................1

    II.    Plaintiffs have shown a likelihood of success on their claims. ................................3

          A.  Dormant Commerce Clause ........................................................................3

          B.  Federal Preemption ......................................................................................6

    III.   Plaintiffs have carried their burden on the remaining preliminary injunction factors.
         .................................................................................................................................9

CONCLUSION ..............................................................................................................................10

CERTIFICATE OF SERVICE ..................................................................................................... 11

## TABLE OF CITATIONS

Page(s)

**Cases**

*Am. Trucking Associations, Inc. v. Rhode Island Tpk. & Bridge Auth.*,
    123 F.4th 27 (1st Cir. 2024) ................................................................................................5

*Bacchus Imports, Ltd. v. Dias*,
    468 U.S. 263 (1984) ............................................................................................................4

*Book People, Inc. v. Wong*,
    91 F.4th 318 (5th Cir. 2024) ...............................................................................................9

*CANarchy Craft Brewery Collective, LLC v. Texas Alcoholic Beverage Comm'n*,
    514 F. Supp. 3d 911 (W.D. Tex. 2021) ...............................................................................3

*Empacadora de Carnes de Fresnillo, S.A. de C.V., v. Curry*,
    476 F.3d 326 (5th Cir. 2007) ..............................................................................................8

*Harrison v. Young*,
    48 F.4th 331 (5th Cir. 2022) ...............................................................................................6

*Herbst v. Ryan*,
    90 F.3d 1300 (7th Cir. 1996) ..............................................................................................1

*Nat'l Meat Ass'n v. Harris*,
    565 U.S. 452 (2012) ............................................................................................................8

*Nw. Selecta, Inc. v. González-Beiró*,
    145 F.4th 9 (1st Cir. 2025) ..................................................................................................7

*Oregon Waste Sys., Inc. v. Dep't of Env't Quality*,
    511 U.S. 93 (1994) ..............................................................................................................5

*Tennessee Wine and Spirits Retailers Ass'n v. Thomas*,
    588 U.S. 504 (2019) ............................................................................................................5

*Turtle Island Foods Inc. v. Abbott*,
    No. 1:23-CV-1032-DII, 2024 WL 5659990 (W.D. Tex. Sept. 23, 2024) ...........................4

*Veasey v. Abbott*,
    830 F.3d 216 (5th Cir. 2016) ..............................................................................................3

*Wal-Mart Stores, Inc. v. Texas Alcoholic Beverage Comm'n*,
    945 F.3d 206 (5th Cir. 2019) ..............................................................................................5

*Williams v. Wingrove*,
   153 F.4th 455 (5th Cir. 2025) ........................................................................................6

**Codes, Statutes, and Rules**

21 U.S.C.

   § 467c ..............................................................................................................................6
   § 467e ......................................................................................................................6, 7, 8

42 U.S.C.

   § 1988 .............................................................................................................................1

**Other Authorities**

Deena Shanker & Priya Anand, *The Biggest Problem with Lab-Grown Chicken Is Growing the Chicken*, Bloomberg (Dec. 14, 2023), https://www.bloomberg.com/news/features/2023-12-14/upside-foods-struggles-with-lab-grown-chicken-despite-600-million ................................................2

San Francisco Chronicle ...................................................................................................1

Tex. House of Representatives, 89th Legis. Sess., at 7:42:20-30 (May 24, 2025), https://house.texas.gov/videos/22257 ...........................................................................3

# INTRODUCTION

In Section I, Plaintiffs will rebut several significant factual claims that the State Defendants make in their response—based on multiple layers of hearsay—that are either wrong or highly misleading. In Section II, Plaintiffs will confirm that they have a likelihood of success on the merits of both their Dormant Commerce and federal preemption claims. Finally, in Section III, Plaintiffs will confirm that they satisfy the remaining preliminary injunction factors.[1]

## I.     Defendants misstate significant facts based on unreliable evidence.

Plaintiffs' Motion for Preliminary Injunction discusses the safety of cultivated meat and the extensive review process that Plaintiffs went through with the FDA before they were allowed to bring their products to market. These processes resulted in scientific memoranda from the FDA finding that both companies' products were safe and suitable for distribution throughout the country. *See* ECF 21 at 2-6.

Against these official government findings and sworn testimony by the Plaintiffs, the State Defendants cite to an article in the San Francisco Chronicle for the claim that "UPSIDE [was] just growing meat described as 'skin-type cells' with higher cholesterol and lead content than real

---

[1] Defendant Garza's response brief focuses only on Garza's argument that she is an improper defendant and incorporates by reference the substantive arguments made in the State Defendants' response brief. ECF 26. As thoroughly explained in Plaintiffs' Combined Response to Defendants' Motions to Dismiss, ECF 25 at 14–15, this is wrong. To the extent Defendant Garza is concerned about the county's potential liability for attorneys' fees under 42 U.S.C. § 1988, federal courts have substantial discretion to apportion attorneys' fees among government defendants, and may impose fees solely on the state where the county attorney's only role is to enforce state policy. *See Herbst v. Ryan*, 90 F.3d 1300, 1306 (7th Cir. 1996) (holding that, in lawsuit seeking declaratory and injunctive relief against the enforcement of state laws by both state and county officials, trial court did not abuse its discretion in awarding attorneys' fees solely against state defendants).

chicken, and that the bioreactors used to produce cultivated cells were a 'contamination nightmare' because they were too complex to clean." ECF 24 at 2–3. That quotation is actually the San Francisco Chronicle's characterization of a Bloomberg article, which is not quoted or cited in Defendants' brief. That article, in turn, purports to be based on interviews with unknown people. *See* Deena Shanker & Priya Anand, *The Biggest Problem with Lab-Grown Chicken Is Growing the Chicken*, Bloomberg (Dec. 14, 2023), https://www.bloomberg.com/news/features/2023-12-14/upside-foods-struggles-with-lab-grown-chicken-despite-600-million.

  It should come as no surprise that the layers upon layers of hearsay here lead to claims that are misleading at best and outright false at worst. As detailed in the attached Declaration of Mark Juhas, Ph.D., who is Senior Director of Upstream Development at UPSIDE, UPSIDE's FDA/USDA-authorized product is not grown from "skin-type cells," but from fibroblasts, which are responsible for providing the structure of animal muscle. Juhas Decl. at ¶ 9. Further, as detailed in the attached Declaration of René Viñas, Ph.D., who is a board certified toxicologist at UPSIDE, the levels of cholesterol and lead in UPSIDE's product are comparable to other commonly consumed foods such as spinach and eggs (and the level of lead is lower than the amount permitted in candy likely to be eaten frequently by young children). Viñas Decl. at ¶¶ 9–12. And although UPSIDE disputes the San Francisco Chronicles characterization of its bioreactors, those bioreactors are not used to make UPSIDE's product, a fact noted in the Bloomberg article. Juhas Decl. at ¶¶ 10–12.

  In short, the Defendants have produced no reliable evidence to call into question the FDA's and USDA's conclusions that Plaintiffs' products are safe.

2

## II. Plaintiffs have shown a likelihood of success on their claims.

### A. Dormant Commerce Clause.

As shown in Plaintiffs' motion, there is extensive evidence that an overriding purpose and effect of SB 261 is to protect in-state agricultural interests from a new form of competition based entirely outside of The State Defendants raise three main arguments in response, none of which have merit.

First, the government disputes that SB 261 was passed for a discriminatory purpose. As a reminder, Plaintiffs cited a wide array of statements from key legislators involved in the passage of SB 261 who confirmed, as the chief House sponsor put it, that "[t]he goal of [SB 261] is to protect our agriculture industry." Tex. House of Representatives, 89th Legis. Sess., at 7:42:20–30 (May 24, 2025), https://house.texas.gov/videos/22257; *see also* ECF 21 at 7–10; ECF 1 at ¶¶ 115–51. The State Defendants dismiss this and all similar comments, insisting that the real purpose of the law was to protect public health and safety. But under the Dormant Commerce Clause, Plaintiffs need not show that discrimination against interstate commerce was the only purpose motivating the law, nor does the mere invocation of some non-discriminatory state purpose defeat a Dormant Commerce claim. Instead, "[t]he challenger must show that the discriminatory effect was 'a substantial or motivating factor' leading to the enactment of the statute." *CANarchy Craft Brewery Collective, LLC v. Texas Alcoholic Beverage Comm'n*, 514 F. Supp. 3d 911, 918 (W.D. Tex. 2021). "If the challenger meets that burden, defendants must 'demonstrate that the law would have been enacted without this factor.' *Id* (quoting *Veasey v. Abbott*, 830 F.3d 216, 231 (5th Cir. 2016).

Second, the government argues that SB 261 cannot have a discriminatory effect because (1) Plaintiffs are not similarly situated to in-state produced conventional meat and (2) any

3

discriminatory effect is *de minimis*. ECF 24 at 14–16. The government misunderstands both of these standards.

The requirement that products be similarly situated has never meant that they must be identical or made in the same way. The Supreme Court decision in *Bacchus Imports, Ltd. v. Dias*, 468 U.S. 263 (1984) is instructive. There, the Supreme Court struck down a discriminatory tax enacted by Hawaii that favored, among other things, producers of okolehao, a brandy distilled from an indigenous Hawaiian shrub and produced only in Hawaii. *Id.* at 265-66. This product was not identical to alcohol imported from outside of Hawaii. And the extent of competition between okolehao and other liquors was small; sales of okolehao represented less than 1% of annual alcohol sales in Hawaii. *Id.* at 269. Yet the Supreme Court easily found that out-of-state liquor companies and producers of okolehao were similarly situated, holding that "as long as there is some competition between the locally produced exempt products and non-exempt products from outside the State, there is a discriminatory effect." *Id.* at 271. Here, Wildtype and UPSIDE compete in the same market for meat as in-state agricultural interests, just as producers of plant-based meat alternatives do. *See* ECF 21 at 46 (¶¶28–29), 85 (¶¶ 29–30); *see also Turtle Island Foods Inc. v. Abbott*, No. 1:23-CV-1032-DII, 2024 WL 5659990, at *11–12 (W.D. Tex. Sept. 23, 2024). They are similarly situated.

The government's argument that Texas can escape Dormant Commerce analysis because SB 261's effects are "*de minimis*" or not "substantial" is equally unavailing. *See* ECF 24 at 15–16. Contrary to the state's characterization of these standards, discriminatory effect is not judged by the market share of the competing out-of-state companies. If it were, states could avoid the Dormant Commerce Clause and protect their incumbent industries from new competition simply

4

by immediately banning out-of-state innovations before they gain market share. But that is not the test. Instead, as the primary case that the State relies on makes clear, the relevant question is whether the challenged law has "a substantial (i.e., beyond de minimis) competitive effect *on nonstate interests*." *Am. Trucking Associations, Inc. v. Rhode Island Tpk. & Bridge Auth.*, 123 F.4th 27, 39 (1st Cir. 2024) (emphasis added). And SB 261 does. Plaintiffs do not face a *de minimis* burden on selling their products to Texans—they are completely banned from selling their products to Texans.

Finally, Defendants argue that even if SB 261 is found to discriminate in purpose or effect, it can satisfy heightened scrutiny, a standard that the Supreme Court has characterized as a "virtually *per se* rule of invalidity." *Oregon Waste Sys., Inc. v. Dep't of Env't Quality*, 511 U.S. 93, 100 (1994). To satisfy heightened scrutiny, the government must produce "'concrete evidence' that the statute 'actually promotes public health or safety,' or evidence that 'nondiscriminatory alternatives would be insufficient to further those interests.'" *Wal-Mart Stores, Inc. v. Texas Alcoholic Beverage Comm'n*, 945 F.3d 206, 213 (5th Cir. 2019) (citing *Tennessee Wine and Spirits Retailers Ass'n v. Thomas*, 588 U.S. 504, 540 (2019). Defendants have not come close. The state has presented no actual evidence or even argument to call into question the FDA's conclusion that Plaintiffs' products are safe for distribution in the interstate market. Nor has it provided any reason to believe that less burdensome alternatives—such as requiring the restaurants serving cultivated meat to disclose that fact to their customers—would not protect the government's asserted interest. That failure is dispositive. Plaintiffs are likely to succeed on the merits of their Dormant Commerce Claim.

## B. Federal Preemption.

Plaintiff UPSIDE is also likely to succeed on the merits of its federal preemption claims under the PPIA. As the Fifth Circuit has held, Congress's "declaration of policy, bolstered by the focus of the [USDA] regulations, makes it clear that the domain of the PPIA is food safety as well as any behavior that would cause 'adulteration of product.'" *Williams v. Wingrove*, 153 F.4th 455, 463 (5th Cir. 2025). Within that domain, the PPIA preempts any state requirements "with respect to premises, facilities and operations of any official establishment which are in addition to, or different than those made under this chapter" as well as any "ingredient requirements . . . in addition to, or different than, those made under this chapter . . . with respect to articles prepared at any official establishment in accordance with the requirements under this chapter." 21 U.S.C. § 467e. The government raises four main arguments for why these provisions do not bar SB 261's application to UPSIDE. All of them fail.

First, the government argues that this Court lacks subject matter jurisdiction over UPSIDE's preemption claims to the extent they arise under § 1983, because Texas has not waived sovereign immunity for § 1983 claims. That argument is squarely foreclosed by Fifth Circuit precedent. *See, e.g., Harrison v. Young*, 48 F.4th 331, 337–39 (5th Cir. 2022) (holding that sovereign immunity does not bar § 1983 lawsuits seeking only prospective relief to remedy ongoing violations of federal law).

Second, the government argues that Congress has foreclosed UPSIDE's cause of action by providing that "[a]ll proceedings for the enforcement or to restrain violations of this chapter shall be by and in the name of the United States." 21 U.S.C. § 467c. But as explained in Plaintiff's response to the State Defendant's motion to dismiss, UPSIDE is not suing to restrain a violation of

6

the PPIA, it is suing to enjoin the threatened enforcement of a state law that violates the Supremacy Clause. ECF 25 at 8–9. No one disputes that if Texas brought an enforcement action against UPSIDE, UPSIDE would be permitted to argue that SB 261 was preempted under federal law, and nothing in the PPIA prevents UPSIDE from seeking a pre-enforcement declaration of that same fact.

Third, the government argues that UPSIDE's preemption claims fail on the merits. But its arguments cannot be squared with the broad language of those clauses. For example, the government argues that UPSIDE cannot prevail under the ingredients preemption provision because "nothing in the PPIA suggests cell-cultivated chicken protein is a required ingredient in any poultry product." ECF at 24. But this argument conflates the PPIA's regime of express preemption with conflict preemption. The ingredient provision preempts *all* state ingredient requirements "in addition to, or different than" federal requirements. 21 U.S.C. § 467e. The USDA need not mandate the inclusion of cultivated poultry cells in poultry products. What matters is that the USDA *permits them* to be included in poultry products. And Texas, by prohibiting an ingredient the USDA expressly permits—and by doing so expressly because Texas disagrees with the USDA's safety assessment of that ingredient—has imposed an ingredient requirement that is "different than" federal requirements.

Texas's arguments against preemption under the even-broader premises, facilities, or operations provision fare no better. As the First Circuit recently observed, "The broad sweep of the language [of this provision] as understood in its ordinary sense suggests that any requirement that impacts [an official establishment's] operations would be within the scope of the preemption clause." *Nw. Selecta, Inc. v. González-Beiró*, 145 F.4th 9, 17 (1st Cir. 2025). And Texas's law surely

7

impacts UPSIDE's operations. If UPSIDE operates as it is authorized to by the USDA, it is not permitted to sell the resulting products in Texas. That is unlawful, as the Supreme Court held when interpreting the identical clause in the Federal Meat Inspection Act. *See Nat'l Meat Ass'n v. Harris*, 565 U.S. 452, 464 (2012) (holding that a state may not circumvent preemption by characterizing its law as a ban on the sale of meat produced in a way it does not like).[2]

Finally, the government argues that this case is similar to *Empacadora de Carnes de Fresnillo, S.A. de C.V., v. Curry*, 476 F.3d 326 (5th Cir. 2007), in which the Fifth Circuit held that the FMIA did not preempt a Texas law banning the slaughter of horses for human consumption. In the government's view, *Empacadora* suggests that states are free to ban "types of meat" from the market. ECF 24 at 27. But this overreads *Empacadora*, which stands for the more limited proposition that the FMIA's preemptive sweep does not extend to decisions about which types of animals may be slaughtered for human consumption. That decision, after all, does not trench on the issues of public health and safety that are the domain of the FMIA and the PPIA. But Texas has not banned the slaughter of chickens or the sale of their meat. Rather, it has banned a particular method of processing chicken tissue in official establishments. That goes to the core of the PPIA. Thus, UPSIDE has a likelihood of success on its federal preemption claims.

---

[2] The State Defendants suggest that *National Meat Association* is distinguishable because the interference with slaughterhouse operations at issue in that case was more extensive than Texas's interference with UPSIDE's operations. ECF 24 at 26. But § 467e forbids states from imposing *any* that requirements "with respect to" the operations of an official establishment that are not identical to federal requirements.

### III. Plaintiffs have carried their burden on the remaining preliminary injunction factors.

As Plaintiffs explained in their motion, besides having a likelihood of success on the merits, Plaintiffs also will continue to suffer a variety of irreparable harms without an injunction. These include lost sales that cannot be recovered against the state because of sovereign immunity, loss of consumer goodwill, and loss of vital business opportunities for an emerging industry. ECF 21 at 26 – 27

In response, the government claims that these harms are speculative or self-inflicted, because Wildtype and UPSIDE could still give their products away, enter negotiations with distributors regarding products they cannot lawfully sell, or even build factories to produce products that no one in Texas may buy. ECF 24 at 28–29. Besides these implausible suggestions, however, the State Defendants do not respond to any of the case law Plaintiffs cite holding that the injuries they are suffering are exactly the sort of irreparable harm that preliminary injunctions are intended to prevent. *See id.* at 26–27 & n.9

Finally, State Defendants quote *Book People, Inc. v. Wong*, 91 F.4th 318 (5th Cir. 2024), for the propositions that "[w]here the State is appealing an injunction, its interest and harm merge with the public interest" and "[w]hen a statute is enjoined, the State necessarily suffers the irreparable harm." State PI Resp. at 27–29. But as *Book People* also says, "neither [the State] nor the public has any interest in enforcing a regulation that violates federal law." 91 F.4th at 341. In other words, whether the state or the public stands to suffer any harm here rises or falls with Plaintiffs' likelihood of success on the merits. Because Plaintiffs have shown that they are likely to prevail on the merits of both their Dormant Commerce and federal preemption claims, the balance of equities favors granting the injunction.

## CONCLUSION

This Court should grant Plaintiffs' motion for preliminary injunction.

Dated: November 24, 2025                    Respectfully submitted,

/s/ Paul M. Sherman
Paul M. Sherman (VA Bar No. 73410)*
INSTITUTE FOR JUSTICE
901 North Glebe Road, Suite 900
Arlington, VA 22203
Telephone: (703) 682-9320
Email: psherman@ij.org

*Admitted *Pro Hac Vice*
*Attorney for Plaintiffs*

**CERTIFICATE OF SERVICE**

      I certify that on November 24, 2025, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which will provide electronic service upon all attorneys of record.

      /s/ Paul M. Sherman
      Paul M. Sherman (VA Bar No. 73410)